# **<u>EXHIBIT B</u>**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                    SUPERIOR COURT DEPARTMENT
                                                 CIVIL ACTION NO.:

|  |  |
|---|---|
| Joshua Drexler, on behalf of himself, | ) COMPLAINT FOR: |
| | ) |
| Plaintiff | ) UNPAID OVERTIME COMPENSATION PURSUANT |
| | ) TO THE FAIR LABOR STANDARDS ACT OF 1938 |
| v. | ) AND G. L. c. 149 § 148 |
| | ) LIQUIDATED DAMAGES PURSUANT TO 29 U.S.C. § |
| TEL NEXX, Inc., Tokyo Electron U. S. | ) 260, *OR* TREBLE DAMAGES PURSUANT TO G. L. c. |
| Holdings, Inc., Tokyo Electron America, | ) 149 § 150, AND THREE-YEAR STATUTE OF |
| Inc., Barry Mayer, Thomas Walsh, | ) LIMITATIONS PURSUANT TO 29 U.S.C. §§ 255 |
| Cristina Chu, Rezwan Lateef, and five | ) BREACH OF CONTRACT - UNPAID WORK |
| Doe Defendants | ) PERFORMED BEYOND AGREED UPON LIMITS OF |
| | ) THE WORK DAY AND WORK WEEK |
| Defendants | ) VIOLATION OF MASSACHUSETTS CIVIL RIGHTS |
| | ) ACT, G. L. c. 12, §§ 11 H & I |
| | ) WAGES DUE AND UNPAID AT TERMINATION, |
| | ) PURSUANT TO G. L. c. 149 § 148 |

INDIVIDUAL COMPLAINT, *pro se*

Plaintiff JOSHUA DREXLER, appearing on his own behalf, alleges as follows:

## I.   NATURE OF THE ACTION

1. First and Second Counts. This Complaint against all Defendants is for willful failure
of Defendants, in the absence of objective or subjective good faith, to pay overtime wages
pursuant to the Fair Labor Standards Act of 1938, as amended (*FLSA*), 29 U.S.C. § 201 et
seq. and Massachusetts G. L. c. 148 § 149 (*Massachusetts Wage Act*).

2. Third Count. This Complaint against all Defendants is for breach of an unambiguous
and enforceable written contract of employment, breached by Defendants TEL NEXX,

Inc, and Cristina Chu. While the contract called for express limitations on the hours and days of Plaintiff's labor, Plaintiff was routinely pressured, threatened, intimidated and coerced to work well beyond those prescribed limits, seven days per week, for months on end. Plaintiff alleges that work performed beyond the limits prescribed by his contract— expressly recited as eight hours per day (on average) and five days per week—was work not compensated by his contract of employment and was thus work unpaid.

3.   Fourth Count. This Complaint against Defendants Chu and NEXX is for violation of Massachusetts G.L c. 12, § 11H & I (the Massachusetts Civil Rights Act, *MCRA*) in that, by and through the exercise of economic coercion against Plaintiff, Defendant Chu did deprive Plaintiff of Plaintiff's right, secured by statute, to enjoy one day of rest in every seven days, pursuant to and guaranteed to him by G. L. c. 149 §§ 48, 50, 51 and 52, i.e. Massachusetts' "one day of rest in seven" law together with its executing statutes.

4.   Fifth Count. This Complaint against Defendant NEXX is for Defendant's failure to pay unpaid fringe benefit and overtime wages incurred while Plaintiff was improperly misclassified as an independent contractor for two and one-half years. The wages in question were due in full on the day of Plaintiff's discharge pursuant to Massachusetts G. L. c. 149 §§ 148, 150. Said wages were demanded by Plaintiff at his discharge, but were denied and were not paid.

5.   Attached to this Complaint is a copy of Plaintiff's Authorization for Immediate Private Suit (*right to sue letter*) from the Fair Labor Division of the Office of the Massachusetts Attorney General pursuant to G. L. c. 149 § 150, dated September 18, 2013.

## II.   JURISDICTION

6.   The amount in controversy in this case well exceeds $25,000 in single damages.

7.   This Court has subject matter jurisdiction over all causes of action asserted herein

pursuant to Mass. Gen. Laws c. 212 § 4. Massachusetts Middlesex Superior Court has

jurisdiction over the federal Fair Labor Standards Act (*FLSA*)-related causes (Counts I and

II) of this action pursuant to 29 U.S.C. 216(b),[1] for claims brought under the FLSA, 29

U.S.C. § 201, et seq.

8.   Massachusetts Middlesex Superior Court has "long arm" jurisdiction pursuant to G. L.

c. 223A § 3 over the Tokyo Electron Texas parties and Defendant Barry Mayer because

the Tokyo Electron Texas parties and Defendant Mayer transact business in the

Commonwealth of Massachusetts, contract to provide divers services to their subsidiaries

in the Commonwealth of Massachusetts, and natural person Defendant Mayer did pay

Plaintiff, a resident of Massachusetts, 30% of Plaintiff's wages in 2013.

9.   The FLSA claims, the Massachusetts G.L c. 12, §§ 11 H & I (Massachusetts Civil

Rights Act, *MCRA*) claim, the defamation claim, breach of contract claim and G. L c. §

149 § 148 claim all originate from a common nexus of operative facts.

10. Massachusetts Middlesex Superior Court has personal jurisdiction over Defendant

TEL NEXX Inc., (*TEL NEXX*) because Defendant does business in Massachusetts, is

---

[1] 29 U.S.C. § 216(b) "An action to recover the liability prescribed in either of the preceding sentences may
be maintained against any employer (including a public agency) in any Federal or State court of competent
jurisdiction by any one or more employees for and in behalf of himself…" etc.

headquartered in Massachusetts, and because most of the acts complained of and giving rise to the claims herein alleged occurred in Massachusetts.

11. Massachusetts Middlesex Superior Court has personal jurisdiction over natural person Defendants Walsh, Chu and Lateef because they are citizens of Massachusetts and upon information and belief domiciled herein and most of their acts complained of and giving rise to the claims alleged herein occurred in Massachusetts.

12. Venue is proper in Middlesex county pursuant to M.G.L. c. 223, §§ 1 and 8 as Plaintiff lives in Middlesex county and Defendant TEL NEXX, Inc. has its usual place of business in Middlesex county.

### III.   PARTIES

13. Plaintiff Joshua D. Drexler (hereinafter *Plaintiff*) has been, at all time pertinent to this Complaint, a resident of Middlesex County, Massachusetts. Plaintiff was employed by defendants as a technical writer and a technical illustrator from at least January 1, 2006[2] through April 11, 2013, when he was summarily discharged.

14. NEXX Systems, Inc. (at first NEXX Systems, LLC, hereinafter *NEXX Systems*) was incorporated in 2001. It designed, built, sold, shipped and installed machinery and equipment used in fabricating computer chips. NEXX Systems, Inc. and its present-day successor, TEL NEXX, Inc., sold and shipped its products, including certain constituent

---

[2] Plaintiff became an employee of the NEXX employer pursuant to Massachusetts law in mid-2003. NEXX did not acknowledge Plaintiff as a payroll-enrolled employee until January 1, 2006.

components of those products made by Plaintiff, in interstate commerce, to customers located throughout the United States and the rest of the world.

15. On May 1, 2012, or thereabouts, a large international enterprise known as the Tokyo Electron group (*TEL*), with presumptive headquarters in the Akasaka Tower, Tokyo, Japan, acquired NEXX Systems, Inc. a going concern, by causing an American corporate subsidiary of TEL to purchase 100% of NEXX Systems Inc.'s outstanding shares.[3]

16. During and after the May 1, 2012 acquisition, NEXX's on-going operations and employment continued seamlessly, without interruption or noticeable change. TEL NEXX, Inc. carried on as the continuation of the previous business, maintaining an identical operation without interruption or hiatus, at the same address, using the same web site, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, producing the same goods and product lines for the same body of customers and, in many cases, the same customers, as predecessor NEXX Systems did.

17. Upon observation and belief, TEL NEXX fulfilled existing contracts negotiated by NEXX Systems prior to the acquisition and change of name.

18. Defendant TEL NEXX, Inc. (hereinafter *TEL NEXX*) is, upon information and belief, a Delaware corporation with its headquarters, at all times pertinent to this action, at 900 Middlesex Turnpike, Bldg. 6, Billerica, MA 01821.

---

[3] Annual Report of Tokyo Electron, Limited, for the fiscal year 2013, ending March 31, 2013, p.31, "Business Combinations," § 20(A): "(A) Acquisition of shares of NEXX Systems, Inc." Subsection §20 (A)(1)(g): "Main basis for determination of the acquiring company: Acquisition of shares in exchange for cash by Tokyo Electron U.S. Holdings, Inc., the Company's consolidated subsidiary." (emphasis added).

19. On April 13, 2012, Plaintiff attended a NEXX Systems, Inc. "all-hands" noon meeting and signed an attendance sheet evidencing his presence. The meeting was called to discuss the upcoming corporate acquisition and transition.

20. Plaintiff took his own extensive minutes of the April 13 meeting. Plaintiff contemporaneously recorded that Chief Financial Officer of NEXX Systems, Inc., Stanley Piekos, speaking to the meeting on behalf of the corporation, stated that TEL NEXX, Inc. would become the "successor owner" to NEXX Systems, Inc.

21. On February 20, 2013, the name of NEXX Systems, Inc. was changed to TEL NEXX, Inc.[4]

22. TEL NEXX, Inc. lists its date of registration in Massachusetts as 02-05-2003.[5]

23. TEL NEXX succeeded in interest to NEXX Systems. TEL NEXX is the former NEXX Systems, renamed.[6] Except where there is cause to refer expressly to the NEXX Systems entity, or to the TEL NEXX entity, distinguished, this Complaint will refer to both simply as *NEXX.*

24. At all times pertinent to this Complaint, NEXX was an employer of Plaintiff. NEXX enrolled Plaintiff on its corporate payroll on January 1, 2006, and otherwise acted directly and indirectly in the interest of an employer in relation to an employee.

---

[4] Website of the office of the Massachusetts Secretary of State, Corporations Division, Business Entity Summary for TEL NEXX, Inc., ID Number: 000835144, last visited 10/21/2013.

[5] *Id.*

[6] *Id.*

25. Upon knowledge and belief based upon Plaintiff's contemporaneous written accounts, during the three year period preceding this Complaint, October 24, 2010 through October 24, 2013, NEXX, through its key management personnel, had actual and constructive knowledge of, and suffered and permitted Plaintiff to work, 3,859 hours of overtime for which Plaintiff was entitled to payment but for which Plaintiff was not paid.

26. Defendant Dr. Thomas Walsh was CEO and an employee of NEXX at all times pertinent to this action, and an employer of Plaintiff and, upon information and belief, a resident of Middlesex County, Massachusetts.

27. As CEO, Dr. Walsh had management of NEXX. CEO Walsh was the corporate officer with complete operational and day-to-day control over all aspects of the business entity.

28. At all times pertinent to this Complaint, CEO Walsh was Plaintiff's employer in economic reality, and because he acted directly and indirectly in the interest of an employer in relation to an employee pursuant to FLSA § 203(d).

29. Upon information and belief, CEO Walsh had authority in economic reality, and did exercise that authority, over terms and conditions of Plaintiff's employment including approval of changes to Plaintiff's salary, bonuses and/or grants of stock options, Plaintiff's opportunities for promotion, and Plaintiff's performance evaluations, discipline and termination.

30. On March 1, 2012, an occasion unforgettable for Plaintiff, CEO Walsh personally disciplined Plaintiff in a meeting in CEO Walsh's office so disturbing that Plaintiff was rendered unable to function further that day and had to be sent home.

31. During the three year period preceding this Complaint, CEO Walsh had actual and constructive knowledge of, and suffered and permitted Plaintiff to work, 3,859 hours of overtime for which Plaintiff was entitled to payment but for which Plaintiff was not paid.

32. At all times pertinent to this Complaint, CEO Walsh had a close, "dotted line" relationship with Plaintiff's immediate supervisor and manager, Strategic Business Development Director Cristina Chu, although Dir. Chu did not formally report to CEO Walsh.

33. Through this close work relationship with Plaintiff's immediate supervisor, CEO Walsh was kept fully informed of Plaintiff's duties, work, priorities and work product.

34. CEO Walsh had actual knowledge that Plaintiff's cardinal priority, and primary duty, was the manufacture of equipment manuals for NEXX's products. CEO Walsh had final approval over the priorities and scope of Plaintiff's work, and, in that manner, directed Plaintiff's work.

35. Upon information and belief CEO Walsh knew that Plaintiff was not paid overtime for Plaintiff's work in excess of 40 hours in a work week.

36. By suffering and permitting Plaintiff to work overtime hours, when CEO Walsh was aware that Plaintiff would not be paid for his overtime, CEO Walsh caused violations of the FLSA and Massachusetts G.L. c. 149 § 148.

37. By causing, suffering and permitting Plaintiff to work overtime hours for which Plaintiff was entitled to payment but for which Plaintiff was not paid, CEO Walsh minimized labor costs of the business under his management, thereby adding to its profits.

38. On February 11, 2010 (and subsequently amended) NEXX Systems, Inc. sought and obtained registration for an initial public offering (IPO). At all time pertinent to Counts I and II of this Complaint prior to May 1, 2012, CEO Walsh actively and energetically marketed NEXX Systems Inc. as a profitable business for sale either through an IPO or by private sale.

39. When NEXX Systems, Inc. was sold to Tokyo Electron for a reported price of $169.7 million[7], on May 1, 2012, upon information and belief the price realized by NEXX Systems, Inc.'s shareholders was approximately twenty times NEXX Systems Inc.'s profits for the preceding twelve month period. Said another way, for every $1 of financial statement profits that CEO Walsh was able to show to putative purchasers or the investing public, CEO Walsh subsequently returned approximately $20 to the shareholders of NEXX Systems, Inc, including CEO Walsh, upon the sale of the NEXX Systems asset.

40. Thus every dollar of phantom profit added to the financial statements of NEXX Systems, Inc. by virtue of CEO Walsh's causing violations of federal and state employment laws to boost his profits at Plaintiff's expense, was magnified in the return to himself and to NEXX Systems' other shareholders by a factor in the range of twenty times, when NEXX Systems was sold as an asset.

41. Upon information and belief, CEO Walsh was additionally compensated for the sale of NEXX Systems, beyond the value of his own shares and/or options, based on the price he was able to obtain for his shareholders.

---

[7] Annual Report of Tokyo Electron, Limited, for the fiscal year 2013, ending March 31, 2013, p.31, §20 "Business Combinations."

42. Thus by causing violations of the FLSA and M.G.L. c. 149 at Plaintiff's expense, and thereby improperly inflating the apparent profitability of the enterprise under his management, CEO Walsh was able to profit directly and indirectly as an employer by increasing the value of his own shares and by enhancing his remuneration for selling the enterprise at a higher price.

43. Defendant Rezwan Lateef was, at all times pertinent to this action, an employee and officer of NEXX and a Vice President who had management of the Customer Operations department of NEXX, reporting to CEO Walsh, and, upon information and belief, resident in Essex County, Massachusetts.

44. Vice President Lateef had management of the Customer Operations department of NEXX and set its departmental policies.

45. Plaintiff was reassigned to Vice President Lateef's Customer Operations department on August 19, 2011, and remained in that department until Plaintiff's discharge on April 11, 2013. During that period Vice President Lateef had management of, and ultimate authority over, the Customer Operations department of NEXX and of Plaintiff.

46. During the period of Plaintiff's assignment to the Customer Operations department, Vice President Lateef was Plaintiff's employer in economic reality, and also because VP Lateef acted directly and indirectly in the interest of an employer in relation to an employee pursuant to FLSA § 203(d).

47. Upon information and belief Vice President Lateef had authority in economic reality, and did exercise that authority, over the significant terms and conditions of Plaintiff's employment. The elements of that economic authority included approval of changes to

Plaintiff's salary, bonuses, promotions and/or grants of stock options. Also authority to approve and did approve Plaintiff's performance evaluations, keep disciplinary records of Plaintiff and approved disciplinary actions toward Plaintiff, had disciplinary meetings with Plaintiff and arranged for Plaintiff's discharge.

48. Vice President Lateef had authority over the assignment of work to Plaintiff. VP Lateef directed and approved, as Plaintiff's cardinal priority, the manufacture of manuals of operation and maintenance for NEXX's products. VP Lateef was thoroughly informed, from weekly meetings which he chaired, and at which Plaintiff's priorities and duties were thoroughly aired, that Plaintiff's primary duty was the manufacture of equipment manuals for customers, including a new manual for a new NEXX product known as the *Stratus Thunder* system.

49. Vice President Lateef closely supervised the status and progress of Plaintiff's work on equipment manuals. Vice President Lateef determined and approved the scope and direction of Plaintiff's work.

50. Because Vice President Lateef maintained routine awareness of, and directed and approved the scope of Plaintiff's work, VP Lateef either knew or should have known that Plaintiff, as an employee engaged in the production of goods for commerce shipped for revenue, should therefore have been classified as non-exempt from payment of overtime for his hours worked in excess of 40 in any work week.

51. During the period of Plaintiff's assignment to the Customer Operations department, Vice President Lateef had actual and constructive knowledge of, and suffered and

permitted Plaintiff to work, 2,697 hours of overtime for which Plaintiff was entitled to payment but for which Plaintiff was not paid.[8]

52. Upon information and belief Vice President Lateef knew that Plaintiff was not paid overtime by NEXX.

53. Vice President Lateef, by suffering and permitting Plaintiff to work overtime hours when he knew that Plaintiff would not be paid for that overtime, caused violations of the FLSA and Massachusetts G.L. c. 149.

54. Vice President Lateef, by causing, suffering and permitting Plaintiff to work overtime hours for which Plaintiff was entitled to payment but for which Plaintiff was not paid, substantially minimized the labor costs of the Customer Operations department under his management, enhancing the appearance of his department's budgetary performance.

55. Upon information and belief, Vice President Lateef was charged with managerial objectives regarding the management of his department's budget, and those objectives were reviewed as an important component of VP Lateef's overall personal performance, and VP Lateef's apparent performance of his budgetary responsibilities influenced his eligibility for increased compensation, bonuses, and other valuable emoluments.

56. Vice President Lateef, by causing Plaintiff to work large numbers of unpaid overtime hours, minimized labor costs of the department under his management, thereby improving

---

[8] As detailed above, Plaintiff's assignment to the Customer Operations department covered only a part of the three-year period pertinent to this Complaint. Thus unpaid overtime hours worked during Plaintiff's time in Customer Operations represents only a part of the total hours of his unpaid overtime alleged, for the entire three year period covered by this Complaint.

the perception of his department's budgetary management, and thus the quality of his personal performance, resulting in tangible rewards for VP Lateef.

57. Plaintiff observed Vice President Lateef over the telephone from his office, on April 10, 2013, arranging with the management of TEL Texas that there be a "parting of the ways," with Plaintiff, i.e. VP Lateef personally arranged the process of Plaintiff's discharge.

58. Defendant Cristina Chu was, at all times pertinent to this action, an employee of NEXX with the title of Strategic Business Development Director, formally reporting to Vice President Lateef, and also a resident of Middlesex County, Massachusetts.

59. By Plaintiff's personal observation, Dir. Chu was also closely, albeit informally, connected to CEO Walsh.

60. Dir. Chu was Plaintiff's employer during the period of Plaintiff's assignment to the Customer Operations department, under the supervision of Dir. Chu, because she acted directly and indirectly in the interest of an employer in relation to an employee pursuant to FLSA § 203(d).

61. Dir Chu was Plaintiff's employer in economic reality during the period of Plaintiff's assignment to the Customer Operations department. Dir. Chu had power in economic reality to determine the scope of Plaintiff's work, assign work to Plaintiff, set and supervise Plaintiff's work schedule, instruct Plaintiff on methods and practices, evaluate Plaintiff's work, and assign others to supervise Plaintiff and instruct Plaintiff on methods and practices and evaluate Plaintiff's work. Dir. Chu kept records of Plaintiff's work performance and conduct, conducted performance evaluations of Plaintiff, decided and

recommended changes to Plaintiff's salary, changed Plaintiff's title several times, and had authority to recommend Plaintiff for bonuses, raises or promotion, and authority to discipline and fire Plaintiff.

62. Dir. Chu often stated to Plaintiff, for the first time on Plaintiff's first day under her supervision, that time she expended managing and supervising Plaintiff distracted from the performance of her other duties, causing her to miss her own assigned deadlines. As a result the perception of Ms. Chu communicated to her by her manager was suffering, causing Ms. Chu's own personal performance evaluations to suffer, with potential tangible negative economic consequences for her.

63. Thus Dir. Chu acted directly in her own economic interest, as an employer when she discharged Plaintiff.

64. Dir. Chu assigned and prioritized Plaintiff's work, and deadlines for that work, deadlines which required Plaintiff to work extraordinarily long hours to complete all of his mandated deliveries by her deadlines.

65. On and about July 17, 2012, Dir. Chu required Plaintiff to submit to her, and to execute for her, a special written work plan and agreement to follow that plan specifying that Plaintiff would work from July 17, until October 5, 2012, (later amended to October 15, 2012) without any time off, i.e. perform work during seven days per week.

66. Dir. Chu's July 17 requirement followed on the heels of two disciplinary notices she had had issued to Plaintiff, on March 1 and June 30, threatening Plaintiff with termination.

67. On July 18, 2010, Plaintiff, acting under a rigid deadline set by Dir. Chu to deliver his current project by an unattainable date of October 1, sent Dir. Chu the first of several

emails and documents outlining his agreement to work for the next 78 days in a row, with no day off, which in Plaintiff's estimation might enable Plaintiff to deliver the project by October 5, five days later than Dir. Chu's deadline.

68. A spreadsheet attached to the July 18 email evidenced in detail that Plaintiff was agreeing, under duress, to work 78 days in a row, with no day off and no day of rest.

69. Dir. Chu objected to the initial format of the proposed 78-days-in-a-row work schedule. She required Plaintiff to reshape the 78-day plan several times in succession until she was thoroughly satisfied with it. The final version of the plan, like its first draft, required Plaintiff to perform work 78 days in a row with no day off.

70. At no time while Plaintiff's planned 78-day work plan was being evaluated and reevaluated did Dir. Chu express any concern over Plaintiff working 78 days in a row. Dir. Chu understood that the price to Plaintiff in meeting her deadline would be work without rest.

71. By July 18, 2012, Plaintiff had already worked 57 days in a row without a day off or a day of rest, in a less formal effort to meet earlier project deadlines demanded by Dir. Chu.

72. The effect of adding the July 18th 78-day plan to the preceding 57 days of continuous work, plus nearly another month of additional continuous work following the eventual October 15 delivery date, was that, under the written agreement, and duress applied by Dir. Chu, Plaintiff worked continuously without a day of rest from May 25, 2012 through November 21, 2012. Plaintiff worked for a period of 181 days without rest.

73. The special express, written agreement between Dir. Chu and Plaintiff breached express terms of Plaintiff's employment agreement with NEXX, as well as that contract's

implied covenant of good faith and fair dealing, and created a distinct, separate and parallel employment agreement between Plaintiff and Dir. Chu.

74. On or about December 17, 2012, Dir. Chu informed Plaintiff that Plaintiff was to follow policies and procedures and take instruction communicated to him by Mr. Jeffery Stoddard, an employee of Tokyo Electron America Inc. in Austin, TX. Plaintiff's tasks and duties, Plaintiff's work, and Plaintiff's work methods were thereafter all closely monitored and supervised by Mr. Stoddard, who was expressly clothed in implied supervisory authority over Plaintiff by Dir. Chu.

75. Dir. Chu knew that Plaintiff's primary duty was the production of goods for commerce because she expressly instructed Plaintiff that his cardinal priority was the manufacture of a new operation and maintenance manual for a new NEXX product, the *Stratus Thunder* equipment, by deadlines Dir. Chu determined and caused Plaintiff to believe were inflexible.

76. Dir. Chu knew that Plaintiff was not paid overtime by NEXX for hours in excess of 40 in a work week.

77. Dir. Chu knew that Plaintiff was an employee engaged in production of goods for commerce shipped for revenue. Thus Dir Chu knew or should have known or was upon sufficient notice that she should have suspected and made inquiry, but chose to refrain from inquiring because it was in her interest to refrain from doing so, that Plaintiff was misclassified as exempt from payment for his overtime.

78. By demanding, coercing, requiring, contracting, suffering and permitting Plaintiff to work overtime seven days per week, when Dir. Chu knew that Plaintiff would not be paid for his overtime, Dir. Chu caused violations of the FLSA and Massachusetts G.L. c. 149.

79. Plaintiff was assigned to Dir. Chu's supervisory authority from August 19, 2011, until Plaintiff's discharge on April 11, 2013. During that period, Dir. Chu had actual and constructive knowledge of, and suffered and permitted Plaintiff to work, 2,697 hours of overtime for which Plaintiff was not paid.

80. The Tokyo Electron Texas party Defendants (hereinafter *TEL Texas*) consist of two separately incorporated Texas affiliates of Tokyo Electron Limited (TEL), an international business conglomerate. The Texas affiliates are located and do business at a common address in Austin, Texas. The two Texas affiliates hereby made parties to this action are Tokyo Electron U.S. Holding Inc. (known within the TEL corporate group by the acronym *TEH*) and Tokyo Electron America Inc. (known by the acronym *TEA*), both of 2400 Grove Blvd., Austin, TX.

81. Plaintiff, on temporary duty assignment, visited the 2400 Grove Blvd. facility for a week, and was unable to discern physical boundaries or other lines of demarcation indicating that two different corporations occupied the premises. TEH and TEA appeared intermingled and commingled. During his visit, Plaintiff met employees of both corporations equally.

82. Plaintiff, from his vantage point as an employee of *some* entity within the TEL business system was, at all times pertinent to this Complaint, confused at the supposed corporate distinctions among the three corporate entities—TEH, TEA and TEL NEXX— named herein, despite Plaintiff's repeated efforts to seek clarification of those distinctions.

83. Upon information and belief TEL Texas/TEH owns and controls TEL NEXX through ownership of 100% of TEL NEXX's outstanding shares.

84. Plaintiff observed that TEL Texas/TEH dictated and executed all human resource policies applicable to Plaintiff, as well as providing the entire service of human resources management of Plaintiff, for TEL NEXX, Inc.

85. The NEXX entity, in Massachusetts, was assigned the part-time, on-site services of a compensation and benefits representative who, on information and belief, reported to TEL Texas/TEH. That representative regularly referred NEXX employees to the TEL Texas/TEH human resources department in Texas, to resolve questions or problems. That representative referred Plaintiff, on multiple occasions, to the TEL Texas/TEH human resources department in Texas to resolve questions or problems.

86. Upon information and belief The TEL Texas/TEH human resources department, headquartered in Texas, designed and administered TEL NEXX's labor policies, and routinely issued directives to Plaintiff and other TEL NEXX employees on all aspects of human resource matters including job titles, salaries, fringe benefits, corporate ethics, corporate policy training, periodic personal reviews, performance bonuses, bonuses for maintaining a healthy lifestyle, and other terms and conditions of Plaintiff's employment.

87. Plaintiff routinely received notifications by email from the Human Resources department of TEL Texas/TEH addressed to Plaintiff as an employee of an amorphous and undifferentiated "Tokyo Electron" business identity, confusingly intermingled.

88. Plaintiff was improperly and unfairly classified as labor exempt from payment for his overtime by NEXX Systems, Inc. Plaintiff's preexisting misclassification was continued automatically by TEL NEXX.

89. The TEL Texas parties were at all times relevant to this Complaint, individually Plaintiff's concurrent, co-employers in economic reality, and also pursuant to 29 U.S.C. § 203(d).

90. All of the US Tokyo Electron entities appear to be associated with, coordinated with, or subordinate to, entities variously known as Tokyo Electron Limited and Tokyo Electron Group, both presumptively of Tokyo, Japan. The Japanese entities of the Tokyo Electron corporate group are not herein made parties to this action.

91. Defendant TEL Texas/TEA exercised close and immediate supervisory authority over Plaintiff during the period on, and after, July 9, 2013, through guidance, direction, instruction and discipline of Plaintiff by and through its agents 'Cactus' May, Katy Frerich, Matt Kimbrough, Mark Rogoyski, and Jeff Stoddard.

92. Discipline of Plaintiff by TEL Texas/TEA's agent Jeff Stoddard, expressly clothed by Dir. Chu of NEXX in implied and apparent authority over Plaintiff, contributed significantly to Plaintiff's discharge.

93. Defendant TEL Texas/TEA also exercised close and immediate supervisory authority over Plaintiff through its custom technical publications management system known as Content Management System (CMS). TEL Texas/TEA employees taught Plaintiff how to use CMS and required Plaintiff to use both CMS and TEA's proprietary software and

computer services. Those services were provided to Plaintiff directly through TEL Texas/ TEA & TEH.

94. Plaintiff performed his work on server computers using software maintained and physically located at TEL Texas/TEA and TEH headquarters, with the indispensable assistance of software and server management personnel of TEL Texas/TEA and TEH. Plaintiff, physically located in Billerica, Massachusetts, occupied at times a "virtual seat" in Austin, Texas.

95. Defendant TEH exercised significant authority over Plaintiff by participating in the proximate decision to terminate him.

96. Defendant Barry Mayer, during the period May 1, 2012 through April 11, 2013, was party to this action as Chief Executive Officer (CEO) of TEL Texas/TEH, and the employee who had management of TEH.

97. As CEO, upon information and belief Defendant Mayer was involved in the day-to-day operations of TEL Texas/TEH's business.

98. Upon information and belief TEL NEXX, Inc. was acquired by TEL TEXAS/TEH on May 1, 2012. From that day through Plaintiff's discharge on April 11, 2013 CEO Mayer was Plaintiff's employer in economic reality.

99. From May 1, 2012, through April 11, 2013 CEO Mayer acted directly or indirectly in the interest of an employer in relation to an employee pursuant to FLSA § 203(d).

100.  NEXX's email and other computer and information technology (IT) systems were merged into the corporate IT system of the TEL Texas parties, on or about August 19, 2012. From that time until Plaintiff's discharge, upon information and belief, CEO Mayer

had instant access to all server records and emails of Plaintiff,[9] which were neither private

nor privileged. Thus CEO Mayer had constructive knowledge of, and suffered and

permitted Plaintiff to work, 1,105 hours of overtime for which Plaintiff was entitled to

payment but for which Plaintiff was not paid.

101.   CEO Mayer did cause tortious injury to Plaintiff, by act or omission in the

Commonwealth of Massachusetts, by suffering and permitting Plaintiff to work overtime

hours for which Plaintiff was entitled to payment but for which Plaintiff was not paid.

102.   CEO Mayer did cause tortious injury to Plaintiff by act or omission in the

Commonwealth of Massachusetts by personally approving Plaintiff's discharge.

103.   CEO Mayer signed a check paying Plaintiff 30% of Plaintiff's wages in 2013.

104.   Defendant Parties Doe are sued herein under fictitious names. Their identities are

uncertain to Plaintiff at this time. When their true names and capacities are ascertained,

Plaintiff will amend this Complaint by inserting their true names and capacities herein.

Upon information and belief, each of the fictitiously-named Doe Defendants is

responsible in some manner for the occurrences herein alleged, and damages to Plaintiff

herein alleged were proximately caused by actions or inaction of such Defendants.

105.   Defendants NEXX, TEL Texas, Mayer, Walsh, Lateef and Chu are subject to the

FLSA and/or Massachusetts G.L c. 149.

---

[9] As described more fully below, Plaintiff, at close of each day's work, sent himself an email documenting
his work performed that day, together with his hours of work, excluding breaks for meals, etc. These daily
'work journal emails' were then contemporaneously compiled into a "work calendar."

106. Defendants NEXX, TEL Texas, Mayer, Walsh, Lateef and Chu are employers within the meaning of the FLSA and Massachusetts G.L c. 149.

107. Defendants TEL Texas/TEA, TEL Texas/TEH and Mayer are subject to Massachusetts' "Long Arm" statute, G. L. c. 223A § 3, through the actions of their employees and agents Jeff Gibson, "Cactus May," Katy Frerich, Matt Kimbrough, Mark Rogoyski and Jeff Stoddard, among others, by transacting business in Massachusetts and by contracting to supply services in Massachusetts.

## IV.   FACTS

108. Plaintiff Joshua Drexler performed technical writing and technical illustrating services for the predecessor of NEXX, Applied Science and Technology, Inc. (*ASTeX*).

109. Plaintiff performed technical writing and technical illustrating services for NEXX from the time that it was "spun out of" ASTeX and separately incorporated, by CEO and co-founder of ASTeX, Dr. Richard Post, in August, 2001.

110. Plaintiff made technical manuals for NEXX from its incorporation until Plaintiff's discharge on April 11, 2013.

111. Plaintiff never had supervisory duties over, or responsibility for, any other employees.

112. Plaintiff never had discretion to choose his own scope of work, objectives or tasks. Rather, Plaintiff was at all times assigned specific tasks, although some tasks, such as complete new equipment manuals, might take many months to deliver. The progress and content of Plaintiff's work was closely and regularly monitored at all times.

113.  At all times relevant to this Complaint, Plaintiff performed his work at his desk or in manufacturing workrooms within NEXX's facility. Plaintiff did no work from home. On two occasions, years apart, during brief out-of-state visits, Plaintiff did some work from his mother's home and his Aunt's hospital bed.

114.  Plaintiff possesses a bachelor's degree in economics and a masters of business administration degree from accredited universities. Plaintiff has no academic or other certification or credential in technical writing, technical illustration, photo retouching, English composition, mechanical drawing and drafting, or computer programming, or mechanical, robotics or electronics maintenance, or systems analysis, or workplace safety or equipment safety, or law.

115.  Plaintiff's duties for NEXX never touched upon the limited scope of Plaintiff's credentialed training in either economics or business administration.

116.  Forty years ago Plaintiff earned approximately two years of general science-related academic coursework credit, but never completed a prolonged course of specialized intellectual training or instruction leading to an academic degree, in a field of either engineering or science.

117.  Plaintiff has no graphic arts or fine arts training.

118.  Plaintiff's employment, prior to his position manufacturing NEXX equipment manuals, included approximately 15 years of industrial sales experience, and also wood carving and cabinet making, economic regulation of airlines (United States Civil Aeronautics Board), and experience as a merchant seaman and sheet metal worker..

119.  Plaintiff had never undertaken a large, complex, technical writing project before he began manufacturing NEXX's equipment manuals. What skill Plaintiff possesses in the manufacture of equipment manuals was gained entirely on the job, through experience.

120.  Plaintiff's technical manuals were assembled through personal observation, through interviews with subject matter experts (*SMEs*), and by his research into underlying internal company documentation.

121.  Plaintiff's primary duty was analogous to that of a reporter with a camera and sketch pad.  Plaintiff observed, gathered information, interviewed subjects, summarized what he learned, organized the information as clearly, concisely and logically as he could, and added retouched photographs and annotated illustrations to the final result.

122.  Plaintiff's work was always subjected to rigorous and extensive internal review. Plaintiff's drafts were circulated to SMEs and review committees. Reviewers 'redlined' Plaintiff's drafts. Plaintiff then revised his drafts based on those redlines and other, informal comments and criticisms. A significant element of Plaintiff's duties was seeking and obtaining precise corrective information from his reviewers.

123.  Plaintiff produced all of his works himself as an individual contributor. He did not coordinate the work of others.

124.  The objectives, scope, priorities and focus of Plaintiff's work, along with decisions about emphasis, were all determined by others than Plaintiff, principally by his supervisor Dir. Chu, and by Dir. of Technical Field Service, Kevin Barbera. Plaintiff relied upon Dirs. Chu and Barbera, and the SMEs, to distinguish important from unimportant details for Plaintiff.

125.   After Plaintiff came under the supervision and control of Jeff Stoddard of TEL Texas/TEA, Mr. Stoddard largely made such decisions for Plaintiff.

126.   Plaintiff took no actions with respect to his completed works beyond delivering them to his management. At all times, Plaintiff's work was submitted to others for approval, and for actions and distribution by others, through established internal channels and procedures.

127.   Plaintiff was not employed to create, invent, design, develop, analyze, interpret, contribute or commit to practice, any engineering concept, principles, plans, objectives, methods, or data, or internal NEXX specifications, or customer requirements or specifications, or vendor supplied items or specifications.

128.   Plaintiff was expressly prohibited from making deductions or inferences. When in doubt, Plaintiff's obligation was to verify all information with subject matter experts.

129.   Plaintiff was employed as a technical writer and illustrator to provide instructional materials to the best of his intelligence, diligence and, above all, accuracy. No other aspect of Plaintiff's work was so crucial as its accuracy. Plaintiff was not employed to create works of imagination, originality or personal expression.

130.   NEXX's equipment is largely computer-controlled. Upon information and belief the computer code that runs the equipment is written in a software language called "C++" ("c-plus-plus") and variants of that language. Plaintiff does not know C++ or any of its variants or any other computer language used to program NEXX's equipment.

131.  Plaintiff never experimented with or participated in testing NEXX's equipment or its software. Plaintiff was required to familiarize himself with the operation of NEXX's equipment in order to produce technical manuals describing that operation.

132.  Upon information and belief, none of the four other persons besides Plaintiff, hired by NEXX to perform technical writing services during NEXX's history, prior to Plaintiff's departure on April 11, 2013, possessed an academic qualification or certification in technical writing or a related field,[10] or science, or computer or mechanical engineering, or a related field.

133.  Despite the fact that NEXX's equipment manuals are produced on NEXX's premises, using NEXX's equipment, in the ordinary course of NEXX's business, Plaintiff was the only person enrolled on NEXX's payroll to perform technical writing services, prior to Plaintiff's departure on April 11, 2013. All other technical writers were classified as "consultants" or independent contractors and, upon information and belief, paid hourly.

134.  Plaintiff experienced an evolving employment status with the NEXX employer.

135.  Between August 2001 and June 30, 2003, Plaintiff was employed episodically by NEXX as a "consultant," i.e. an independent contractor. Plaintiff was paid on an IRS 1099 basis, without benefits or deductions.

136.  Plaintiff performed services for NEXX full time while he worked, but was retained episodically, between August 2001 and June 30, 2003. Those services were performed

---

[10] Upon information and belief, one NEXX technical writer was a recent college graduate, hired originally to perform graphic arts services, who possessed an academic degree in graphic arts. That individual had no professional work experience or prior technical writing experience. After being hired to perform graphic arts duties that person was subsequently asked to perform technical writing duties in addition to graphic arts.

within NEXX's usual course of business, were a core and indispensible part of NEXX's fulfillment of its contracts for the sale and delivery of its products, and were primarily performed at NEXX's place of business.

137.   On March 8, 2002 Plaintiff was surgically treated for non-small cell lung cancer. Plaintiff subsequently received multiple chemotherapy and daily dose radiation treatments throughout 2002. Plaintiff worked full time for NEXX during the winter and spring of 2002, and episodically during the remainder of the year. Including his hospital stay for major lung surgery, Plaintiff was away from work at NEXX for 16 days.

138.   Plaintiff returned to work following his lung surgery as soon as he could sit upright at a desk, because as a "consultant" he did not enjoy benefits available to NEXX's payroll employees, such as paid sick leave and short- and long-term disability insurance.

139.   On or about July 1, 2003,  Plaintiff ceased all work with any other employer, to devote his efforts exclusively, full time, for NEXX.

140.   From on or about July 1, 2003, through December 31, 2005, Plaintiff performed services for NEXX daily, full time, at a desk in the employer's headquarters. From July 1, 2003 onward, Plaintiff derived 100% of his income from NEXX.

141.   Plaintiff manufactured customer operation and maintenance manuals for NEXX's semiconductor processing equipment. Physical copies of Plaintiff's manuals were shipped to customers in the same sets of shipping crates that carried NEXX's products.

142.   An additional electronic copy (a PDF file) of Plaintiff's manual was stored in the system computer of each machine shipped.



**Photo caption #1. (above)** Two loose-leaf bound copies of one of Plaintiff's equipment manuals rest on an outbound shipping rack. Manuals await shipment to a customer, along with secondary equipment parts. Equipment parts were poly-bagged, and manuals were printed on special paper, for "cleanroom"-level cleanliness. Photo by Plaintiff, 2006. The photograph predates the time period pertinent to this Complaint, but is representative because the form and shipment of manuals did not change. Photo illustrates that Plaintiff manufactured shipped constituents of NEXX's products.

143.   Plaintiff's manuals were assigned equipment part numbers. This was done in the same manner, utilizing the same part numbering system, as part numbers assigned to machine frames, pumps, motors, electronics, computers, special machine parts, wiring, and all other identifiable component pieces of NEXX's products.

144.   As part of its manufacturing control system, NEXX generates what are called "bills of materials" (BOMs) for each instance of equipment that it builds. BOMs list every part and component of the final product, from the frame of the equipment to the fasteners holding the equipment together. Components are listed by name and part number.

145.   Plaintiff's manuals, referenced by name and part number, are included in product BOMs, evidencing that Plaintiff's equipment manuals were shipped components.

146.   Plaintiff's manuals comprise a constituent element of NEXX's products. Plaintiffs manuals are amalgamated into NEXX's products and are integral to those products. NEXX's major products were incomplete without the inclusion of the appropriate manual made by Plaintiff.

147.   Thus Plaintiff created a part of NEXX's shipped goods, pursuant to FLSA § 203(i). NEXX sold Plaintiff's works, amalgamated into the whole piece of equipment, for revenue. This was the dimension of Plaintiff's work performance that was of primary value and importance to the employer.

148.   Plaintiff's manuals were mentioned in some of the commercial documents that defined the purchase and sale of NEXX's products. Upon information and belief, on at least one occasion when a manual was back-ordered, the customer withheld a payment until the manual was received.

149.   Upon information and belief NEXX's customers believe they purchase equipment manuals as components of their purchases of new equipment. Customers seek to hold NEXX to account for the delivery of manuals as part of their new equipment purchase.

150.   Plaintiff's technical writing and technical illustrating services were within NEXX's usual course of business and were indispensible to NEXX in fulfilling its contracts for the sale and delivery of its complete equipment products.

151.   During the period July 1, 2003 through December 31, 2005, Plaintiff performed his technical writing and illustrating services daily at NEXX's facility, under the immediate authority of NEXX's acknowledged employees, including defendant Lateef. NEXX

employees directed, "red-lined," and approved Plaintiff's work on a weekly basis,
although the work took many months to complete.

152.   Subsequent to July 1, 2003 Plaintiff became, by action of Massachusetts law, a bona
fide employee of defendants NEXX and Lateef, pursuant to an Advisory to employers
issued at by the office of the Massachusetts Attorney General,[11] and a year later pursuant
G. L. c. 149 §148B and a second AGO's Advisory.

153.   Despite Plaintiff's status as an employee by action of law, entitled to the same
benefits which NEXX accorded to all of its acknowledged employees, including paid sick
time, paid holidays, employer subsidized health, life and disability insurances, and also
statutorily mandated benefits of Workman's Compensation and Unemployment Insurance,
and also opportunity to earn regular bonuses and stock options, among other benefits,
Plaintiff continued to be treated by NEXX as, and paid on, an independent contractor/IRS
1099 basis, without any benefits.

154.   Plaintiff was continuously employed by NEXX, and other defendants as they
entered the picture, without interruption, from on or about July 1, 2003 until April 11,
2013.

155.   On November 18, 2005 NEXX's then CEO, Dr. Richard Post, spontaneously wrote
to Plaintiff about Plaintiff's employment status in an email titled "your employment." Dr.
Post wrote, in the entirety: "Josh, you are a consultant, but you are now working so much

---

[11] Advisory 94/3, an "Advisory from the Attorney General's Fair Labor and Business Practices Division on
the Issue of Employee Versus Independent Contractor," issued in 1994; Advisory 2004/2, "An Advisory
from the Attorney General, Amendments to Massachusetts Independent Contractor Law," Advisory 2004/2,
issued December 10, 2004. Plaintiff did not learn of the existence of these advisories until many years later.

for NEXX, that the State may consider you an employee. I would like to discuss this situation with you to decide if you should convert or if you do enough work for others that you would be viewed by the State as a consultant." (email from Dr. Post to Plaintiff, November 18, 2005, emphasis supplied)

156. At the time of the November 18, 2005 email, Dr. Post, Rezwan Lateef, and other NEXX employees, were aware that Plaintiff was working exclusively for NEXX. Plaintiff had openly discussed this fact on multiple occasions, with multiple NEXX employees.

157. NEXX's employee head count at its headquarters from 2001 through 2005, was not large, typically averaging between two and four dozen people. By November, 2005, having observed Plaintiff's attendance at his desk on a daily basis for several preceding years, Dr. Post could not have been unaware that Plaintiff worked full time for NEXX, and lacked time or opportunity to engage in a significant way with other potential clients.

158. The "your employment" email was not expressed in passive voice. The opening sentence begins with a straightforward declaration to Plaintiff that "you are a consultant...". The subsequent qualifier merely reserves the employer's right to disagree with those Commonwealth authorities charged with enforcing the employment laws.

159. Plaintiff relied upon the fact that Dr. Post, as a serial founder and CEO/COB of multiple, multi-million dollar enterprises, with 100 or more employees working for him in times past, would and could speak truthfully and, moreover, reliably, on the subject of Plaintiff's employment status.

160. Plaintiff did not suspect at the time he received the "your employment" email that he might have been misclassified. Plaintiff relied upon Dr. Post's statement, that Plaintiff

"was," i.e. currently and at times previously, correctly classified as a "consultant,"
although Dr. Post's email in fact stated a material misrepresentation.

161.  Dr. Post's email initiated negotiations between himself, NEXX, Comptroller Donna
Tinsley and Plaintiff aimed at changing Plaintiff's status from "consultant," to payroll-
enrolled employee.

162.  A surprise term of Plaintiff's employment agreement arose during this employment
negotiation. Dr. Post spontaneously offered Plaintiff a one-time payment of $1000 "for all
your trouble." Plaintiff had not requested such a payment. When Plaintiff, not being aware
that there had been any "trouble," asked what trouble Dr. Post had in mind, and why he
was spontaneously being offered $1000,  Dr. Post responded: "You know, working all that
time without health insurance, that sort of thing."

163.  The other terms of employment, decided in negotiations which took place in late
November, 2005, were memorialized in a spreadsheet, prepared by Dr. Post, entitled
"comp for Josh.xls." Dr. Post emailed the spreadsheet to Plaintiff on November 29, 2005.
Dr. Post modified his spreadsheet slightly and resent it the next day, November 30.

164.  "comp for Josh.xls" described the offer of payroll-enrolled employment being made
to Plaintiff by Dr. Post and Comptroller/Human Resources Manager Donna Tinsley.

165.  Among the many detailed terms and conditions of employment included in "comp
for Josh.xls" are:

  • "Hours worked per day on average…………………  8"

  • "Available working days comparable to NEXX…….239"

In the spreadsheet emailed to Plaintiff, "239" is arrived at by a formula: 52*5-SUM(vacation days + holidays offered by NEXX). The term "52*5" signifies Dr. Post's intention and expectation that the employment be for five days of work per week, 52 weeks per year. Subtracted from 52*5 is the number of days representing total annual paid time off. Plaintiff, who is competent with spreadsheets and examined the formulas in "comp for Josh.xls" when it was sent to him, was aware of the spreadsheet formula, comprehended its meaning, and accepted this express term of the employment agreement upon that understanding.

- "Bonus percent eligibility..............................10%"

- "Liklihood (sic) of bonus in 2006.......................100%"

166.  "comp for Josh.xls" sets forth an express employment agreement in which the contract for base wages covers eight hours of work per day (on average), five days per week, pegging the contractual duration of an average work week at 40 hours per week.

167.  During the three years preceding this Complaint Plaintiff worked averages of 63.5, 65, 74, and 69.5 hours per week in 2010, 2011, 2012 and 2013, respectively.

168.  During the three years preceding this complaint Plaintiff worked an average of 6.4 days per week.

169.  Neither Dr. Post, nor Comptroller Tinsley, who participated fully in the employment negotiations, mentioned to Plaintiff the Massachusetts Independent Contractor Act, G.L. c.149 s.148B, or the Attorney General's advisory bulletins, or any information possessed on their or on NEXX's part that Plaintiff had been unlawfully misclassified for either the

prior 1-1/2 or 2-1/2 years.[12] Other than Dr. Post's November 18 "your employment" email, no explanation was offered for abruptly altering Plaintiff's employment status in November, 2005, despite Plaintiff's repeated inquiries.

170.  An Offer Letter for of payroll-enrolled employment was sent to Plaintiff on December 8, 2005. Plaintiff accepted the offer.

171.  "comp for Josh.xls" presents a more comprehensive and more detailed picture of the employment agreement than Plaintiff's abridged Offer Letter. The Offer Letter recapitulated a narrow subset of the terms and conditions expressed in "comp for Josh.xls." In those conditions which it recites, the Offer Letter is consistent, in all respects, with "comp for Josh.xls."[13]

172.  The Offer Letter did not disavow, rescind or repudiate any term or condition expressly detailed in "comp for Josh. xls."

173.  Among terms of employment stated in the Offer Letter, prepared, upon knowledge and belief, by Comptroller Tinsley, were:

---

[12] On July 19, 2004, an amendment to M.G.L. c. 149 s. 148B, the "Independent Contractor Law" was signed into law as part of "An Act Further Regulating Public Construction in the Commonwealth." The legislature's bill contained an emergency preamble, rendering the amendment immediately effective. The 2004 amendment essentially confirmed, as black letter law, the substance of the Attorney General's two previous Advisories dating back to 1994. Whether Plaintiff's misclassification as an independent contractor lasted 1-1/2 years or 2-1/2 years depends on whether his misclassification is dated from Plaintiff's factual change in status on or about July 1, 2003, or dated from the advent of the amended law on July 19, 2004.

[13] The exception is a scriveners error in the second version of "comp for Josh.xls" that entirely omitted the 13 days of annual paid leave. The first version of "comp for Josh.xls" included the 13 annual leave days. When Plaintiff questioned its omission in the second version, the oversight was acknowledged as such by Comptroller Tinsley, and corrected in Plaintiff's Offer Letter. The intention of the parties on this point was never in dispute.

- "You will be eligible for a bonus of up to 10% of your base salary based on your performance and Company profit. The Company Bonus Plan is subject to Board of Director's approval."

- Vacation will accrue at a rate of 13 days per year.

174. Plaintiff understood the statement "Liklihood (sic) of bonus in 2006.....100%" in "comp for Josh.xls" to mean that a pool of money would become available to pay bonuses in 2006, along with a willingness on the part of NEXX's BOD, of which Dr. Post was Chairman, to allocate money, generally, for that purpose. Plaintiff further understood that extra labor hours on Plaintiff's part would be required to actually receive the entire 10% of his annual salary for which he might theoretically be "eligible."

175. The potential to earn substantial future bonus payments was recited to Plaintiff at least four times: verbally by Dr. Post during negotiations, in both versions of "comp for Josh.xls," and in Plaintiff's Offer Letter.

176. Plaintiff construed the repeatedly offered enticement of potential bonus payments "based on your performance" as a unilateral invitation to wager extra labor hours against the possibility of future substantial cash payments. Unlike casino gambling, no objective rule governed a determinate payout. But the offer to wager was unambiguous, was intended by the offeror to induce valuable consideration, and was unilateral.

177. During the period of Plaintiff's payroll-enrolled employment, from January 1, 2006 through April 13, 2013 Plaintiff was, from time to time, paid bonus compensation entirely dependent on the quantity and the quality of his work.

178. Plaintiff entered into payroll-enrolled employment status with NEXX on January 1, 2006. Plaintiff was misclassified by NEXX as labor exempt from payment for his overtime. Plaintiff was not asked to keep records of his overtime hours and Plaintiff was never at any time paid additional compensation for his overtime hours.

179. Plaintiff was expressly and repeatedly cautioned, on multiple occasions, not to keep or maintain either official or private records of his overtime hours, as detailed *infra*.

180. By reanalyzing Plaintiff's independent contractor misclassification, but then assigning Plaintiff a new misclassification, Defendant NEXX expressly informed itself in 2005, or should have adequately informed itself, of Plaintiff's proper employment status. Yet Defendant NEXX chose to misclassify Plaintiff a second time, both times to NEXX's benefit and Plaintiff's detriment. This surpassed mere negligence.

181. Defendant's second misclassification of Plaintiff showed reckless disregard for their duty to properly classify Plaintiff under applicable statutes and to pay Plaintiff for his overtime hours worked in excess of 40 hours per week.

182. Plaintiff received his promised $1000 special payment "for all your trouble" in January, 2006.

183. Plaintiff's *primary duty* during his employment with NEXX was the duty he performed that was of principal value and importance to his employers.

184. Plaintiff's primary duty at all times during his employment with NEXX was making customer-facing manuals of operation, maintenance and troubleshooting that explained and illustrated the operation and repair of NEXX's products.

185.   Plaintiff's customer manuals were an integral part of the equipment that NEXX

made, marketed, sold and shipped in interstate and international commerce, as the term

"commerce" is defined in FLSA § 203(b).

186.   Plaintiff's primary duty at all times pertinent to this Complaint was direct

production of goods for commerce. Plaintiff was never at any time during his employment

properly subject to any exception or exemption from the payment of overtime as set forth

in 29 U.S.C. § 213, or the DOL regulations and interpretations in 29 C.F.R. Part 541.

187.   Defendants employed Plaintiff to produce goods for commerce. In the oft-cited

dichotomy between administrative and production duties, Plaintiff's primary duty was

plainly the manufacture of goods sold for revenue, not "servicing the business."

188.   As a production employee, Plaintiff should have been, at all times, classified as

labor non-exempt from payment of overtime for work in excess of 40 hours in a week.

189.   During the period relevant to this Complaint Plaintiff worked a total of 3,859 hours

of overtime, NOT INCLUDING meal breaks or other interruptions.

190.   Plaintiff was not properly classified. It is rare in FLSA jurisprudence for persons

employed to manufacture goods shipped for revenue to be misclassified as exempt labor.

Plaintiff's misclassification was far more malicious in character than mere negligence.

191.   Plaintiff was not paid for his overtime.

192.   Plaintiff's other occasional duties included production of preventive maintenance

procedures (PMs), best known methods procedures (BKMs) which explain the alignment,

calibration and/or repair of NEXX's products, and divers other procedures and

explanations, such as machine loading procedures or descriptions of safety features.

193. Plaintiff's other occasional duties included classroom equipment training for customers. Plaintiff's training duties were episodic and infrequent during the period pertinent to Counts I and II of this complaint. Supplemental to his training duties, Plaintiff repurposed material from his manuals for use as curriculum and instructional materials with his training classes.

194. Plaintiff's other occasional duties included preparation of technical illustrations and photo retouching, and layout, for use in NEXX's marketing materials, and for audience presentations by members of the technical staff. Plaintiff's graphics duties were episodic, often assigned with extremely short deadlines necessitating 12-to-16 hours-per-day intensive stretches of work.

195. Plaintiff maintained a personal work journal, at first intermittently, beginning in February, 2007. Plaintiff's work journal became regular and daily on July 16, 2007.

196. Plaintiff's work journal listed starting and ending times of his work day, less time deducted for meal breaks or occasional health care appointments. In most cases the journal entry also provided a summary of work performed during that day. These summaries of hours and work performed, day by day, were and continue to be in the possession of Defendants, who are thus well acquainted with Plaintiff's work performed nearly every day of the period pertinent to this Complaint.

197. Defendants were also aware at all times of Plaintiff's work activities through multiple convergent channels, such as weekly review meetings, reviews of Plaintiff's work product, personal observation, late-night internet chats and time-stamped emails. Defendants seldom expressed any concerns over Plaintiff's extraordinary work hours and often praised his work product.

198.   The backbone of Plaintiff's work journal was a daily email from Plaintiff to himself, sent from the computer at his desk via his company email address. The email was typically, but not always, sent shortly before Plaintiff shut down his computer and left the building for the night. The emails bore date-stamp and timestamp indicia of the time they were sent, assigned by the company's email server, beyond Plaintiff's control.

199.   Plaintiff's work journal was entirely contemporaneous, written day by day.

200.   Plaintiff's work journal and work calendar were his routinely maintained business records of his occupation and of his employment.

201.   The work journal emails varied in composition, but they nearly always included the day's starting and stopping times for work, and, during times pertinent to this action, the duration of periods excluded for meal breaks and/or interruptions during the workday for medical appointments.

202.   After each work journal email was created, Plaintiff copied and pasted its contents into Plaintiff's contemporaneous work calendar. Plaintiff did not expect privacy regarding emails he sent via the corporate email system. When Plaintiff had supplemental observations or concerns for which he wished to secure complete privacy, he added that material to his contemporaneous calendar, but not to the daily emails. Hours of work were, however, always included in the daily emails.

203.   Supplementary comments added to the contemporaneous calendar were usually written the same day as the work journal email. On rare occasions supplementary material was added a day or two later, but this was uncommon.

204.   Because internal corporate email is neither private nor privileged, defendants had at all times in their possession constructive knowledge of Plaintiff's work journal emails. These usually described a summary of the day's work, the starting and ending times of Plaintiff's work each day, and the duration of time to be excluded for meal breaks.

205.   Plaintiff was regularly assigned short deadline tasks late on afternoons, often on Friday afternoons, with results due the following business day, or next-few-days-following, despite the fact that the work was often painstaking and time consuming.

206.   Plaintiff's deadlines, unachievable under a normal work schedule and routinely urged upon him as absolute and inflexible, necessitated that he work large numbers of overtime hours, both nights and weekends, in an effort to mitigate otherwise routine verbal censure and abuse from his supervisors when he missed a deadline. The routine expressions of contempt directed towards him by his supervisors left Plaintiff physically drained, mentally pained, and often exhausted and depressed.

207.   Many contemporaneous entries in Plaintiff's work journal attest to the effects on Plaintiff's mental and physical health of the unremitting and routinely demeaning, contemptuous and disrespectful style of NEXX's corrosive supervisory culture.

208.   Plaintiff often finished and delivered his assignments by email late at night, sometimes after midnight, or on weekends.

209.   Plaintiff's supervisors and other senior managers were generally the recipients of Plaintiff's delivery emails. They had actual knowledge of Plaintiff's presence at his desk during the day by observation, and actual knowledge of his routine presence at his desk

until midnight or later, and on weekends, by his time-stamped emails. Sometimes there were also telephone calls or internet chat conversations with supervisors during late hours.

210.  For the period 2010 - 2013 Plaintiff's work week, exclusive of meal breaks, averaged from 64 hours (2010) to 74 hours (2012) per week.

211.  Between October 2010 and April 2013, Plaintiff performed work during numerous of the eight annual company paid holidays, including at least once each Christmas Day, New Years Day, Memorial Day, July 4th, Labor Day and Thanksgiving Day holidays.

212.  Plaintiff also performed work during several company paid ad hoc shutdowns, including during the IT merger (of server systems) shutdown in August, 2012.

213.  Plaintiff was forced to work during these holiday periods extended to other employees by virtue of the inflexible deadlines imposed on him, after mid-2011, by his supervisor Dir. Chu, and prior to that date, by his then-supervisor Dir. Kevin Barbera.

214.  On June 30, 2012, in a disciplinary notice threatening Plaintiff with termination, Plaintiff's supervisor Dir. Chu wrote: "Josh has had difficulties since he started working for me in September of 2011 with setting priorities for his daily tasks, meeting deadlines and managing his workload. At first, I believed that this problem may have been due to the fact that his role broadened to include the production of many collateral materials, beyond manuals, and that after a few months of transition, we would surpass the inefficiency. But, this has not occurred." (emphasis added). In other words, when Plaintiff was transferred to Dir. Chu's supervision, Plaintiff's tasks and duties were increased—"broadened"— by piling on new tasks and duties, without relieving Plaintiff of any of his prior more-than-full-time tasks, and as a result Plaintiff fell behind on his deadlines. But

Dir. Chu bizarrely chose to conceive the problem as one of *Plaintiff's inefficiency*, although she herself acknowledged that she was the one who had increased the already heavy burden of Plaintiff's workload. Unscrupulous demands combined with repeated threats of termination was the hallmark of Plaintiff's coercive supervision.

215.  As noted, *supra*, Plaintiff was guaranteed paid company holidays as a term of his employment in "comp for Josh.xls," and by Plaintiff's Offer Letter.

216.  Plaintiff received no additional compensation for work he performed during paid company holidays or headquarters-wide paid shutdowns, thus these days were not "holidays" for Plaintiff.

217.  During the period when Dir. Barbera was Plaintiff's supervisor, Dir. Barbera instructed Plaintiff that if Plaintiff was out of the building during "normal working hours," Monday through Friday, Plaintiff was required to account for his absence by taking deductions from Plaintiff's accrued sick or vacation leave accounts.

218.  Dir. Barbera expressly instructed Plaintiff that hours worked outside of NEXX's "normal business hours," i.e. the many hours Plaintiff worked on nights or on weekends, could not be used or credited to offset Plaintiff's absences during "normal business hours" and a leave deduction was always required, either for a full day or for hours taken.

219.  Thus Plaintiff was regularly required to exhaust his leave accounts for absences due to illness, emergencies or medical appointments, during days in which Plaintiff in actuality worked more than eight hours in that day, and during weeks in which Plaintiff performed more than 40 hours of actual work during the week in which Plaintiff was required to deduct accrued leave. This policy was enforced throughout Plaintiff's

employment, despite Plaintiff's written employment agreement that called for work five days per week and eight hours per day, on average, yielding a designated work week of 40 hours, on average.

220.   On or about August 19, 2011, Plaintiff was reassigned from the Field Service department, under the ultimate supervision of Dir. Barbera, to the Customer Operations department. Plaintiff remained in the Customer Operations department throughout the remainder of his tenure with NEXX.

221.   In the Customer Operations department Plaintiff was supervised by Director Cristina Chu, reporting both to Vice President Rezwan Lateef and, by Plaintiff's personal observation, to CEO Thomas Walsh.

222.   On February 24, 2012 Plaintiff was severely reprimanded by Director Chu for alleged misconduct that was in reality the performance of discretionary extra weekend work by Plaintiff, in what Plaintiff mistook, in his independent judgment, to be required in NEXX's best interest. Plaintiff was threatened with immediate termination by Dir. Chu during this episode, disciplined, and placed on a performance improvement plan.

223.   Over the next 14 months Plaintiff was reprimanded and disciplined by Director Chu three more times, at roughly four-to-five month intervals, for alleged misconducts that included, on April 9, 2013, Plaintiff's requesting of Dir. Chu an instruction on whether or not Plaintiff should sign a $2550 invoice to pay a vendor.

224.   The first time that Dir. Chu had approached Plaintiff with a vendor invoice, for Plaintiff's signature, was on March 7, 2012. That invoice was for approximately $2000.

225.  Plaintiff could not recall ever before, in a dozen years of association with NEXX, being asked to sign an invoice. When Plaintiff, an individual contributor not associated with a NEXX procurement role, sought guidance from Comptroller Tinsley in March, 2012, as to whether or not Plaintiff had authority to sign invoices of that magnitude, Plaintiff was advised that he had no authority to sign invoices of any magnitude, as Plaintiff's name was not on the corporation's "signature authority" list.

226.  When Plaintiff returned the invoice to Dir. Chu, with the information Plaintiff had learned from Comptroller Tinsley that Plaintiff lacked authority to approve the invoice, Dir. Chu became agitated, contemptuously remonstrated with Plaintiff, and, in his presence, scrawled her signature on the invoice without consulting it further. Plaintiff was left confused as to why the invoice had been presented to him in the first place.

227.  Plaintiff's activities were integrated into the TEL Texas/TEA's CMS system on July 9, 2012. Thereafter, Plaintiff's manuals, authored works, were stamped automatically with a notice attributing copyright of Plaintiff's works, created in Massachusetts ostensibly for TEL NEXX, Inc., to *Tokyo Electron Limited*, at an address in Tokyo, Japan.

228.  On November 13, 2012, Plaintiff met privately with Vice President Lateef in the latter's office.

229.  At the November 13, 2012 meeting, Plaintiff, exhausted at that point from what was by then his 173rd day of work in a row, expressed his feelings of frustration to Vice President Lateef that Plaintiff was always being pressured by Dir. Chu to take on additional duties, including entirely new duties for which Plaintiff had not been hired, without relief from any existing duties. Plaintiff expressed cautious gratitude for 'confidence' shown, but indicated that it seemed to him that NEXX simply wanted to add

to his existing heavy burden of technical writing duties with considerable new additional duties of planning departmental requirements, drawing up budgets, negotiating with vendors, verifying invoices and taking charge of trade shows and other ministerial aspects of marketing operations. At the meeting Plaintiff suggested that VP Lateef and NEXX should either acknowledge Plaintiff as performing in a new role and relieve some part of Plaintiff's constantly expanding volume of obligations, or Plaintiff could simply continue performing only non-exempt technical writer and technical illustrator duties, for which Plaintiff had been hired and that underlay his contract of employment.

230.   Plaintiff later expressed these same views on April 9, 2013, in a meeting in Vice President Lateef's office, with VP Lateef and Dir. Chu.

231.   The November 13, 2012 meeting between Plaintiff and VP Lateef did not go well for Plaintiff. VP Lateef expressed disappointment in Plaintiff's declining to perform new managerial functions in addition to all of his regular duties, without some express acknowledgement of a change in Plaintiff's status.

232.   At the November 13, 2012 meeting, Vice President Lateef expressed the view that he (VP Lateef) personally had performed duties outside of his "normal" functions while awaiting his promotion to Vice President and that Plaintiff should expect to do the same. VP Lateef stated that he was taking "umbrage" at Plaintiff's request for recognition of any change in Plaintiff's status.

233.   On November 19, 2012, Plaintiff's 179th day of work without a day off, Plaintiff hand-delivered a letter to Vice President Lateef entitled "This Is A Wages And Hours Complaint / Please File This Complaint In My Permanent Personal File."

234. The November 19 letter described Plaintiff's concern with his classification as exempt labor under provisions of the FLSA, and certain regulations and interpretations issued by the U.S. Department of Labor (DOL) at 29 C.F.R. Part 541, et. seq., which define and delimit the classification of covered employees as to whether they are to be considered exempt or non-exempt labor under the federal statute, and Massachusetts laws.

235. Plaintiff's letter of November 19 identified Vice President Lateef as Plaintiff's "senior supervising authority and employer." VP Lateef never thereafter excepted to or denied to Plaintiff that he was Plaintiff's employer.

236. The letter of November 19 expressed Plaintiff's belief that Plaintiff was "presently misclassified as exempt labor under the provisions of these statutes and regulations and paid incorrectly." The letter of November 19 further requested that Plaintiff be reclassified as non-exempt labor "subject to payment of overtime for all work beyond 40 hours in each workweek and I should be paid for all of my hours of work." (Plaintiff's November 19 letter)

237. Vice President Lateef did not ask Plaintiff about the November 19th letter when Plaintiff hand-delivered it to him. Nor was Plaintiff at any subsequent time asked about the November 19 letter. Plaintiff was never asked to further explain its contents, or why he submitted it.

238. Plaintiff heard nothing more about his letter for one month, until December 17, 2012.

239. Between the time Plaintiff handed in his letter alleging misclassification, and the response Plaintiff received one month later, in which Plaintiff was assured that there

would be no retaliation against him for his letter, a number of events occurred that Plaintiff construes as retaliatory.

240. On November 21, 2012, two days after Plaintiff submitted his letter, Plaintiff was scheduled for a semi-annual performance review meeting with Dir. Chu. Dir. Chu was accompanied at the meeting by local TEL corporate benefits and compensation representative Marie Graichen.

241. During the November 21 meeting Plaintiff asked whether there had been any response to his November 19 letter of complaint. HR Rep. Graichen told Plaintiff that a lawyer had considered the matter and determined that Plaintiff was correctly classified.

242. During the November 21 meeting Plaintiff stated that he was unable to meet the deadlines imposed on him by working only "normal" work hours. Plaintiff asked for a definition of the term "normal work hours." Plaintiff's question was turned aside, and he received no answer at that meeting or at any other time.

243. In the evening of November 21, Plaintiff emailed TEL corporate human resources representative Marie Graichen asking for clarification of the term "normal work hours." Plaintiff never received a reply.

244. At all times relevant to this complaint a sign posted on the outside of NEXX's headquarters building, next to the rear employee entrance, read: "Normal Working Hours" "8:00 AM to 12:00 Noon" "12:30 PM to 5:30 PM." This sign was prominently visible each time an employee entered the building through the rear employee entrance. Plaintiff used that entrance many times.



**Photo caption #2. (above). "Normal Working Hours" signage beside rear employee entrance to NEXX. Photo by Plaintiff, March 31, 2013.**

245.  On November 27, 2012 Plaintiff was interviewed about the precise nature and extent of his job duties and work methods by Katy Frerich, a manager employed by TEL Texas/TEA, and 'Cactus' May, formerly a manager of Technical Writing at TEL Texas/TEA.

246.  From approximately December 17, 2012, onward, Dir. Chu delegated day-to-day management of Plaintiff, his objectives, methods of work, oversight of Plaintiff's work, and key aspects of Plaintiff's schedule to Mr. Jeff Stoddard, of the technical writing group of TEL Texas/TEA.

247.  Management of Plaintiff became rigidly prescriptive under Jeff Stoddard's supervision. Plaintiff's exercise of even a scintilla of discretion or independent judgment was not merely discouraged, it became the active focus of reprimand.

248.  On February 7, 2013 Plaintiff received email from Mr. Stoddard at TEL Texas sharply criticizing Plaintiff's work, and reprimanding Plaintiff for Plaintiff's working methods. Mr. Stoddard wrote, in part: "**Your job is to edit the content to match NEXX**

tools. It is not to impose Josh standards on TEL." (email from Jeff Stoddard to Plaintiff, February 7, 2013; bolding and underlining emphasis in the original). Mr. Stoddard copied his reprimand to Dir. Chu for disciplinary action.

249. On February 12, 2013, acting directly and solely on the basis of Mr. Stoddard's reprimand, Dir. Chu caused Plaintiff to be issued a third, and final, disciplinary warning.

250. It appeared to Plaintiff that the primary source of Mr. Stoddard's ire were certain minor revisions made by Plaintiff to a proposed cover for a new equipment manual, being submitted to Mr. Stoddard for his approval. Plaintiff had undertaken this change upon his own initiative and independent judgment. Plaintiff was unaware that exercise of independent judgment was forbidden, and that his exercise of initiative and independent judgment would result in disciplinary proceedings and, ultimately, Plaintiff's termination.

251. On December 4, 2012 Plaintiff received a telephone message from Ms. Angela Conrad, a TEL Texas/TEH human resources specialist. In her message, HR Specialist Conrad instructed Plaintiff to execute, through an internet site, a waiver of all of Plaintiff's personal privacy rights regarding information "bearing on your character, general reputation, personal characteristics, mode of living and credit standing" that might be obtained by a third-party investigating subcontractor at any time "before, during or after my employment" "through interviews or correspondence with your past or present coworkers, neighbors, friends, associates, current or former employers, educational institutions or other acquaintances."

252. On several occasions during December, 2012, Plaintiff sent H/R Representative Conrad requests for clarification regarding this waiver, particularly concerning any limits to the nature of the information that might be sought by a third-party investigator. Those