limits were only vaguely described in the text of the agreement as "The types of information that may be obtained include, but are not limited to..." followed by a short catalog of some types of personal information (emphasis added).

253. Per the usual confused intermingling of TEL corporate entities which Plaintiff experienced at all times with respect to his employment under the Tokyo Electron umbrella, Plaintiff was unable to determine from the text of the proposed waiver agreement which corporate entity was seeking a waiver of Plaintiff's entire privacy rights. Plaintiff inquired by email who was instructing him to execute the agreement, and with whom Plaintiff was being instructed to contract. Plaintiff received no reply.

254. Plaintiff also inquired, twice, by email whether executing the privacy wavier was a condition for retention of his employment. Plaintiff received no responsive reply to any of his inquiries.

255. On December 5, December 7, and December 14, 2012, and again on January 7, 2013, Plaintiff was instructed to execute the waiver of all of his privacy, despite being offered no responsive reply to any of his requests for clarification.

256. Plaintiff did not execute the waiver of his privacy rights.

257. At approximately 11:00 am On December 17, 2012, Plaintiff was summoned without notice by local TEL NEXX human resources representative Marie Graichen to a teleconference with a TEL Texas corporate compensation and benefits manager, who introduced himself as Jeff Gibson.

258. HR Representative Graichen was present for the teleconference at NEXX. Mr. Gibson did not introduce the other attendees of the meeting at his end.

259. The brief (5 - 8 minutes) December 17 teleconference was attended by Plaintiff in a meeting room at NEXX. Corporate Benefits Mgr. Gibson, speaking from TEL Texas headquarters in Texas, expressly clothed himself in apparent authority to speak to Plaintiff on the matter of Plaintiff's employment although he introduced himself as an employee of TEL Texas/TEH.

260. Benefits Mgr. Gibson, told Plaintiff that he had "determined that [Plaintiff was] properly classified as exempt" and that "This is not open for discussion or debate."

261. Benefits Mgr. Gibson stated to Plaintiff that there would be no retaliation against Plaintiff for Plaintiff's November 19 letter of complaint.

262. During the December 17 teleconference, Benefits Mgr. Gibson refused to explain to Plaintiff the basis for his exemption determination, or cite to Plaintiff which exemption category(ies) he was applying to Plaintiff's duties and employment.

263. During the December 17 teleconference, Benefits Mgr. Gibson did not ask Plaintiff why Plaintiff believed there might have been violations of law or regulations.

264. During the December 17 teleconference Benefits Mgr. Gibson made no mention of contacting the U.S. Department of Labor's Wage and Hour division, or of any request to DOL that it perform a wage and hour audit.

265. During the December 17 teleconference, Benefits Mgr. Gibson did not address any collateral matters of Massachusetts law raised in Plaintiff's November 19 letter of complaint, or that Plaintiff had recently been made to submit to working 181 days in a row without a day of rest.

266.   During the December 17 teleconference, Benefits Mgr. Gibson did not mention the recent award of semi-annual bonuses, or that Plaintiffs bonus, upon information and belief, was sharply reduced in comparison with his peers.

267.   During the December 17 teleconference Benefits Mgr. Gibson did not address the then-live issue of Plaintiff being repeatedly instructed to execute a waiver of his entire privacy rights, instructions that had arisen since Plaintiff tendered his November 19 letter.

268.   Benefits Mgr. Gibson did not address whether Plaintiff's execution of the waiver of privacy rights was or was not a condition for Plaintiff's retention of his employment.

269.   During the December 17 teleconference Benefits Mgr. Gibson did not address Plaintiff's recent assignment to supervision under Mr. Stoddard of TEL Texas/TEA.

270.   Immediately following the December 17 teleconference, while walking back to their respective desks, HR Representative Graichen elaborated further on what she had told Plaintiff about Plaintiff's exemption complaint during Plaintiff's November 21 semi-annual review meeting. HR Rep. Graichen stated to Plaintiff that she had discussed Plaintiff's November 19th letter over the telephone with an attorney in Houston, Texas. HR Rep. Graichen further stated to Plaintiff that she and the "Houston attorney" had reviewed Plaintiff's written job description point by point over the phone, and that this conversation formed the basis on which it was determined that Plaintiff was correctly classified as exempt labor.[14]

---

[14] If true, HR Rep. Graichen's statement describes a basis for formulating exemption status not in accord with 29 C.F.R. § 541.2 "Job titles insufficient" or the substantial body of jurisprudence affirming that an employee's actual duties govern the determination of exemption status, rather than a job description.

271.   On April 9, 2013, Dir. Chu caused accounts payable clerk Vickie Krupnik to present to Plaintiff a vendor invoice for $2550 for certain website hosting services.

272.   Since the previous episode involving an invoice, on March 7, 2012, Dir. Chu had caused Plaintiff's name to be added to the corporation's "signature authority" list of persons authorized to sign vendor invoices for payment.

273.   Upon information and belief, Plaintiff was the only individual contributor without routine procurement duties, whose name was placed on NEXX's "signature authority" list.

274.   Plaintiff exercised no supervision over the website that was the source of the $2550 invoice. Plaintiff did not exercise supervision over the website vendor, nor had Plaintiff been involved in the development of the website or any commitments made with or by the vendor seeking payment. Plaintiff was wholly ignorant of any contractual arrangements with this vendor, who Plaintiff had met and spoken with only once before, more than a year earlier. Plaintiff did not know whether the vendor had satisfactorily honored its commitments behind the invoice.

275.   Upon knowledge and belief, Dir. Chu handled all of the arrangements with the website vendor, and had developed the contractual commitments between NEXX and that vendor, and monitored deliveries by that vendor, and had regular contact with that vendor.

276.   Plaintiff had previously inquired of Dir. Chu, by email on November 30, 2012, about this particular $2550 invoice, at that time presented for payment in advance. Plaintiff had received no response from Dir. Chu to his email.

277.   On April 9, 2013, Plaintiff took the $2550 invoice to Dir. Chu, in her office, requesting an instruction from Dir. Chu whether Plaintiff should sign the invoice. Dir.

Chu immediately became agitated. She refused to issue an instruction to Plaintiff whether or not he should sign the invoice to authorize payment. She said, with great emphasis: "I won't give you an instruction to do that!" Thereupon she immediately took Plaintiff next door to Vice President Lateef's office for a disciplinary/firing conversation.

278. At approximately 10:00 pm on the evening of April 9, 2013, Chief Financial Officer (CFO) Thomas Mungovan stopped by Plaintiff's cubicle as CFO Mungovan was leaving work for home. While CFO Mungovan stood at Plaintiff's desk eating an apple, Plaintiff described to him the circumstances of the $2550 invoice, and Plaintiff's confusion with, and discomfort over, being asked to approve payment for vendor invoices over which Plaintiff had neither control nor relevant information. CFO Mungovan's brisk response was "Then don't sign it."

279. Plaintiff explained to CFO Mungovan how Plaintiff had gone into Dir. Chu's office asking for a formal instruction from her whether or not to sign the invoice, but was met with a point blank refusal to provide such an instruction. Plaintiff stated to CFO Mungovan that any further repeat of requests to Plaintiff that he blindly authorize invoices about which he had no knowledge would cause Plaintiff to seek advice from a representative of the Massachusetts' Attorney General's office.

280. Plaintiff was discharged two days later, without severance or settlement, on April 11, 2013, at a termination meeting between Plaintiff and Dir. Chu, Vice President Lateef, and local human resources representative Marie Graichen.

281. At the termination meeting, Benefits Representative Graichen stated that Plaintiff was fired by Dir. Chu.

282. At the termination meeting a document of termination, upon information and belief prepared by Dir. Chu, was read to Plaintiff by Dir. Chu.

283. At the termination meeting Plaintiff requested a copy of the document of termination but was informed that the only way he could receive a copy of said document was by filing a request for a review of the termination decision with TEL Texas/TEH department of human resources, within three business days of the termination. Plaintiff had the flu at the time of his discharge, and missed the three-day deadline.

284. At the termination meeting Plaintiff demanded that a hold in expectation of litigation be placed on all files and electronically stored information "to me, by me, for me or about me" including Plaintiff's computer files, Billerica server files and records, Texas server files and records, Plaintiff's stored email going back to 2002, door badge-in logs, and any other files or stored information by or regarding Plaintiff, whether maintained in Massachusetts, Texas, Japan, or elsewhere.

285. Plaintiff's demand for a litigation hold was heard by all three attendees at the meeting and acknowledged by HR Representative Graichen.

286. At the termination meeting Plaintiff demanded his unpaid back wages and fringe benefits which should have been paid, but were not paid to him, during the period in which Plaintiff was misclassified by NEXX as an independent contractor, pursuant to the statutory language of Massachusetts G. L. c. 149 § 148 which states that "any employee discharged from such employment shall be paid in full on the day of his discharge." HR Representative Graichen replied emphatically: "I'm (sic) not paying you for that." Plaintiff was not paid his unpaid back wages.

287. On April 15, 2013, Plaintiff wrote to NEXX Chief Financial Officer (CFO) Thomas Mungovan, inquiring about the status of Plaintiff's final 10% hold-back payment for certain NEXX Systems, Inc. stock options belonging to Plaintiff that Plaintiff had been required to tender and liquidate as part of the TEL acquisition of TEL NEXX, Inc. on May 1, 2012.

288. Plaintiff's final 10% payment for his stock options was held back for one year. The scheduled due date for his final hold-back payment was May 1, 2013. Plaintiff was discharged on April 11, 2013, 21 days prior to the due date for payment of his hold-back.

289. On May 6, 2013 Plaintiff received a letter from TEL Texas/TEH vice president of human resources Vickie Lee. Vice President Lee's letter, from Texas, on Tokyo Electron U.S. Holdings, Inc. stationary, was in reply to Plaintiff's letter to TEL NEXX, Inc. CFO Mungovan. Plaintiff received no other reply to his query.

290. Vice President Lee asserted that Plaintiff had no right to receive a final hold-back payment for his stock options. Plaintiff has not been paid his final hold-back payment.

291. As a result of the wrongful conducts of Defendants, individually and collectively, Plaintiff has suffered damages, in amounts to be proved at trial.

## V. PLAINTIFF'S FIRST CAUSE OF ACTION - UNPAID OVERTIME - ALL DEFENDANTS

292. Plaintiff reincorporates and re-adopts all allegations contained within Paragraphs 1-291 above, incorporating them by reference as if fully set forth herein.

293.  At all times relevant herein, all Defendants were Plaintiff's concurrent, co-employers in economic reality, and also pursuant to FLSA 29 U.S.C. 201, et. seq., §§ 203(d), (e) and (g). Defendants were subject to the FLSA and Massachusetts G.L. c. 149.

294.  At all times relevant herein, Defendants caused Plaintiff to be classified as exempt from the operation of the FLSA. Thus Defendants claimed to exempt themselves from their obligation to pay Plaintiff *anything* for his overtime labor.

295.  There was no reason for the belief of Defendants that Plaintiff was exempt from the protections of FLSA § 207 and G. L. c. 149, except Defendants' desire to so believe.

296.  There are numerous categories of exemption to the operation of the FLSA enumerated in 29 U.S.C. § 213 and in the "Defining and Delimiting" regulations and interpretations of the U.S. DOL. However "[a]n employer bears the burden of proving that an employee falls within the scope of an exemption. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir. 1997). Additionally, 'the remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them' and 'limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit.' Id. (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960))." (*Hines v. Longwood Events, Inc.*, 2010 U.S. Dist. LEXIS 62259 (D.Mass))

297.  Plaintiff was not a bona fide "Executive" employee pursuant to the DOL's "Defining & Delimiting" regulations, 29 C.F.R. 541.100, et. seq., at any time during Plaintiff's employment with Defendants.

298. Plaintiff was not a bona fide "Administrative" employee pursuant to the DOL's "Defining & Delimiting" regulations, 29 C.F.R. 541.200, et. seq., at any time during Plaintiff's employment with Defendants.

299. Plaintiff was not a bona fide "Learned professional" employee pursuant to the DOL's "Defining & Delimiting" regulations, 29 C.F.R. 541.301, at any time during Plaintiff's employment with Defendants.

300. Plaintiff was not a bona fide "Creative professional" employee pursuant to the DOL's "Defining & Delimiting" regulations, 29 C.F.R. 541.302 at any time during Plaintiff's employment with Defendants.

301. Plaintiff was not a bona fide "Computer professional" employee pursuant to either FLSA § 213(a)(17) or the DOL's "Defining & Delimiting" regulations for "Computer professional" employees, 29 C.F.R. 541.400 et. seq., at any time during Plaintiff's employment with Defendants.

302. At all times during his employment with Defendants, Plaintiff's primary duty was the production of goods for commerce, goods that NEXX included as part of its shipments for revenue. Plaintiff made goods, Plaintiff did not "service the business."

303. Plaintiff's duties never included the exercise of discretion and independent judgment in matters of significance. Plaintiff's tasks were dictated, his manner of performing them minutely styled, and his primary objective was accuracy of exposition, closely monitored, verified and vetted by others.

304. At all times relevant herein, Plaintiff's exempt classification was improper, pursuant to § 213 of the FLSA, and the *Defining and Delimiting* regulations and interpretations

published by the U.S. Dept. of Labor (*DOL*) at 29 C.F.R. Part 541. At all times pertinent

to this Complaint, Plaintiff should properly have been classified non-exempt from

payment for his hours of work greater than 40 in one week. Thus Defendants were at all

times required to pay Plaintiff for his statutory overtime hours.

305.   At all times relevant herein Defendants paid Plaintiff on a bi-weekly basis.

306.   Massachusetts G.L. c. 149 s. 148  provides in part: "...and provided, further, that

employees engaged in a bona fide executive, administrative or professional capacity as

determined by the attorney general and employees whose salaries are regularly paid on a

weekly basis or at a weekly rate <u>for a work week of substantially the same number of</u>

<u>hours from week to week</u> may be paid bi-weekly or semi-monthly unless such employee

elects at his own option to be paid monthly..." (emphasis added). In other words, an

employer's privilege of paying, on a bi-weekly basis, those of its employees that it

classifies as *bona fide* executive, administrative or professional employees, i.e. employees

it classifies as labor exempt from payment for their overtime, is expressly conditioned on

the employer's contracting with those employees that their work week shall comprise

substantially the same number of hours from week to week.

307.   Plaintiff's express, written contract of employment, "comp for Josh.xls," recited that

Plaintiff was to work an average of eight hours per day, five days per week, evidencing

Defendant's stated intention that Plaintiff work substantially 40 hours per week, each

week, in full conformance with G. L. c. 148 § 149. Had Defendants intended Plaintiff, by

his contract of employment, to work a variable number of hours per week, or some

variation of "all hours required," "or all hours demanded," then Defendant could not have

paid Plaintiff on a bi-weekly basis, as it did in fact, and still remained in conformance with the dictates of G. L. c. 148 § 149.

308. By paying Plaintiff on a bi-weekly basis Defendants evidenced their intention that Plaintiff work "substantially the same number of hours from week to week" and not on an "all hours required" or an "all hours demanded" basis.

309. At all times relevant herein Defendants unilaterally and openly invited Plaintiff to perform extra hours of his labor over the course of bonus evaluation periods, for the express purpose of creating a variable constituent of Plaintiff's salary. This variable component could increase Plaintiff's compensation by up to 10%, to be reduced to practice based on personal satisfaction with the quality and quantity of Plaintiff's work.

310. The Defendant's unilateral open offer to Plaintiff to wager extra work for extra compensation was an express provision of Plaintiff's Offer Letter, and of his contract of employment, as memorialized in "comp for Josh.xls."

311. Though Defendants did not bind themselves to redeem their promise to Plaintiff, they experienced no evident difficulty at accepting thousands of hours of valuable overtime labor from Plaintiff, in quantity denotable in man-years. Defendants commanded the performance of that labor, suffered and permitted the performance of the labor, and converted the labor to Defendants' use and tangible benefit and profit, all without demur.

312. Though Defendants did not bind themselves to an exact stipulation of amounts they would pay for Plaintiff's additional labor, it was clear from their oft-repeated invitation to Plaintiff to wager that labor, that Defendants intended that Plaintiff's contract of employment include, as a material constituent of Plaintiff's salary, a non-fixed, volatile

component based on the quantity and quality of the work performed, to be paid episodically, annually or semi-annually, but founded on, and summarizing, work performed week by week over the preceding bonus evaluation period. Or else Defendant's invitation to Plaintiff was utterly without foundation, and a fraud, and monstrous. However, Plaintiff did receive bonus payments under Defendants' system of wagered-labor, once even the 10% advertised, so Defendant's expressed desire to include a non-fixed, variable component of compensation in Plaintiff's salary does appear to have been honorable and genuine– and an intentional component of the employment contract as Defendants dictated its terms.

313.   Although Plaintiff's bonus payments were as infrequent as once or twice per year, Plaintiff's salary was never "fixed" at any time pertinent to this Complaint because Defendants expressly intended that there be a volatile and variable component in Plaintiff's regular salary, paid to him, when it was paid, episodically.

314.   At all times relevant herein, the FLSA, 29 U.S.C. 207, required employers to pay non-exempt employees one and one-half times their regular rate of pay for all hours worked over forty hours in a work week.

315.   At all times relevant herein Plaintiff was not paid anything for his overtime hours.

316.   Plaintiff relies upon his contemporaneous work journal to compute the number of overtime hours he worked in excess of 40, in each 7-day period since October 24, 2010.

317.   Plaintiff's computation, to be proved at trial, is that he worked 3,859 hours of unpaid overtime from October 24, 2010 until his discharge on April 11, 2013.

318.   Plaintiff seeks his unpaid overtime wages.

## VI.   PLAINTIFF'S SECOND CAUSE OF ACTION - LIQUIDATED

## DAMAGES *OR* TREBLE DAMAGES, AND THREE-YEAR STATUTE

## OF LIMITATIONS - ALL DEFENDANTS

319.   Plaintiff reincorporates and re-adopts all allegations contained within Paragraphs 1-318 above, incorporating them by reference as if fully set forth herein.

320.   At all times pertinent to this Complaint, Defendants were aware that Plaintiff's primary duty was the production of goods for commerce shipped for revenue. Such primary duty was not in conformance with any of the listed classes of exemption from the statutory requirements for overtime compensation prescribed by the FLSA and the "Defining and Delimiting" regulations and interpretations of the U.S. DOL. Defendants' decision to improperly classify Plaintiff as exempt from payment of overtime wages was not made in subjective good faith and was objectively unreasonable.

321.   Because Plaintiff was employed to make goods for commerce, NEXX's decision to misclassify Plaintiff as exempt labor could not have been objectively founded; it was self-serving and unlawful.

322.   Pursuant to 29 U.S.C. § 260, Plaintiff is entitled to liquidated damages in an amount equal to his unpaid overtime wages.

323.   Alternatively, pursuant to G. L. c. 149 § 150, Plaintiff is entitled to automatic treble damages for unpaid wages, subsequent to July 12, 2008,[15] retrospectively to within three years of the filing of this Complaint.

---

[15] Rosnov v. Molloy, 952 N.E.2d 901, 905 (Mass. 2011)

324.   The existence of unpaid wages subject to the Massachusetts Wage Act is demonstrable where there has been violation of federal overtime law.[16]

325.   From Plaintiff's first association with Defendant NEXX, through the end of December, 2005, NEXX misclassified Plaintiff as an independent contractor, despite well publicized advisory warnings to the contrary from the office of the Massachusetts Attorney General. NEXX's founders and management were amply qualified as experienced merchants and knowledgeable and well-resourced employers, but they chose to disregard the advisories of the Attorney General, and the advent of M.G.L. c. 149 s. 148B in 2004, to NEXX's profit and Plaintiff's harm.

326.   At some point, by November, 2005, or possibly much earlier, Defendant NEXX came to be upon notice that it had misclassified Plaintiff and therefore had legally harmed Plaintiff. This is evidenced by NEXX's abrupt move on its own initiative to reclassify Plaintiff.

327.   NEXX's CEO Dr. Post was sufficiently aware of the harm that had been caused to Plaintiff that he spontaneously and unexpectedly offered Plaintiff a $1000 sum of money "for all your trouble." The sum offered amounted to approximately three or four cents on the dollar on Plaintiff's actual damages, an act of expiation. The sum was not offered as a settlement of claims, nor was it accepted by Plaintiff as a knowing waiver of claims. Plaintiff could not have waived FLSA unpaid overtime claims in any event.[17]

---

[16] Carroca v. All Star Enterprises And Collision Center, Inc., Civil Action No. 12-11202-DJC, Dist. Court, D. Massachusetts, July 10, 2013

[17] See *Brooklyn Sav. Bank v O'Neil*, 324 US 697 (1945).

328. Despite evident knowledge on the part of NEXX's management in November and
December, 2005, that Plaintiff had been legally harmed for a considerable length of time
by his misclassification, NEXX's management sought to conceal this knowledge from
Plaintiff. NEXX's management did not disclose to Plaintiff what it knew about Plaintiff's
misclassification, despite repeated inquiries by Plaintiff to CEO Post, Manager Lateef, and
Comptroller Donna Tinsley, as to why his status was being changed. NEXX's CEO wrote
to Plaintiff in the "your employment" email telling Plaintiff outright that Plaintiff was
properly classified—"Josh, you are a *consultant…*" and "I would like to discuss this
situation with you to decide if you should *convert*"—even while CEO Post must have
been aware that this was not a correct statement because he was in the very process of
changing Plaintiff's classification in a bid to conform Plaintiff's employment to
Massachusetts law.

329. The deliberate concealment of Plaintiff's first misclassification clearly evidences a
devious frame and willful state of mind in formulating Plaintiff's labor classifications.

330. In December 2005, in full knowledge that it had already misclassified Plaintiff once,
and although Plaintiff was being added to NEXX's payroll to perform the same duties
Plaintiff had been performing for it for years, and in full knowledge that those duties
involved manufacturing components for shipment to its customers, NEXX chose to
misclassify Plaintiff a second time, this time as labor exempt from payment for overtime.

331. The decision to misclassify Plaintiff did Plaintiff immense harm. Viewed as mere
legal damages, the decision to misclassify Plaintiff as exempt from payment for his
overtime took money wages from Plaintiff's pocket. But the more profound practical
effect was that Plaintiff's labor was thereinafter designated a "free" commodity which

could be, and was, demanded of Plaintiff by his managers in prodigious quantity without restraint or scruple. Plaintiff's managers had tangible benefit to gain, polishing the perception of their managerial skills, and nothing to pay. This was cheap. They weren't in reality the better managers they claimed to be, merely adept at squeezing people like Plaintiff–older, sicker and desperate to keep his job. Plaintiff's managers, through manipulation of Plaintiff's work schedules and deadlines with harsh, threatening and coercive remonstrance when Plaintiff fell short, polished their personal ambitions at no cost to themselves, and at every cost to Plaintiff. Plaintiff's managers would have been subject to the discipline of economic, if not moral, restraint, if the extra hours, the very stuff of life that they demanded from Plaintiff, had come with a tangible cost accounting.

332. On Wednesday, February 29, 2012, Plaintiff, working at his desk, could plainly hear CEO Walsh shouting at his manager of software engineering, through CEO Walsh's closed office door, about a potential new hire. "If he can't work at our pace, if he has a family work-life balance problem, then you better not hire him." By "family work-life balance problem" Plaintiff understood CEO Walsh, from the context of his remarks, to mean an employee who wished to enjoy a family life in addition to work.

333. Plaintiff was undercompensated as the result of being overworked.

334. When NEXX misclassified Plaintiff as exempt labor, NEXX was already upon notice that it once before had violated employment laws and caused harm to Plaintiff through a previous misclassification. Thus NEXX and its management had an affirmative duty to ensure that such conduct was not continued. NEXX's failure to obtain and follow a competent legal analysis of Plaintiff's employment status recklessly disregarded its duty, beyond simple negligence.

335. NEXX's decision to misclassify Plaintiff as exempt labor reaped substantial financial benefits for NEXX, at great personal cost to Plaintiff.

336. When NEXX Systems, Inc. was renamed, then acquired by the corporate successor in interest, TEL NEXX, Inc. automatically continued Plaintiff's existing misclassification.

337. In the thirty month period of employment at issue in this action, Plaintiff's work journal entries disclose that he worked 3,859 overtime hours, excluding meal breaks and appointments.

338. Plaintiff's long hours and long work weeks were well known throughout NEXX to Plaintiff's colleagues, managers and employers. Those hours are also documented by NEXX's own ordinary business records, including door badge-in logs, email records and server records.

339. If Plaintiff's employers had had to pay for those 3,859 labor hours by hiring additional labor they would have been required to budget between $100,000 to $200,000 for that purpose. By misclassifying Plaintiff, NEXX had the benefit of that labor without payment.

340. Plaintiff's employers benefited themselves handsomely from the tremendous cost savings in labor services that they enjoyed by misclassifying Plaintiff.

341. **DEFENDANTS' FAILURE TO KEEP, AND ATTEMPTS TO SUPPRESS THE KEEPING OF, ACCURATE RECORDS OF HOURS WORKED**

342. During Plaintiff's employment with NEXX, two managers, as well as the human resources compensation and benefits coordinator, all instructed Plaintiff, on a total of five occasions, not to make, submit or keep accurate records of Plaintiff's true hours worked.

343. On two occasions NEXX's Comptroller, Donna Tinsley, instructed Plaintiff not to submit or keep accurate records of his hours worked.

344. Prior to submitting his first timesheet as a payroll-enrolled employee, in January, 2006, Plaintiff approached Comptroller Tinsley for instructions on how to fill out his timesheet, for a week in which he had worked overtime hours. Comptroller Tinsley instructed Plaintiff to strictly limit his submitted hours to 40, suggesting that Plaintiff record his hours as eight per day, Monday through Friday, despite the fact that Plaintiff told her that he had worked more than 40 hours that week, and on more than five days.

345. On a second occasion, in 2007, after Plaintiff had worked a full day during a paid company holiday, Plaintiff asked Comptroller Tinsley whether he should be keeping a private record of his hours. Comptroller Tinsley, with some evidence of alarm, instructed Plaintiff not to keep personal records of his work hours.

346. On June 10, 2008, Plaintiff described his perpetual 40-hours-per-week timesheet as his weekly "work of fiction" to his then-supervisor, Director of Field Service Kevin Barbera. Director Barbera thereupon requested a one-time accurate hours accounting from Plaintiff, emphasizing that it was for internal departmental use, i.e. his own personal use. Director Barbera repeated to Plaintiff several times in that conversation that for whatever reasons, he didn't know why, Field Service department personnel were not allowed to put more than 40 hours on their time sheets in any one week.

347. Never before or after June 10, 2008 was Plaintiff asked to produce an accurate accounting of his hours.

348.   On another occasion, on a date Plaintiff cannot recall, Plaintiff asked his then-supervisor, Director Barbera, how Plaintiff should record on his timesheet a work week in which Plaintiff worked four out of the five days, Monday through Friday, plus a Saturday or Sunday. Director Barbera sternly warned Plaintiff that when he took time off, on a Monday through Friday, it was incumbent upon Plaintiff to deduct accrued sick or vacation leave for the absent day, or absence during any part of that day during *normal work hours,* and to record it as such on Plaintiff's timesheet. Plaintiff was expressly instructed that timesheets for such weeks should therefore read: four eight hour days worked, plus eight (or however many) hours of accrued leave taken. Supplemental work performed at night, or on Saturday or Sunday, was to be disregarded and could not be credited against absences during *normal work hours* and was not to be entered on timesheets.

349.   Other than the clear and unambiguous statements in "comp for Josh.xls," none of Plaintiff's managers was ever willing to define for Plaintiff the scope of their expectations regarding Plaintiff's *normal work hours.* Plaintiff asked for such a definition from Dir. Barbera on multiple occasions during the period when Dir. Barbera was Plaintiff's immediate supervisor. But Plaintiff was always told that he "worked by the task, not by the hour," which was neither a responsive reply nor a rational explanation for why "normal work hours" would then require a strict accounting. Plaintiff requested a definition of "normal work hours" at a meeting with Dir. Chu and human resources representative Marie Graichen on November 21, 2012, but Plaintiff's question was turned aside. Plaintiff later emailed H/R Representative Graichen with the same question, and never received the courtesy of a reply.

350. Despite demanding nearly twice as much labor from Plaintiff as was called for in Plaintiff's contract of employment, none of Plaintiff's managers ever unambiguously redefined or reset the terms of "comp for Josh.xls," even with respect solely to their own personal expectations.

351. When demanding work from Plaintiff, Defendants defined "normal business hours" as, in effect, limitless. When demanding that Plaintiff debit his accrued leave against absences, Defendants defined "normal business hours" in the most restrictive possible fashion. This policy was designed to be exploitative, and accomplished its goal. This policy also derogated the idea of *contract*, or fixed expectations, in favor of floating expectations which could be infinitely malleable as each corporate manager saw fit to enforce the employment relationship to his or her own personal interest. The immunity generally accorded agents of a disclosed principal who are *acting within the scope of their authority* is inapposite where manager/agents of an employer/principal abuse the contract of employment between their principal and a subordinate employee, from which their own authority springs.

352. Sometime in 2007 or 2008, NEXX switched timesheet submission procedures from use of paper sheets to an internet-based form known as "EZ Labor." Shortly after that change, Plaintiff approached human resources compensation and benefits coordinator Lori Vitale, with a question as to whether the new EZ Labor system would be better able to accommodate accurate records of his work hours. Ms. Vitale instructed Plaintiff to continue the practice of submitting fictitious eight-hour-per-day, five-day-per-week timesheets, always adding up to a total of 40 hours per workweek.

353.  Plaintiff was never comfortable with the practice of submitting fictitious timesheets, but obedient to his instructions, the timesheets Plaintiff submitted show a uniform pattern of 40 hours worked per week, each week, from January, 2006 until Plaintiff and other exempt employees were instructed to stop submitting timesheets altogether in September, 2013.

354.  Plaintiff's instructions to always state exactly 40 hours worked on his timesheets further evidences the employer's intention that Plaintiff's hours were intended to conform to the "8 hours (on average)" term of the employment contract as stated in "comp for Josh.xls."

355.  Notwithstanding that Defendants were not provided with accurate and truthful timesheets or summaries of Plaintiff's overtime, due to consistent instructions from Defendants not to make or submit such records, during the entire relevant period defendants were keenly aware of Plaintiff's extensive overtime hours through a combination of close managerial oversight, personal observation within a not overly-large office suite, routine responses from Plaintiff to requests made and answered at non-standard work hours, and other indicia.

356.  As well as actual knowledge of Plaintiff's extensive hours of work, defendants also had constructive knowledge of Plaintiff's true hours from two convergent streams of information available to them at all times.

357.  Defendants had unfettered access to Plaintiff's self-emailed work journal records, on the corporation's email server. Those emails listed Plaintiff's work hours day-by-day.

358.   Defendants had access to electronic door badge-in logs that evidenced Plaintiff's arrivals at work on weekends and other times outside of normal work hours. Upon information and belief, those logs were checked periodically by NEXX Vice President of Operations Phillip Villari.

359.   To quote *Davis v. Pennsylvania Co.*[18] "At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith, unless said failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, -that is to say, where there is an intentional closing of the eyes or stopping of the ears." (citation omitted) Defendants deliberately 'closed their eyes and stopped their ears' to receiving accurate records of Plaintiff's work hours.

360.   NEXX's conduct in misclassifying Plaintiff was pernicious, openly in bad faith, and was deliberate and willful.

361.   Pursuant to 29 U.S.C. § 255 Plaintiff is entitled to a three year statute of limitations for his FLSA-related cause.

---

[18] 337 Pa. 456, 460, 12 A.2d 66 (1940)

## VII.   PLAINTIFF'S THIRD CAUSE OF ACTION - BREACH OF

## CONTRACT - WORK PERFORMED BEYOND THE AGREED LIMITS

## OF THE WORK DAY AND THE WORK WEEK - ALL DEFENDANTS

362.   Plaintiff reincorporates and re-adopts all allegations contained within Paragraphs 1-
361 above, incorporating them by reference as if fully set forth herein.

363.   As recited above, Plaintiff's contract of employment with NEXX was negotiated in
late November, 2005, between Plaintiff, then-CEO of NEXX, Dr. Richard Post, and
Comptroller Donna Tinsley.

364. .  Plaintiff's contract was memorialized in great detail in the spreadsheet "comp for
Josh.xls."

365.   Plaintiff's Offer Letter subsequently confirmed "comp for Josh.xls." The Offer
Letter presented an abridged version of "comp for Josh.xls," but in no way repudiated or
rescinded any provisions of "comp for Josh.xls" not otherwise set out in the Plaintiff's
Offer Letter.

366.   As recited more fully above, Plaintiff's contract of employment called for a work
day of eight hours (on average) and work weeks of five days, for the average performance
of work of forty hours per work week.

367.   As recited more fully above, Plaintiff was commanded and coerced, through
manipulation of his work schedules and his deadlines, urged upon him as rigid and
inflexible, and further facilitated by Plaintiff's misclassification as exempt from payment
of extra wages for Plaintiff's extra work, to work averages of 64 to 74 hours per week

from 2010 through 2013, and nearly six-and-one-half days per week. Plaintiff's long hours at work were well known throughout NEXX.

368.   The Defendants, by requiring considerably more performance from Plaintiff than was called for in Plaintiff's contract of employment, breached express terms of that agreement as well as its implied covenant of good faith and fair dealing.

369.   Plaintiff's salary under his contract of employment expressly compensated him for only eight hours of work per day (on average). Work performed that was not within that average range was not compensated by his contract of employment. To the extent that Plaintiff can prove that he worked an average of more than eight hours per day between November 1, 2007 and April 11, 2013, pursuant to Massachusetts G.L. c. 260, § 2, Plaintiff asserts he is entitled to be paid for that work required of him, and performed by him, but not paid under his contract of employment, in an amount to be proved at trial.

370.   Plaintiff's salary under his contract of employment expressly compensated him for only five days of work per week. Work performed outside that limit was work not compensated by Plaintiff's contract of employment. To the extent that Plaintiff can prove that he worked weeks of six or seven days, between September 1, 2007 and April 11, 2013, pursuant to Massachusetts G.L. c. 260, § 2, Plaintiff asserts he is entitled to be paid for that work required of him, and performed, but not paid under his contract of employment, in an amount to be proved at trial.

371.   Plaintiff does not seek duplicative damages under any cause. To the extent that Plaintiff's actual damages for unpaid overtime under the FLSA and/or G.L. c. 149 § 148 might overlap with damages under Plaintiff's breach of contract cause, or overlap between

hours-per-day breach and days-per-week breach causes, Plaintiff seeks only those damages to which he is legally entitled.

## VIII. PLAINTIFF'S FOURTH CAUSE OF ACTION - VIOLATION OF MASSACHUSETTS G.L c. 12, §§ 11 H & I (MASS. CIVIL RIGHTS ACT) - DEFENDANTS CHU AND NEXX

372. Plaintiff reincorporates and re-adopts all allegations contained within Paragraphs 1-371 above, incorporating them by reference as if fully set forth herein.

373. As more fully set forth above, Defendant Dir. Chu knowingly, and by means of unscrupulous economic coercion, did deprive Plaintiff of Plaintiff's right to enjoy one day of rest in every seven days, a right secured and guaranteed to Plaintiff by G. L. c. 149 §§ 48, 50, 51 and 52, i.e. Massachusetts "one day of rest in seven" statutes.

374. If, as the below attests, an undisturbed and unpaid half-hour meal period "may constitute a benefit of significant value" purely as a temporary respite from the day's work, how much more valuable then is the opportunity for "one day of rest in seven" as is required by the laws of the Commonwealth?

> "The motion judge concluded that 'given the undisputed fact that meal periods are unpaid, a missed meal period does not result in economic damages.' Therefore, he reasoned, absent any independent private right of action under G.L. c. 149, § 100, there can be no contract claim for missed meal periods. He therefore allowed Wal-Mart's motion for summary judgment on this issue. However, merely because meal periods are unpaid, it does not follow that they have no value. To an hourly employee at Wal-Mart, the opportunity to stop work and eat a meal in peace

during a busy workday may constitute a benefit of significant value. Wal-Mart argues that any employees who were made to work through their meal breaks were paid for that work, and so were unharmed by any breach of contract. Essentially, Wal-Mart's argument is that only wages have value, and that other bargained-for benefits that may be part of an employment contract, such as meal breaks or indeed any form of unpaid leave, are valueless. We decline to reach such a sweeping conclusion." *Salvas v. Wal-Mart Stores, Inc*, 452 Mass. 337, 374 (2008)

375. Dir. Chu demanded from Plaintiff under threat of Plaintiff's termination, after causing Plaintiff to be issued two disciplinary notices threatening Plaintiff with termination, and did obtain from Plaintiff under such condition of duress, a written agreement that Plaintiff would work for her and for NEXX from July 17, 2012 through October 5, 2012 (later extended to October 15) without a day off or a day of rest, in contravention of Plaintiff's contract of employment with NEXX, and Massachusetts law.

376. As a result of Dir. Chu's coercion Plaintiff was deprived of the benefit of his contract of employment, which limited his required performance to five days of work per week. Plaintiff was unable to enjoy even one day of rest or relief from May 25, 2012 through November 21, 2012, a period of 25 weeks.

377. As a result of Dir. Chu's coercion Plaintiff was deprived of the benefit of one day of rest in each seven, a right secured to him by statute. Plaintiff never waived his right to the

benefits of G. L. c. 149 § 48 at any time. In general, jurisprudence on G. L. c. 149 § 48 appears to be sparse, but the right that it secures may not be waivable in any event.[19]

378.  Defendants Chu and NEXX violated Plaintiff's civil rights through economic coercion and thereby violated the Massachusetts Civil Rights Act G.L c. 12, §§ 11 H & I.

379.  Plaintiff seeks damages in the form of general, compensatory, and/or punitive damages in an amount in excess of $50,000 (two thousand dollars per week in which Plaintiff was deprived of a day of rest).

## IX.   PLAINTIFF'S FIFTH CAUSE OF ACTION - FAILURE TO PROMPTLY PAY UNPAID WAGES AT DISCHARGE PURSUANT TO MASSACHUSETTS G.L. c. 149 § 148 - DEFENDANT TEL NEXX, INC.

380.  Plaintiff reincorporates and re-adopts all allegations contained within Paragraphs 1-379 above, incorporating them by reference as if fully set forth herein.

381.  As set forth more fully above, Plaintiff was misclassified by Defendant NEXX as an independent contractor from on or about July 1, 2003 through December 31, 2005. Beginning January 1, 2006 Plaintiff was formally enrolled on NEXX's payroll, although again, as recited above, subject to a second and subsequent misclassification.

382.  During the 30 month period of Plaintiff's misclassification as an independent contractor Plaintiff was paid on a "1099 basis," without the economic benefits granted to 100% of NEXX's acknowledged employees, including upon information and belief 21

---

[19] *Bujold v. EMC Corporation*, Mass. Super. Ct. Civil Action No. 06-2166-BLS2, December 7, 2007 (Gants, J.)

100% of NEXX's acknowledged employees, including upon information and belief 21 days per year of vacation and holiday pay, sick pay, medical insurance, short- and long-term disability insurance, life insurance, and the opportunity to earn annual bonuses and stock options.

383.  During the 30 month period of Plaintiff's misclassification as an independent contractor Plaintiff spent varying amounts, in the range of $600 per month, to purchase health insurance coverage, while NEXX's acknowledged employees, upon knowledge and belief, were able to obtain as a benefit of their legitimated employment status, equivalent coverage for approximately 15% of what Plaintiff, at that time undergoing continual monitoring of his lung cancer, was forced to pay.

384.  Plaintiff was an employee of NEXX by law prior to July 19, 2004, when G.L. c. 149 s. 148B, the "Independent Contractor Law" came into effect, as detailed in an advisory to employers published by the Massachusetts Attorney General Advisory in 1994 ("Advisory 94/3 from the Attorney General's Fair Labor and Business Practices Division on the Issue of Employee Versus Independent Contractor").

385.  On and after July 19, 2004 Plaintiff was further affirmed as an employee of NEXX by law pursuant to G. L. c. 149 § 148B, the Massachusetts "Independent Contractor Law."

386.  Despite Plaintiff's legal status under the laws of the Commonwealth, NEXX refused to recognize that status and did not pay Plaintiff the benefits that it paid to its acknowledged employees.

387.  Massachusetts G. L. c. 149 § 148 provides, in part: "Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him

to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week...".

388.  NEXX did not pay Plaintiff the full wages due to him during the 30 month period July 1, 2003 through December 31, 2005, because NEXX omitted payment for "fringe" benefits that it accorded to its acknowledged employees, and for Plaintiff's overtime.

389.  The management of NEXX was sophisticated, experienced and well-resourced. They deliberately chose to misclassify Plaintiff and thereby deprive him of the wages he was due, to their benefit and to Plaintiff's detriment.

390.  Massachusetts G. L. c. 149 § 150 provides, in part: "An employee claiming to be aggrieved by a violation of sections 33E, 148, 148A, 148B, 150C, 152, 152A or 159C or section 19 of chapter 151 may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits." (emphasis supplied)

391.  More than three years has elapsed since December, 2005 when the NEXX employer last misclassified Plaintiff as an independent contractor, thereby violating the Massachusetts Wage Act by that conduct.

392.  If Massachusetts G. L. c. 149 § 150 was a substantive *statute of repose*, all hope by Plaintiff of recovering his unpaid wages from 2003 - 2005 would be forever time barred.

393.  Massachusetts G. L. c. 149 § 150 is, however, exclusively a *statute of limitations*, not one of repose. It's language is clear and express: reduced to its main point, it reads:

"An employee claiming to be aggrieved by a violation....may ... within three years of the violation...institute and prosecute...a civil action ...."

394.   The text of G. L. c. 149 § 150's limitation provision only "governs the time within which legal proceedings must be commenced after the cause of action accrues." § 150's language does not purport to limit the time within which an action may be brought that is "not related to accrual of any cause of action."[20] The statute identifies *violation*, a matter purely the subject of judicial interpretation, rather than "identifi[ng] the *event* that commences the running of the statutory period, leaving nothing to judicial determination."[21]

395.   The limitations language of G. L. c. 149 § 150 is unlike, for instance, that of the medical malpractice limitations provision of G. L. c. 260 § 4, which includes both a statute of limitations and one of repose. Language that has frequently been affirmed by the Massachusetts Supreme Judicial Court as exemplifying the language of a statute of repose was identified by the SJC in *Rudenauer v. Zafiropoulos*: "Section 4 states the time bar unequivocally: '*in no event shall* any such action be commenced' after seven years."[22] "Seven years" is the event in Section 4, unrelated to the accrual of a cause of action, which effectuates this language as a statute of repose. No equivalent "repose language" appears in G. L. c. 149 § 150.

396.   G. L. c. 149 § 150 extended to Defendant NEXX a *procedural* time bar against Plaintiff's recovery of his unpaid wages. § 150 terminated subject matter jurisdiction of

---

[20] Harlfinger v. Martin, 435 Mass. 38, 41 (2001), quoting Klein v. Catalano, 386 Mass. 701, 702 (1982)
[21] *Rudenauer v. Zafiropoulos*, 445 Mass. 353, 358 (2005), emphasis added
[22] *Id.* 358-359 (2005), emphasis in original

the courts to hear any case by Plaintiff for contemporaneous recovery of his unpaid wages filed more than three years after the violations of § 148 took place. But while § 150 fully extinguished Plaintiff's jurisdiction to seek contemporaneous recovery, it did nothing to abolish Plaintiff's *substantive* right to those underlying unpaid wages. Plaintiff's right to his unpaid wages always retained the potential to be reanimated and made enforceable under certain narrowly drawn circumstances.

397. Such reanimating circumstances are contained in another passage of G. L. c. 149 § 148's text, the clause that addresses the subject of prompt payoff in full of an employee's unpaid wages at termination. It must be recognized that G. L. c. 149 § 148 is an omnibus statute, containing a string of related, but differentiable provisions, many of them compressed together in a single, extensive run-on sentence. Despite being precipitously concatenated into one sentence, the distinct provisions of G. L. c. 149 § 148 each exists and has force and effect in its own right.

398. Such is the case of the Wage Act's provision for prompt payoff of employees at termination: "...and any employee discharged from such employment shall be paid in full on the day of his discharge..." (emphasis added). The provision for prompt payoff at termination is a distinct provision of the Wage Act; prompt payoff at termination laws possess a separate legal history and identity of their own, distinguishable from laws securing contemporaneous payment of regular wages.[23]

---

[23] See for instance 38 Marq. L. Rev. 61 1954-1955, Corman, Calvin W., *The Partial Performance Interest Of The Defaulting Employee - Part I (Part II* continued at 38 Marq L R 139 (1954 - 1955), recounting widespread mischief and abuse that preceded, and provoked, eventual passage of nationwide prompt payoff at termination legislation at the beginning of the 20th century.

399.   When Plaintiff was terminated on April 11, 2013, he had been in the continuous and unbroken employ of the NEXX employer since on or about July 1, 2003. He experienced no other discharge. The provision that Plaintiff "shall be paid in full on the day of his discharge" incorporated all of Plaintiff's nine years and nine months of continuous service, and all of his wages owed but as yet unpaid.

400.   Contemporaneous payment of regular wages due, and prompt payoff *in full* on the day of discharge, are necessarily separate laws even where they operate on common facts. This must be so because applying the § 150 time bar applicable to contemporaneous payment, to prompt payoff at termination, would then, in effect and in all such cases, convert the statute of limitations applicable to prompt payoff into a statute of repose. The legislature wrote § 150

> (a) to apply equally to all of the multifarious provisions of the § 148 omnibus statute, and
>
> (b) as a statute of limitations, excluding from it elements or supplementary language of repose.

Thus there is no basis for converting § 150 into a statute of repose with respect to any of § 148's distinct provisions.

401.   Plaintiff had no advance notice of his termination. But at his mid-day termination meeting he informed those present— Vice President Lateef, Director Chu and Human Resources Representative Graichen —that he was owed back wages and that his unpaid back wages were due to be paid to him by close of business that day. H/R Rep. Graichen replied: "I'm (sic) not paying you for that."

402.   G. L. c. 149 § 150 is a statute of limitations, not one of repose. While it long ago extinguished Plaintiff's jurisdictional right to seek contemporaneous recovery of his unpaid wages, it did not extinguish Plaintiff's underlying right to those wages. That right was reanimated by the provision for prompt payoff "in full on the day of his discharge" of G. L. c. 149 § 148.  The limitations clock on prompt payoff began running on April 12, 2013, and currently has approximately two and one-half years left to run.

403.   NEXX willfully and outrageously misclassified Plaintiff as an independent contractor, as its own actions by

> (a) deliberately concealing his initial misclassification, including the material misrepresentation in the "your employment" email, and
>
> (b) spontaneously offering Plaintiff $1000 in propitiation of the harm it understood that it had caused him, evidence.

404.  Plaintiff seeks his unpaid fringe benefits and unpaid overtime wages for the 30 month period during which he was misclassified as an independent contractor, from on or about July 1, 2003 through December 31, 2005, with treble damages together with interest thereon from the date such back wages became due until the date back wages are finally paid.

## X.  PRAYER FOR RELIEF

405.  WHEREFORE, Plaintiff prays for the following relief: his unpaid overtime wages since October, 2010 with either liquidated damages in an amount equal to his unpaid overtime wages pursuant to 29 U. S. C. § 260, or treble damages for all unpaid overtime wages pursuant to G. L. c. 149 § 150, as the court shall direct, from all Defendants, jointly and severally.

406.  Asserting breach of an unambiguous and enforceable express contract of employment, Plaintiff seeks his unpaid contract wages from October 2007, from all Defendants, jointly and severally.

407.  Plaintiff seeks damages for violation of the Massachusetts Civil Rights Act, G. L. c. 12 §§ H and I, from Defendants Chu and TEL NEXX, Inc. for using economic coercion to deprive Plaintiff of his guaranteed right to one day of rest in seven, a right secured to him pursuant to G. L. c. 149 §§ 48, 50, 51 and 52, and his right to agreed-upon limits to the performance work, as expressed in his contract of employment.

408.  Plaintiff seeks his unpaid "fringe benefit" and overtime wages from the period July 1, 2003 through December 31, 2005, with treble damages for willfully and outrageously withholding those wages, pursuant to G. L. c. 149 §§ 148, 150, from Defendant TELNEXX, Inc., together with interest on his unpaid wages from the date such back wages became due until the date his back wages are finally paid.

409.  Entry of judgment in Plaintiff's favor on all counts.

410.  Plaintiff seeks his costs and expenses of this legal action, together with any other such relief in law or in equity as the court shall allow.

Respectfully submitted,

JOSHUA DREXLER

appearing *pro se*

Joshua Drexler

7 Lakeside Road

Billerica, MA 01821

978-489-9648

Scr1b0rFid3s@gmail.com

Dated: October 28, 2013



SOPHANY U. SAR
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
November 10, 2017

VERIFICATION OF COMPLAINT

Joshua Drexler, on behalf of himself,

Plaintiff

v.

TEL NEXX, Inc., Tokyo Electron U. S. Holdings, Inc., Tokyo Electron America, Inc.,
Barry Mayer, Thomas Walsh, Cristina Chu, Rezwan Lateef, and five Doe Defendants
Defendants

The undersigned, JOSHUA D. DREXLER, Plaintiff, being duly sworn, deposes and says

that:

I, Joshua Drexler, drafted the foregoing verified Complaint. I know the contents thereof.

The same are true to my own knowledge, except as to matters therein stated to be alleged

on information and belief, and as to those matters I believe them to be true.

JOSHUA DREXLER

Sworn to before me this __28__ day of October, 2013

Notary Public

10.28.13

SOPHANY U. SAR
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
November 10, 2017

# ATTACHMENT 1



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

September 18, 2013

(617) 727-2200
www.mass.gov/ago

Mr. Joshua D. Drexler
7 Lakeside Road
Billerica, MA  01821

Re: Private Right of Action – Joshua D. Drexler

**Authorization for Immediate Private Suit – TEL NEXX, Inc.**

Dear Mr. Drexler:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

This letter is to inform you that we carefully reviewed the complaint and have determined that the proper resolution of this matter may be through a private suit in civil court. Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

Massachusetts General Laws, chapter 149, sec. 150 and chapter 151, secs. 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws. If you elect to sue in civil court, you may bring an action on your clients' behalf and others similarly situated, and they may obtain injunctive relief, treble damages for any loss or wages and other benefits, as well as the costs of litigation and reasonable attorneys' fees.

Without making a judgment on the merits of the complaint, this correspondence represents this office's written assent to sue and grants you the authority to pursue this matter against the employer *as well as against the president, treasurer of the corporation and any officers or agents having the management of such corporation,* immediately, as permitted by Massachusetts General Laws chapters 149 and 151. This office will not take further enforcement action at this time.

Thank you for your attention to this matter.

Sincerely,

Bruce Trager
Assistant Attorney General
Fair Labor Division
(617) 727-2200 extension 2336

BT/mm

# ATTACHMENT 2

*nb-* Attachment #2 is the final version of the "78-days-in-a-row" required work plan, originally demanded of Plaintiff by Dir. Chu on July 19, 2012, and sent to her in final form on August 9, 2012, 12:02am. By the final version of this plan on August 9, and subsequently approved by Dir. Chu, the plan had expanded by an additional 10 days, to become an "88-days-in-a-row" required work plan, stretching from July 19 through October 15, 2012.

"Est. Days of Work" required to complete each subtask, when added to the promised delivery date of the prior subtask, yielded the next promised delivery date, with no break, from 20-Jul through 15-Oct. Promised delivery dates fell on all days of the week, dictated solely by the estimated interval needed to complete each new subtask. One example is shown marked in blue: an earlier delivery date of Aug. 6, plus six days estimated to perform the next task in sequence, yielded a next delivery date of Aug. 12. No time for days off entered the schedule from July through October.

**Thunder Doc Modules Due**          Rev 2.0          8/6/12

| PM Group | Status | | Primary Maintenance | Assigned to | Change? | Est. Days of Work | |
|---|---|---|---|---|---|---|---|
| CellMaint | 1stDraft | 20-Jul | Remove & replace Input Block (combined into R&R Anode Ass'y) | JDD | Yes | 2 | "Days of Work" required to edit, complete, turn around |
| CellMaint | 1stDraft | 20-Jul | Remove & replace Anode Ass'y | JDD | Yes | 1 | and port incoming partly formed Word documents received from |
| CellMaint | 1stDraft | 20-Jul | Remove & replace Shield | JDD | Yes | 3 | NEXX internal sources to TEL's QMS documentation and reuse |
| CellMaint | 1stDraft | 22-Jul | Remove & Replace Membrane | JDD | Yes | 1 | system. |
| CellMaint | 1stDraft | 24-Jul | Remove & replace Anode | JDD | Yes | 2 | |
| CellMaint | 1stDraft | 26-Jul | Remove and replace Align Blocks | JDD | Yes | 1 | Note: Assumed receipt of "partly to fully formed" input documents. |
| PUP | Special | | Check wafer presence sensor | JDD | Yes | 3 | The writing burden required to complete "partly formed" |
| CellMaint | | Jul 30 | Drain, purge, leach and refill anolyte reservoir | JDD | Yes | 2 | documents is conjectural at this stage, without benefit of an |
| | | | Inspect & Rebuild or replace Anode Ass'y contact pistons | JDD | Yes | 2 | experience baseline. |
| | | | | | | 3 | Wed, Aug 1 |
| Revisions | Rev_Mtg | 30-Jul | 7/30 Redlines | JDD | Yes | 5 | ← Mon, Aug 6 |
| | Safety | | Safety Section + TEL Safety | JDD | Yes | 5 | Sun, Aug 12 |
| Brooks EffEN | | | Operator "Load & Go" (boot, select recipe, initiate, change comms status) | JDD from Brooks | Yes | etc. 6 | Sat, Aug 18 |
| WH&OHS | | | Inspect & Clean OIS | JDD from BKMs | Yes | 6 | Wed, Aug 22 |
| WH&OHS | | | Inspect & Clean Wafer Holders | JDD from BKMs | Yes | 4 | Sun, Aug 26 |
| | | | • spool contacts | | | | |
| | | | • o-rings | | | | |
| | | | • c-rings | | | | |
| | | | • WH bar codes | | | | |
| | | | • spring plates | | | | |
| | | | • handles | | | | |
| | | | Check operation of the Shearplate for free movement with Umouts disconnected | BMD/Adv/Develop | Yes | 2 | Tue, Aug 28 |
| | | | Check lower containment for possible chemistry/DI water leaks | BMD/Adv/Develop. | ? | 3 | Fri, Aug 31 |
| | | | Check all facilities settings are set correctly & adjust as necessary | BMD/Adv/Develop. | ? | 3 | Sun, Sep 2 |
| | | | Check the Loader leak check pressure. | BMD/Adv/Develop. | ? | 2 | Tue, Sep 4 |
| | | | Drain, purge, leach & refill anholyte reservoir | BMD/Adv/Develop | No | 2 | Thu, Sep 6 |
| CellMaint | | | Check HVD blower motors for deterioration | ControlsEng | Yes | 2 | Sat, Sep 8 |
| Transporter | | | Check pressure and flow of purge box N2 | ControlsEng | Yes | 2 | Mon, Sep 10 |
| SRD EdgeGrip | | | Check and adjust as needed SRD sensors | MfgEng | Yes | 4 | Fri, Sep 14 |
| SRD EdgeGrip | | | Inspect & PM edge grippers | MfgEng | Yes | 2 | Sun, Sep 16 |
| WH&OHS | | | Check bladder drive rod leak when pressurized | MfgEng | No | 3 | Wed, Sep 19 |
| AutoLoader | | | Autoloader drive component maintenance | Thunder/SysEng | Yes | 8 | Thu, Sep 27 |
| Transporter | | | Check elevator drop band & flex circuit | Thunder/SysEng | Yes | 2 | Sun, Sep 30 |
| Plumb&System | | | Check chemistry replenishment containers are full | Thunder/SysEng | Yes | 2 | Tue, Oct 2 |

JDD

advanced/Devel Due          Sun, Aug 26

ControllingEng Due          Thu, Sep 6

OfgEng Due          Mon, Sep 10

Thunder/SysEng Due          Wed, Sep 19



| PM Group | Status | Primary Maintenance | Assigned to | Change? | Est. Days of Work | Process Eng Tue, Oct 2 | INPUT DUE | JDD DELIVERABLE |
|---|---|---|---|---|---|---|---|---|
| Cell/Maint | | Take anolyte chemistry sample by hand for analysis | ProcessEng | Yes | 2 | Thu, Oct 4 | | |
| Cell/Maint | | Take catholyte chemistry sample by hand for analysis | ProcessEng | Yes | 2 | Sat, Oct 6 | | |
| Transporter | | Inspect & clean drip tray & actuation system (if exists?) | MechEng | Yes | 3 | Tue, Oct 9 | | |
| Transporter | | Remove, clean & inspect elevator purge box | MechEng | Yes | 3 | Mon, Oct 15 | | |
| | | Revisions | JDD | | 90 | | | |
| Safety&Compliance | | Safety (SEMI S2/S8 compliance) | Compliance Eng | Yes | 7 | | Mon, Oct 22 | Mon, Oct 22 |
| Alpha | | Upgrade Install Guide | AdvDevelop | Yes | 7 | | Mon, Oct 29 | Mon, Oct 29 |
| Operation | | Operator Primary | Software | Yes | 7 | | Mon, Nov 5 | Mon, Nov 5 |
| Operation | | Simple Recovery | ProcessEng | Yes | 7 | | Mon, Nov 12 | Mon, Nov 12 |
| Setup | | Simple Setup & Teach | AdvDevelop | Yes | 7 | | Mon, Nov 19 | Mon, Nov 19 |
| Service | | Secondary Maintenance | Mfg Eng | Yes | 45 | | Mon, Nov 26 | Mon, Nov 26 |
| Service | | Tool Install Guide | Service | Yes | 7 | | Thu, Jan 10 | Thu, Jan 10 |
| | | | | | | | | Thu, Jan 17 |

# ATTACHMENT 3

nb- Attachment #3 is comp for josh.xls, version #2 (final version). Version #2 accidentally omitted, on a scriveners error, the standard 13 days of vacation pay that was originally included in Version #1, and was subsequently corrected and restored by Plaintiff's Offer Letter.

The printout of the spreadsheet displays only the individual cell values, it is not set to display cell formulas. A screen capture (screenshot) of the spreadsheet is also provided, focused on cell B7, which evidences the intention of the parties (Plaintiff Drexler and Defendant NEXX) that Plaintiff's contract of employment cover 5 days per week, 52 weeks per year, less paid time off (the sum of 8 paid company holidays plus, in its corrected, final form, 13 days of paid vacation per year).



comp for Josh

Home   Insert   Page Layout   Formulas   Data   Review   View   Developer   Ad

B7   =52*5-SUM(B5:B6)

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | Contractor Hourly rate | 48 | | | |
| 3 | Hours worked per day on average | 8 | | | |
| 4 | Contractor revenue per day average | 384 | | | |
| 5 | Vacation Days offered by NEXX | | | | |
| 6 | Holidays offered by NEXX | 8 | | | |
| 7 | Available working days comparable to NEXX | 252 | | | |
| 8 | **Annual top line revenue as contractor** **Based on same # vacation & holiday** | 96768 | 96000.00 | | |
| 9 | FICA withholding contractor must pay above what individual must pay (percent) | 6.2% | | | |
| 10 | FICA witholding amount ($) | 6000 | | | |
| 11 | Medicare withholding contractor must pay above what individual must pay (percent) | 1.4% | | | |
| 12 | Medicare witholding amount ($) | 1355 | | | |
| 13 | Legal, LLC filing, office, & advertising costs of running sole proprietarship or LLC | | | | |
| 14 | New Hampshire Business tax | | | | |
| 15 | **Annual pre-tax personal income as contractor** **Based on same # vacation & holiday** | 89414 | | | |
| 16 | Medical insurance paid by NEXX (annual, family) | 8420 | | 8420.80 | |
| 17 | Dental  insurance paid by NEXX (annual, family) | 980 | | | |
| 18 | Short/Long term disabilitypaid by NEXX | 751 | | | |
| 19 | Life paid by NEXX | 236 | | | |
| 20 | SUI tax paid by NEXX | 675 | | | |
| 21 | FUTA tax paid by NEXX | 56 | | | |
| 22 | Workers Compensation Ins paid by NEXX | 930 | | | |
| 23 | 401K match at 50% assuming 5% contribution | 2235 | | | |
| 24 | Sum total of benefits paid by NEXX | 14283 | 21637.46 | | |

calc sheet  Sheet2  Sheet3

Ready

| | | |
|---|---|---|
| Contractor Hourly rate | 48 | |
| Hours worked per day on average | 8 | |
| Contractor revenue per day average | 384 | |
| Vacation Days offered by NEXX | | |
| Holidays offered by NEXX | 8 | |
| Available working days comparable to NEXX | 252 | |
| **Annual top line revenue as contractor** | **96768** | **96000.00** |
| **Based on same # vacation & holiday** | | |
| FICA withholding contractor must pay above what individual must pay (percent) | 6.2% | |
| FICA witholding amount ($) | 6000 | |
| Medicare withholding contractor must pay above what individual must pay (percent) | 1.4% | |
| Medicare witholding amount ($) | 1355 | |
| Legal, LLC filing, office, & advertising costs of running sole proprietarship or LLC | | |
| New Hampshire Business tax | | |
| **Annual pre-tax personal income as contractor** | **89414** | |
| **Based on same # vacation & holiday** | | |
| Medical insurance paid by NEXX (annual, family) | 8420 | 8420.80 |
| Dental  insurance paid by NEXX (annual, family) | 980 | |
| Short/Long term disabilitypaid by NEXX | 751 | |
| Life paid by NEXX | 236 | |
| SUI tax paid by NEXX | 675 | |
| FUTA tax paid by NEXX | 56 | |
| Workers Compensation Ins paid by NEXX | 930 | |
| 401K match at 50% assuming 5% contribution | 2235 | |
| Sum total of benefits paid by NEXX | 14283 | 21637.46 |
| **Equivalent base salary to contractor payments** | **75131** | |
| **Determined by subtracting off benefits** | | |
| | | |
| **Proposed base salary** | **77000** | |
| Bonus percent eligibility | 10% | |
| Liklihood of bonus in 2006 | 100% | |
| Estimated value of bonus | 7700 | |
| **Estimated 2006 remuneration** | **84700** | |
| Stock option grant for 2006 | 2000 | |
| Conservative estimate of value of stock option (approx $3-$1=$2) | 1 | |
| Value of stock options | 2000 | |
| **Estimated Total 2006 remuneration** | **86700** | |
| | | |
| **Amount by which Employee package exceeds contractor package** | **$11,569** | |
| **Amount by which Employee package exceeds contractor package (%)** | **15%** | |