UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JOSHUA DREXLER,                    )
                                   )
          Plaintiff,               )  CIVIL ACTION NO.
                                   )  13-cv-13009-DPW
     v.                            )
                                   )
TEL NEXX, INC., TOKYO ELECTRON     )
U.S. HODINGS, INC., TOKYO          )
ELECTRON AMERICA, INC., BARRY      )
MAYER, THOMAS WALSH, CHRISTINA     )
CHU, REZWAN LATEEF, and            )
five DOE Defendants,               )
                                   )
          Defendants.              )


MEMORANDUM AND ORDER
August 28, 2015

Joshua Drexler worked for Tel Nexx, Inc., first as an

independent contractor and later as a payroll employee,

authoring technical manuals that accompanied the electronic

goods manufactured by the defendants.

Mr. Drexler alleges that, in order to complete his assigned

tasks, he was required to work excessively long hours for which

he was not compensated.  He claims that by failing to pay

overtime compensation, the defendants violated state and federal

labor laws, including the Fair Labor Standards Act (FLSA).  He

also claims that the defendants breached his employment

contract, violated the Massachusetts "one day of rest" statute,

and misclassified him as an independent contractor.

The defendants have moved to dismiss all of the claims asserted against them.

## I. BACKGROUND

In his complaint, Mr. Drexler sets forth the facts as follows:

### A. The Parties

Tel Nexx[1] is a corporation that designs, builds, and installs machinery and equipment used in the fabrication of computer chips.  Tel Nexx sells and ships its products to customers located throughout the United States and the rest of the world.  Compl. ¶¶ 14, 16.  Mr. Drexler worked as a technical writer for Tel Nexx from August 2001 until April 11, 2013, when he was discharged.  Compl. ¶ 135, 139, 178, 280.

Thomas Walsh, Cristina Chu, and Rezwan Lateef are individuals who work for Tel Nexx and who were Mr. Drexler's supervisors there.  Mr. Walsh was the CEO.  Compl. ¶ 26.  Ms.

---

[1] For simplicity, throughout this memorandum, I will use the term "Tel Nexx" to refer collectively to the corporate defendants, which include Tel Nexx, Inc., and its related corporate entities, Tokyo Electron U.S. Holdings, Inc. and Tokyo Electron America, Inc.  The relationship among these entities is discussed further below.

Chu was the Strategic Business Development Director and was Mr. Drexler's immediate supervisor and manager.  Compl. ¶ 32.  Mr. Lateef was the Vice President and Manager of the Customer Operations Department of Tel Nexx; he supervised Mr. Drexler from August 19, 2011, until Mr. Drexler's discharge in April of 2013.  Compl. ¶¶ 43-45.

From May 1, 2012 through April 11, 2013, Barry Mayer was the CEO of the corporate parent of Tel Nexx, Inc.  Compl. ¶ 96.

**B.  *Mr. Drexler's Work for Tel Nexx***

Mr. Drexler possesses a Bachelors Degree in Economics and a Masters Degree in Business Administration.  He has no other degrees or credentials, including none in the areas of technical writing, technical illustration, engineering, electronics, robotics, law, or any related fields.  Compl. ¶ 114.  He did earn approximately two years of general science-related academic course credit nearly 40 years ago.  Compl. ¶ 116.

Prior to working for Tel Nexx, Mr. Drexler's experience included approximately fifteen years of industrial sales as well as wood carving, economic regulation, and experience as a merchant seaman and sheet metal worker.  Compl. ¶ 118.

Mr. Drexler's job at Tel Nexx involved drafting technical manuals.  Compl. ¶ 110.  Prior to his work at Tel Nexx, he had

never been engaged in technical writing.  His skills in the
field were gained entirely on the job and through experience.
Compl. ¶ 119.  Mr. Drexler analogizes his work as a technical
writer to that of a reporter.  He gathered information,
interviewed relevant subjects, and summarized and organized the
information that he learned as clearly, concisely, and logically
as possible.  Compl. ¶ 121.  Mr. Drexler was never given
discretion to choose his own scope of work, objectives, or
tasks.  He was instead assigned specific tasks, although some of
these, such as a complete new equipment manual, took many months
to deliver.  Mr. Drexler's progress was closely and regularly
monitored at all times.  Compl. ¶ 112.  His work was also
subjected to rigorous internal review.  His drafts were
circulated through review committees where they were redlined.
He then revised his drafts based on redlines and comments.
Compl. ¶ 122.  In this role, accuracy was the paramount
consideration.  Compl. ¶ 129.  According to Mr. Drexler, his
role was not to create, invent, or innovate.  Compl. ¶ 127.

The manuals drafted by Mr. Drexler were shipped to
customers in the same sets of shipping crates that carried Tel
Nexx's manufactured products.  The manuals were assigned
equipment numbers much the same as other Tel Nexx goods such as

electronics, computers, or other parts.  Compl. ¶ 143.  The manuals are referenced by name and part number, and are included in the bills of materials included in the shipment to Tel Nexx's customers.  Compl. ¶¶ 144, 145.

Between August 2001 and June 30, 2003, Mr. Drexler was employed episodically by Tel Nexx as a consultant or independent contractor without receiving employee benefits or standardized deductions.  Compl. ¶ 135.  This was consistent with the treatment of all other technical writers who were also classified as independent contractors and paid on that basis. Compl. ¶ 133.  On or around July 1, 2003, Mr. Drexler ceased working for any other employer and devoted his time exclusively to Tel Nexx.  From that time until December 31, 2005, Mr. Drexler performed work for Tel Nexx daily at a desk in the employer's headquarters and derived 100% of his income from Tel Nexx.  Compl. ¶¶ 139, 140.

From July 1, 2003, through December 2005, Mr. Drexler continued to be classified as an independent contractor; he was paid as such using an IRS Form 1099 and was not provided with health or other benefits.  Compl. ¶¶ 152, 153.

## C.   *Contract Discussions Between Tel Nexx and Mr. Drexler*

On November 18, 2005, Tel Nexx's CEO at the time, Dr.

Richard Post, sent Mr. Drexler an email entitled "Your

Employment."  The email stated in its entirety

> Josh, you are a consultant, but you are now working so
> much for Nexx that the state may consider you an
> employee.  I would like to discuss the situation with
> you to decide if you should convert or if you do
> enough work for others that you would be viewed by the
> state as a consultant.

Compl. ¶ 155.  At the time Dr. Post wrote this email, he, Mr.

Lateef and other Tel Nexx employees were aware that plaintiff

was working exclusively for Tel Nexx.  Mr. Post had observed Mr.

Drexler's daily attendance at his desk and could not have been

unaware that Mr. Drexler worked full-time for Tel Nexx.  Compl.

¶ 157.  Dr. Post's email spurred discussions between Tel Nexx

and Mr. Drexler aimed at changing Mr. Drexler's status from a

consultant to a full time Tel Nexx employee.  Compl. ¶ 161.  As

part of those discussions, Dr. Post offered Mr. Drexler a one-

time payment of $1,000 for "all your trouble."  When Mr. Drexler

asked what trouble Dr. Post was referring to, Dr. Post responded

"you know, working all that time without health insurance, that

sort of thing."  Compl. ¶ 162.

The employment discussions were memorialized in a

spreadsheet prepared by Dr. Post entitled "Comp for Josh.xls."

Compl. ¶ 163.  Among the terms included in the spreadsheet were

"Hours Worked Per Day On Average . . . 8;" "Available Working
Days Comparable to Nexx . . . 239;" "Bonus Percent Eligibility
. . . 10%;" and "Likelihood of Bonus in 2006 . . . 100%."
Compl. ¶ 165; Compl. Exs. 2-3.  The 239 working days were
arrived at based upon 5 work days per week for 52 weeks,
adjusted for vacation days and holidays.  Compl. ¶ 165.

Tel Nexx sent an offer letter to Mr. Drexler on December 8,
2005, which Mr. Drexler accepted.  Although consistent with the
spreadsheet "Comp for Josh.xls," the offer letter presents only
a subset of the terms referred to in the spreadsheet.  Compl.
¶ 171.  The December 8, 2005, offer letter explained that Tel
Nexx was offering Mr. Drexler a position of Senior Technical
Writer.[2]  The letter continued, "the starting bi-weekly salary
for this position is $2,961.54, which is equivalent to
$77,000.00 annually" and that Mr. Drexler would be "eligible for
a bonus for up to 10% of his base salary based on his
performance and company profit" subject to the Board of
Directors' approval.  Mr. Drexler would also be entitled to

_____

[2]  The defendants have provided an affidavit attaching the
December 8, 2005, offer letter.  Because this is a document
incorporated by reference in the Complaint, I may consider it
when evaluating defendants' motion to dismiss.  *See, e.g.*,
*Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993).

participate in a benefits package described in documents attached to the offer letter.  He was in fact paid bonuses dependent on the quantity and quality of his work from time to time during the period January 1, 2006, through his termination. Compl. ¶ 177.  The letter said nothing about average hours worked or number of working days per year.

In addition to producing technical manuals, Mr. Drexler engaged in other occasional duties for Tel Nexx, including production of preventative maintenance procedures, best known method procedures, and other similar procedures and explanations for Tel Nexx's products.  Compl. ¶ 192.  He also occasionally conducted classroom equipment training for Tel Nexx's customers and produced graphic materials for inclusion in Tel Nexx's marketing materials and presentations.  Compl. ¶ 193-94.

Mr. Drexler maintained a personal work journal beginning intermittently in February 2007 and becoming regular and daily in July of that year.  Compl. ¶ 195.  In his journal, Mr. Drexler listed the starting and ending time of his work day and a summary of the work performed for Tel Nexx on each day. Compl. ¶ 196.  This journal chronicled the fact that Mr. Drexler regularly worked late into the evenings and on weekends.  Compl. ¶¶ 204-08.  The journal also reflects the corrosive effect that

these long hours coupled with the sometimes contemptuous
attitude of Mr. Drexler's supervisors had on Mr. Drexler.  Compl.
¶ 206.  The deadlines set by his supervisors were absolute and
inflexible and necessitated that Mr. Drexler work large numbers
of overtime hours both on nights and weekends.  Compl. ¶ 206.
In the years 2010 through 2013, Mr. Drexler worked on numerous
holidays including on Christmas Day, New Years Day, Memorial
Day, the 4th of July, Labor Day, and Thanksgiving.  Compl.
¶ 211.

    Mr. Drexler worked averages of 63.5, 65, 74, and 69.5 hours
per week in 2010, 2011, 2012, and 2013 respectively.  During
those years, Mr. Drexler worked an average of 6.4 days per week.
Compl. ¶¶ 167, 168.  Based upon records that he kept of his
time, he has computed that he worked 3,859 hours in excess of 40
hours per week in the period from October 24, 2010, until his
discharge on April 11, 2013.  Compl. ¶ 317.

    Although he was paid bonuses, Mr. Drexler was not paid any
additional compensation for the sizable amounts of time above 40
hours per week that he worked for Tel Nexx.  Compl. ¶¶ 178, 181,
191.

### D. Reprimands and Events Leading to Mr. Drexler's Termination

On June 30, 2012, in a disciplinary notice threatening Mr. Drexler with termination, Mr. Drexler's supervisor, Director Chu, wrote:

> Josh has had difficulties since he started working for me in September 2011 with setting priorities for his daily tasks, meeting deadlines and managing his workload. At first, I believed that this problem may have been due to the fact that his role broadened to include the production of many collateral materials beyond manuals and that after a few months of transition we would surpass the inefficiency, but this has not occurred.

Compl. ¶ 214. On February 24, 2012, Mr. Drexler was reprimanded by Ms. Chu for his performance of discretionary weekend work which Mr. Drexler believed to be required in Tel Nexx's best interest. Ms. Chu threatened Mr. Drexler with immediate termination, disciplined him and placed him on a performance improvement plan. Compl. ¶ 222. Over the next fourteen months, Mr. Drexler was reprimanded by Ms. Chu three more times at roughly four to five month intervals. These reprimands included one instance on April 9, 2013, when Mr. Drexler requested an instruction from Ms. Chu on whether or not to sign an invoice to pay a vendor. Compl. ¶ 223. This incident stemmed in part from an earlier instance when Mr. Drexler had been asked to sign an invoice, but had been informed by Tel Nexx's CFO that he lacked

proper authority to do so.  Compl. ¶¶ 224-26.

On November 13, 2012, Mr. Drexler met with Mr. Lateef.  At the time of that meeting, Mr. Drexler had worked 173 days in a row.  Compl. ¶¶ 228-29.  He expressed his frustration at being pressured to take on additional tasks by Ms. Chu including tasks for which he had not been hired and which he felt fell outside of his job role.  During the meeting, Mr. Drexler suggested that Tel Nexx either acknowledge that Mr. Drexler had taken on an expanded role and relieve him of some of his constantly expanding obligations, or else Mr. Drexler should be permitted to perform only the technical writing and illustrating duties for which he had been hired and which he understood to underlay his contract of employment.  Compl. ¶ 229.  Mr. Drexler expressed these same views on April 9, 2013, in a meeting with Mr. Lateef and Ms. Chu.  Compl. ¶ 230.

During these meetings, Mr. Lateef expressed his disappointment that Mr. Drexler declined to perform new managerial functions in addition to his previous regular duties. Compl. ¶ 231.  On November 19, 2012, Mr. Drexler provided a letter to Mr. Lateef.  In that letter, Mr. Drexler expressed his concern with his classification as an exempt worker under provisions of the FLSA.  Compl. ¶¶ 233-34. In his letter, Mr.

Drexler expressed his belief that he was "misclassified as exempt labor under the provisions" of the FLSA and related regulations and requested that he be reclassified as a non-exempt laborer "subject to payment of overtime for all work beyond 40 hours in each workweek and [he] should be paid for all of [his] hours of work." Compl. ¶ 236.

On November 21, 2012, two days after Mr. Drexler submitted his letter, he attended a previously scheduled semi-annual interview with his supervisor, Ms. Chu, who was accompanied at the meeting by a representative of Tel Nexx's Corporate Benefits and Compensation department, Marie Graichen. Compl. ¶ 240. During this meeting, Mr. Drexler asked whether there would be any response to his November 21, 2012, letter. Ms. Graichen told Mr. Drexler that she had considered the matter and determined that Mr. Drexler was correctly classified as an exempt worker. Compl. ¶ 241. During that same meeting, Mr. Drexler stated that he was unable to meet the deadlines imposed on him by working only normal work hours and asked for a definition of normal work hours, a request which was turned aside. That same evening, Mr. Drexler emailed Ms. Graichen asking for a classification of the term "normal working hours." Mr. Drexler never received a reply to this email. Compl. ¶¶

241-243.  A sign posted on the outside of Tel Nexx's headquarter's building, near to the rear employee entrance reads "Normal Working Hours 8:00 AM - 12 Noon" and "12:30 PM to 5:30 PM." Compl. ¶ 244.

On December 17, 2012, Mr. Drexler attended a teleconference with representatives of Corporate Benefits and Human Resources at Tel Nexx.  Compl. ¶ 259.  During that meeting, a Corporate Benefits Manager, Mr. Gibson, told Mr. Drexler that he had "determined that [Drexler] was properly classified as exempt" and that the topic was "not open for discussion or debate." Compl. ¶ 260.  Mr. Gibson also stated that there would be no retaliation against Mr. Drexler for filing his letter of complaint.  Mr. Gibson provided no explanation to Mr. Drexler for the basis for his determination that Mr. Drexler was an exempt employee, nor did he explain what exemption category Mr. Drexler fell within.  Mr. Gibson did not ask Mr. Drexler why he (Mr. Drexler) believed there may have been violations of federal or state wage or fair labor standards.  During that meeting, Mr. Gibson also did not address a waiver of privacy rights form that Mr. Drexler had been asked, but refused, to sign up until that date.  Compl. ¶¶ 262-67.

From approximately December 17, 2012, onwards, Ms. Chu delegated management of Mr. Drexler to Mr. Jeff Stoddard, a manager in the Technical Writing group.  Compl. ¶ 246.  Under Mr. Stoddard, the management of Mr. Drexler's work became rigidly prescriptive.  Any discretion or independent judgment was discouraged and subject to reprimand.  Compl. ¶ 247.  On February 12, 2013, acting on the basis of one of Mr. Stoddard's reprimands of Mr. Drexler, Ms. Chu issued a disciplinary warning to Mr. Drexler.  Compl. ¶ 249.  The source of Mr. Stoddard's reprimand was a minor revision made by Mr. Drexler to a proposed cover for a new equipment manual that was submitted to Mr. Stoddard for his approval.  Mr. Drexler had undertaken this change based upon his own initiative and exercising his independent judgment.  Compl. ¶ 250.

On April 11, 2013 — two days after being reprimanded by Mr. Chu for his inquiry about his authority to sign an invoice — Mr. Drexler was terminated in a meeting attended by Ms. Chu, Mr. Lateef and Ms. Graichen.  Ms. Graichen stated that Mr. Drexler had been fired by Ms. Chu.  Compl. ¶ 280.  At the termination meeting, Mr. Drexler demanded that a litigation hold be placed on all files and electronically stored information about him held within defendants' files, including computer files and

14

email stored dating back to 2002.  Compl. ¶ 284. Mr. Drexler
also demanded payment of his back wages and fringe benefits for
the period when he believed that he should have been classified
as a full time employee, but instead was classified as an
independent contractor.  Compl. ¶ 286.

Mr. Drexler did not receive any unpaid back wages.  Compl.
¶ 286.  On April 15, 2013, Mr. Drexler wrote to Thomas Mungovan,
Tel Nexx's CFO, inquiring about the held back payment of stock
options that Mr. Drexler had owned but were liquidated as part
of a corporate merger and acquisition that occurred in May 2012.
Compl. ¶ 287.  Mr. Drexler believed that the final 10% payment
of his stock options was to be held back for one year.  The
scheduled due date for his final hold back payment was May 1,
2013, only 21 days after the date of Mr. Drexler's termination.
Compl. ¶ 288.  On May 6, 2013, Mr. Drexler received a letter
from Tel Nexx's Human Resources Vice President Vicky Lee in which
Ms. Lee informed Mr. Drexler that he had no right to receive a
final hold back payment for his stock options.  Compl. ¶ 289-90.

**E.    *The Merger and Acquisition of Tel Nexx***

Mr. Drexler develops his complaint with a brief description
of corporate level transactions involving his employer.  Mr.
Drexler was initially employed as an independent contractor by

15

Nexx Systems, Inc.  On or about May 1, 2012, Nexx was acquired by an American subsidiary corporation of Tokyo Electron Group, and was thereinafter referred to as Tel Nexx, Inc.  Compl. ¶¶ 16, 21.

The sale price of Nexx Systems was $169.7 million, which is equal to approximately twenty times its profits for the previous year.  Compl. ¶ 39.  Mr. Drexler suggests that this provides a motive for the corporation generally, and particularly for Mr. Walsh whose compensation was linked to Nexx's sale price, to have reduced employee compensation and thereby inflated the corporation's profits at the time of the sale.  Compl. ¶¶ 39-42.

## II. PROCEDURAL BACKGROUND

Mr. Drexler first filed his complaint with the Massachusetts Superior Court on October 28, 2013.  On November 25, 2013, the defendants removed this matter to federal court pursuant to federal question jurisdiction, 28 U.S.C § 1331, and filed a motion to dismiss on December 2, 2013.

On December 24, 2013, Mr. Drexler, who is appearing *pro se*, filed an opposition to the removal of this case to federal court and a motion for remand, and on January 13, 2014, he filed six briefs in opposition to the motion to dismiss, two affidavits, and a memorandum of disputed facts.  Included in these filings

16

were various averments to facts that had not been pled in the complaint.

In response, the defendants filed a motion to strike the multiplicitous filings, which I denied, and a reply in support of their motion to dismiss.

Mr. Drexler responded by filing a motion to convert the motion to dismiss to one for summary judgment, a motion for leave to file a sur-reply, and a motion to stay discovery, among other miscellaneous requests.

On April 3, 2014, I held a scheduling conference to discuss the orderly management and resolution of this matter.  During that hearing, I granted the plaintiff's motion to stay discovery and then discussed the resolution of the pending motion to dismiss:

> Well, I guess the way I will deal with it this way,
> Mr. Drexler, is this: That if you want to make
> additional allegations that are not currently in the
> pleading, I will permit you to file within 20 days
> supplemental pleadings, we call it, or supplemental
> allegations, and then the defendant can respond to
> those supplemental allegations. I do not want to get
> into the process of second amended complaint and stuff
> like that. So that if there are allegations that you
> think you must make here, then you will do that. You
> have seen what they say is the problem, and they will
> get to respond to it. And then I will deal with the
> case as stated in your original complaint and any
> supplemental allegations for purposes of the Motion to
> Dismiss.

> So, what happens is, they get to see any supplemental
> allegations you make, and they can have a supplemental
> Motion to Dismiss or supplement to the Motion to
> Dismiss, if that is what you want to do.

Hearing Transcript at 11:7-23, No. 13-cv-13009 (D. Mass. April 3, 2014).

Mr. Drexler elected not to file a supplemental pleading including allegations beyond those pled in his original complaint and instead filed a sur-reply addressing defendants' legal arguments. Accordingly, consistent with my statements, in evaluating a motion to dismiss (which — to clarify in response to the defendants' expressed concerns — I will treat as a motion to dismiss rather than one for summary judgment), I will consider only those facts properly alleged in the plaintiff's original complaint. In treating the matter in this way, however, I note my belief that consideration of any of the additional factual matters asserted in various of the plaintiff's non-pleading submissions would not alter the conclusions set forth below.

### III. STANDARD OF REVIEW

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678

(2009) (citation and internal quotation marks omitted).
Dismissal for failure to state a claim is appropriate when the
pleadings fail to set forth "factual allegations, either direct
or inferential, respecting each material element necessary to
sustain recovery under some actionable legal theory." *Berner* v.
*Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley* v.
*Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (internal
quotation marks omitted)).  "[W]here the well-pleaded facts do
not permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged — but it has not 'show[n]'
— 'that the pleader is entitled to relief.'" *Maldonado* v.
*Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Iqbal*, 556
U.S. at 679).

## IV. ANALYSIS

Based upon the facts described above, Mr. Drexler asserts
five separate claims against the defendants.

He asserts in Count I a claim for unpaid overtime wages,
claiming that he was improperly classified by the defendants as
an exempt worker for purposes of the Federal Labor Standards Act
(FLSA), 29 U.S.C. § 201 *et seq.*, and the Massachusetts Wage Act,
Mass. Gen. Laws c. 149, § 148.

In Count II, Mr. Drexler seeks either liquidated damages
pursuant to 29 U.S.C. § 260 in an amount equal to his unpaid
overtime wages or, alternatively, trebling of his unpaid wages
pursuant to Massachusetts General Laws Chapter 149, § 150 for
all wages owed retrospectively within three years of the filing
of his complaint.

In Count III, the plaintiff asserts a breach of his
contract of employment with Tel Nexx.  As he explains, he
understood his contract of employment to call for an average
work day of eight hours and a work week of five days for an
average performance of forty hours per week.  Rather than
working forty hours per week, plaintiff was required to work an
average of sixty-four to seventy-four hours per week during the
time period of 2004 to 2013 to meet his deadlines and complete
his assigned tasks, often working more than six days per week.
This additional work, which went beyond that required by his
contract, was not compensated by Tel Nexx.

Mr. Drexler asserts in Count IV a violation of the
Massachusetts Civil Rights Act, Mass. Gen. Laws c. 12, § 11H&I,
explaining that Ms. Chu knowingly and by means of economic
coercion deprived Mr. Drexler of his right to enjoy one day of
rest in every seven days, a right guaranteed to Mr. Drexler by

Massachusetts law, Mass. Gen. Laws c. 149 § 48.  Rather than enjoying one day of rest per week, Mr. Drexler worked more than 180 consecutive days.

Finally, in Count V, Mr. Drexler asserts a claim against Tel Nexx for its failure to pay unpaid wages promptly at the time of his discharge pursuant to Massachusetts General Law Chapter 149, § 148.

## A.    Did Tel Nexx Improperly Classify Mr. Drexler as an "Exempt Worker" Under the FLSA?

The FLSA requires employers to pay overtime compensation at one and one-half an employee's regular salary rate for any work in excess of forty hours in any week.  29 U.S.C. § 207.[3]  This

---

[3] The Massachusetts statute governing overtime pay mirrors the FLSA. It states, in relevant part, that "[e]xcept as otherwise provided in this section, no employer in the commonwealth shall employ any of his employees in an occupation . . . for a work week longer than forty hours, unless such employee receives compensation for his employment . . . in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed." Mass. Gen. Laws c. 151, § 1A.  The statute also provides for an exception where an employee is employed "as a bona fide executive, or administrative or professional person ... earning more than eighty dollars per week." *Id.* § 1A(3).  The "basic overtime provision of the Massachusetts statute is essentially identical to the [Fair Labor Standards Act]." *Valerio* v. *Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999); accord *McLaughlin* v. *Liberty Mut. Ins. Co.*, 224 F.R.D. 295, 296 (D. Mass. 2004); *Swift* v. *AutoZone, Inc.*, 806 N.E.2d 95, 98 (Mass. 2004) ("[T]he overtime provisions under State law were intended to be 'essentially identical' to Federal law . . . . .") (citing *Valerio*, 173 F.3d at 40).  The

21

general rule, however, is subject to exceptions, and does not
apply to "any employee employed in a bona fide executive,
administrative, or professional capacity."  29 U.S.C.
§ 213(a)(1).  "Because of the remedial nature of the statute,
the Supreme Court has emphasized that the exemptions should be
'narrowly construed' and 'limited to those establishments
plainly and unmistakably within their terms and spirit.'"  *Hines*
v. *State Room, Inc.*, 665 F.3d 235, 242 (1st Cir. 2011) (quoting
*Arnold* v. *Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).  The
FLSA places the burden of establishing the applicability of an
exemption on the employer.  *Id.* at 240.

The Defendants claim two of these exceptions, those for
"professional" and "administrative" employees, apply here.[4]

The "professional" exemption applies to:

> any employee . . . (1) [c]ompensated on a salary or
> fee basis at a rate of not less than $455 per week . .
> . and (2) [w]hose primary duty is the performance of
> work: (i) Requiring knowledge of an advanced type in a
> field of science or learning customarily acquired by a
> prolonged course of specialized intellectual
> instruction; or (ii) Requiring invention, imagination,

---

resolution of Mr. Drexler's FLSA claim is equally applicable to
his Massachusetts statutory claim.

[4] In response to facts contained in Mr. Drexler's responsive
materials, the defendants have also suggested that the
"artistic" exemption may also be applicable.  I discuss this
briefly below.

originality or talent in a recognized field of
artistic or creative endeavor.

29 C.F.R. § 541.300.

To qualify for the learned professional exemption, an
employee's primary duty must be the performance of work
requiring advanced knowledge in a field of science or
learning customarily acquired by a prolonged course of
specialized intellectual instruction. This primary
duty test includes three elements: (1) The employee
must perform work requiring advanced knowledge; (2)
The advanced knowledge must be in a field of science
or learning; and (3) The advanced knowledge must be
customarily acquired by a prolonged course of
specialized intellectual instruction.

*Id.* § 541.301.

The Department of Labor's FLSA regulations establish a

three-prong test for determining whether an employee qualifies

under the administrative exemption:

The term "employee employed in a bona fide
administrative capacity" in section 13(a)(1) of the
Act shall mean any employee: (1) Compensated on a
salary or fee basis at a rate of not less than $455
per week . . . exclusive of board, lodging or other
facilities; (2) Whose primary duty is the performance
of office or non-manual work directly related to the
management or general business operations of the
employer or the employer's customers; and (3) Whose
primary duty includes the exercise of discretion and
independent judgment with respect to matters of
significance.

29 C.F.R. § 541.200(a).

I have found, or been directed by the parties to, four

federal court decisions addressing whether "technical writers"

are exempt from the FLSA's overtime compensation requirements.

Each of the four decisions involve close factual analysis of whether an exemption applies.

In *Rothstein* v. *Cannon & Sullivan Tech. Publisher*, 13 Wage & Hour 389, 1957 U.S. Dist. LEXIS 4785 (S.D. Cal. June 21, 1957) the court held a trial to determine whether the plaintiff, employed as a "technical writer," either fell within the professional exemption or else was owed overtime compensation under the FLSA.  In its findings of fact, the court described the plaintiff's job as requiring him to "to take a blueprint, drawing or design, and from it prepare and write a technical handbook or manual dealing with the particular article represented in the drawing."  *Id.* at *2.  In performing this task, the plaintiff was to use his "best judgment and discretion . . . but he was required to follow certain specifications and other criteria . . . He had available for his use other handbooks which he used as a guide or a pattern; there was also available for plaintiff's use various text books in defendant's technical library, which books contained basic information on mathematics, engineering and the like."  *Id.* at *3.  The court concluded that:

> The type of work performed by a technical writer is
> predominantly intellectual and creative, rather than
> routine; it requires the exercise of discretion or
> judgment in its performance, and being creative and

24

> predominantly intellectual in character, cannot be
> standardized in relation to a given period of time.
> Writing a technical handbook or manual involves the
> translation of certain scientific or engineering data
> into instructional form.

*Id.* Based upon its factual findings, the court concluded that
the plaintiff was a professional employee exempted from the
overtime provisions of the FLSA.

Similarly, in *Renfro* v. *Indiana Michigan Power Co.*, 497
F.3d 573 (6th Cir. 2007), the Sixth Circuit reviewed a grant of
summary judgment to the plaintiffs on their FLSA claims, and
considered whether those plaintiffs, who were employed by the
defendant as technical writers tasked with developing written
procedures on how to maintain power plant equipment, fell within
the "administrative" exemption.  To make this determination, the
court engaged in a lengthy and detailed analysis of the tasks
performed by the writers.  The court explained that the
technical writers in that case first "consult[ed] numerous
sources . . . to determine how to maintain a particular piece of
equipment . . . When confronted with a novel maintenance
obstacle, a writer determines how best to remove that obstacle
and memorializes her proposed solution into a draft procedure
. . . ."  *Id.* at 575.  Next, "[t]he writer . . . writes a
procedure incorporating her solution and has wide latitude to

25

determine how to do so." *Id.* The writers "work without direct supervision." *Id.* Although the writers are provided a manual for writing procedures, "[t]he manual does not . . . restrict a technical writer's discretion to determine the level of detail a procedure needs." *Id.*

The court applied these facts to the question "whether the technical writers' primary duty — writing procedures — requires that they exercise sufficient discretion and independent judgment to exempt them from the FLSA's overtime requirements." *Id.* at 576-77. The court found the technical writers exempt:

> They do not work under constant supervision and, when preparing a procedure, select the best method to maintain the plant's equipment. Their job requires them to create a clear and understandable set of highly technical instructions for maintaining the electrical and mechanical systems of a particular piece of equipment. Looking to various source materials for some of the technical information and using a computer to aid research and recommendations does not detract from the import of the discretion and independent judgment exercised. Channeling discretion through a manual on procedure writing does not eliminate the existence of that discretion . . . Neither the technical writers' manual nor the daily realities of their work environment eliminates their use of considerable discretion or independent judgment.

*Id.* at 577.[5]

_____

[5] The analysis in *Renfro* focused largely on the degree of

In *Bohn* v. *Park City Group, Inc.*, 94 F.3d 1457 (10th Cir. 1996), the Tenth Circuit reached a different conclusion and reversed the grant of summary judgment in favor of the defendant employer on the issue of whether the plaintiff, a technical writer, was an exempt employee, as either a "skilled worker in the computer software field" or under the "artistic professional exemption." In *Bohn*, the court explained that there simply was insufficient information in the evidentiary record to conclude that the requirements of the professional exemption were met:

> We believe that under the regulations a computer professional could certainly include some kinds of documentation or technical writing work. Defendants provided evidence that documenters at Park City Group worked without close supervision and that their work involves consistent exercise of discretion and judgment. But based on the record before us we cannot agree that defendants met their burden to show that no issues of material fact remained on this question.

*Id.* at 1464.

---

discretion involved in the writer's task. A different characteristic of the work in *Renfro* that may distinguish it from Mr. Drexler's work is that the writers in *Renfro* wrote manuals about the internal operations of the power plant itself, whereas Mr. Drexler wrote manuals for consumer products that were produced by Tel Nexx. Although this feature was not discussed in *Renfro*, I note that Mr. Drexler's manuals seem further removed from "management" or "general business operations" of Tel Nexx or Tel Nexx clients, as required for the administrative exemption. *See* 29 CFR § 541.201.

Finally, in *Houk* v. *SEI Technical Services Co.,* 657 F.Supp. 1014 (W.D.N.C. 1987), the plaintiff, a "technical editor," asserted claims under the FLSA for failure to pay overtime.  The defendants argued that the plaintiff was exempt as a "professional" employee.  The claims were permitted to go to the jury for fact-finding on whether the plaintiff was a professional employee.  The jury found that the plaintiff was not "salaried," as necessary to satisfy the first prong of the tripartite test for a professional exemption.  Accordingly, the jury did not reach what would have been the subsequent question — whether the plaintiff otherwise qualified for the "professional" exemption.  *Id.* at 1015.

In the pleading before me, Mr. Drexler has provided some level of factual detail regarding the tasks that he performed for Tel Nexx; the defendants' position is that this factual detail is sufficient to carry their burden of proving the applicability of an exemption.  They point to those facts that suggest that Mr. Drexler exercised independent discretion and judgment, such as the fact that he "observed, gathered information, interviewed subjects, summarized what he learned, organized the information as clearly, concisely and logically as he could."  Compl. ¶ 120.  They also contend that the work of

28

writing manuals is intellectually challenging and requires creativity.

Mr. Drexler points to allegations that suggest the opposite — that his work was more functionary, e.g., his allegations that the "objectives, priorities and focus of Plaintiff's work, along with decisions about emphasis, were all determined by others" and that he "was not employed to create works of imagination, originality, or personal expression." Compl. ¶¶ 124, 129. He suggests therefore, with some force, that his role is akin to that of the staff reporters determined to be non-exempt in *Reich* v. *Newspapers of New England, Inc.*, 44 F.3d 1060, 1075 (1st Cir. 1995) (finding non-exempt the majority of reporters whose work "depends primarily on intelligence, diligence, and accuracy" rather than "invention, imagination, or talent").

The parties dispute what legal consequence for purposes of the professional exemption should be derived from Mr. Drexler's training. The professional exemption applies to work involving knowledge "customarily acquired by a prolonged course of specialized intellectual instruction."

> [T]he word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge

29

> through a combination of work experience and
> intellectual instruction . . . The learned
> professional exemption also does not apply to
> occupations in which most employees have acquired
> their skill by experience rather than by advanced
> specialized intellectual instruction.

29 C.F.R. § 541.301(d).  Here, Mr. Drexler possesses

advanced degrees, but not in the fields most relevant to

his position.  This fact, though not dispositive, suggests

that he falls outside of the exemption.  While the proper

inquiry is whether the position requires the sort of

knowledge typically acquired while obtaining an advanced

degree and not whether the plaintiff actually possesses an

advanced degree, there is nothing in the record to suggest

that specialized knowledge — as opposed to general

knowledge and generalized experience — are required for the

performance of Mr. Drexler's job.  Mr. Drexler alleges that

the chief skills involved are those of observation and

organization, though these skills are applied to technical

materials.

The parties also dispute the degree of autonomy and

discretion that Mr. Drexler had for purposes of the

administrative exemption.  Discretion and independent judgment

require more than "applying well-established techniques,

procedures or specific standards described in manuals or other

sources ... [or] recording or tabulating data, or performing
other mechanical, repetitive, recurrent or routine work." 29
C.F.R. § 541.202(e).  In his allegations, Mr. Drexler suggests
that his work is rote and unimaginative, that he is simply a
functionary performing tasks at the direction of his
supervisors.  The defendants characterize his work as requiring
independent analysis and judgment.  Similarly, to fall within
the administrative exemption, an employee must exercise judgment
with respect to "matters of significance."  There is nothing in
Mr. Drexler's allegations which suggest any competent measure —
either qualitatively or quantitatively — of the significance of
the tasks he performed.

As the cases discussed above suggest, the title of
"technical writer" holds no talismanic importance in determining
whether to classify an employee as exempt or non-exempt.
Rather, in each case, some level of rigorous fact-finding —
either at the summary judgment stage or by trial — was required
to determine whether the employee fell within the professional
or administrative exemptions.  Notably, no court found it
appropriate to dismiss a technical writer's overtime claim upon a
motion to dismiss.

Here, the parties dispute the nature of Mr. Drexler's job. At this stage, Mr. Drexler's characterization of his job controls. Because the defendants bear the burden here, this disputed issue may not be resolved in their favor.[6]  The defendants have not carried their burden of demonstrating — at the motion to dismiss stage — that Mr. Drexler falls within any of the specified exemptions.

Mr. Drexler has alleged that he was employed by Tel Nexx and that he regularly worked more than forty hours per week, but that Tel Nexx did not pay him overtime compensation as it was required to do unless Mr. Drexler was an "exempt" employee under the FLSA.  Because Tel Nexx cannot show conclusively — at the motion to dismiss stage — that Mr. Drexler falls within any

---

[6] In his responsive briefing, Mr. Drexler has included factual statements relating to the photography work he performed as part of his job.  In response, the defendants suggest that this qualifies him for the exemption for "artistic or creative endeavors."  An employee is exempt if their "*primary duty* is the performance of work . . . requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor."  29 C.F.R. § 541.300(a)(ii).  The allegations taken as a whole, however, even when augmented by the references to photographical work, do not carry the defendant's burden to demonstrate that Mr. Drexler's "primary duties" involved artistic or creative endeavors.  *See also Bohn* v. *Park City Group, Inc.*, 94 F.3d 1457 (10th Cir. 1996) ("[W]e doubt plaintiff's duties as a technical writer/documenter could qualify for an artistic professional exemption.").

exemption, Mr. Drexler has adequately alleged a plausible claim for relief and so I will not dismiss Counts I and II.

**B.    *Does Mr. Drexler Adequately State a Claim for Breach of Contract?***

"Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show: 1) existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach." *Aspect Software, Inc.* v *Barnett*, 787 F. Supp. 2d 118, 127-28 (D. Mass. 2011) (citing *Coll* v. *PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995)).  "In order to create an enforceable contract, '[i]t is a necessary requirement that [the] agreement ... be sufficiently definite to enable the courts to give it an exact meaning.'"  *Id.* at 128 (alterations in original; citations omitted).

Mr. Drexler describes two documentary sources for his contractual rights.  The first is the spreadsheet prepared by Dr. Post entitled "Comp for Josh.xls."  Mr. Drexler has alleged that the terms of his employment were decided in negotiations taking place in November 2005 and memorialized in a spreadsheet. Among the terms included in the spreadsheet were "Hours Worked Per Day On Average . . . 8;" "Available Working Days Comparable to Nexx . . . 239;" "Bonus Percent Eligibility . . . 10%;" and

"Likelihood of Bonus in 2006 . . . 100%."  Mr. Drexler alleges
that this spreadsheet "sets forth an express employment
agreement in which the contract for base wages covers eight
hours of work per day (on average), five days per week, pegging
the contractual duration at 40 hours per week."  Compl. ¶ 166.
A review of the spreadsheet, however, makes clear that it lacks
both material terms and any language indicating mutual agreement
or obligation.  The spreadsheet, which is attached as an exhibit
to Mr. Drexler's complaint, instead appears simply to show a
comparison of Mr. Drexler's earnings as an independent contractor
against an estimated or proposed salary structure as an
employee.

Although some degree of uncertainty is not necessarily
fatal to an agreement, *see, e.g. Lafayette Place Ass.* v. *Boston
Redevelopment Authority*, 694 N.E.2d 820, 825–26 (Mass. 1998),
the parties must have "progressed beyond the stage of imperfect
negotiation."  *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 724
N.E.2d 699, 703 (Mass. 2000).  "It is axiomatic that to create
an enforceable contract, there must be agreement between the
parties on the material terms of that contract, and the parties
must have a present intention to be bound by that agreement."
*Id. See also Ross* v. *Raytheon*, 2001 WL 1455863 at *4 (Mass.

Super. Nov. 1, 2001) (the promise of an unspecified employment position on unspecified terms is "too indefinite and ambiguous to be enforceable as a matter of law"). As alleged, the spreadsheet described by Mr. Drexler does not constitute an agreement that is capable of being enforced. At best, the spreadsheet reflects an inchoate contractual discussion and terms of a potential agreement. This is insufficient to form the basis for a breach of contract claim. *See Mendel Kern, Inc. v. Workshop, Inc.*, 508 N.E.2d 853, 855 (1987) ("an intention to do something is not necessarily a promise to do it"); *Jones* v. *Consol. Rail Corp.*, 597 N.E.2d 1375, 1377 (Mass. App. Ct. 1992) ("[I]nchoate language, which both anticipates a final agreement and is imperfect in material respects, fails to bind the parties.").[7]

The second source of contractual obligation to which Mr. Drexler points is the December 8, 2005, offer letter from Tel Nexx, which Mr. Drexler signed. That document, however,

---

[7] In his memorandum, Mr. Drexler suggests that the agreement outlined in the spreadsheet was ratified by a handshake between Dr. Post and himself. Even if the spreadsheet was in some way ratified an agreement — under which Mr. Drexler would provide forty hours of work in exchange for a fixed salary — such an agreement does not address the crucial issue here: how or whether Mr. Drexler would be compensated for work in excess of forty hours per week.

35

provides no indication that the salary indicated, $77,000, represents compensation for only forty hours of work per week or that Mr. Drexler would be separately compensated for time worked beyond that benchmark.  The agreement simply provides that Mr. Drexler would be employed by Tel Nexx as a "Senior Technical Writer" and that Tel Nexx would pay Mr. Drexler a fixed amount and provide certain benefits.  Mr. Drexler has not alleged that Tel Nexx did not provide these benefits, rather he claims that Tel Nexx was obligated to provide more compensation than the contract requires.  However, that "more" is not provided for under the contractual terms set forth in the offer letter (or in the antecedent spreadsheet) and so Tel Nexx's failure to provide it is not a breach of its contractual obligations.

Mr. Drexler puts the situation thus: "Plaintiff's salary under his contract of employment expressly compensated him for only five days of work per week.  Work performed outside that limit was work not compensated by Plaintiff's contract of employment."  Compl. ¶ 370.  However, Mr. Drexler seeks to enforce a contractual term — a right to compensation for hours worked above and beyond forty hours per week — that is nowhere to be found in any of the contractual documents to which he points or to any other allegation in the complaint.

36

Regardless of whether Mr. Drexler's allegations state a claim under other theories — a possibility discussed above — the failure to provide compensation not called for by a contract does not constitute breach.

## C.   Does Mr. Drexler State a Claim For Relief For a Violation of The Massachusetts "One Day of Rest" Statute?

Mr. Drexler asserts that his supervisor, Ms. Chu, and Tel Nexx violated Massachusetts General Laws, Chapter 149, § 48,[8] which guarantees workers one day of rest in every seven days, and he seeks relief under the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws c. 12, §§ 11H, 11I.[9]   The "one day of

---

[8] The Massachusetts one day of rest statute provides:
> Every employer of labor engaged in carrying on any manufacturing, mechanical or mercantile establishment or workshop in the commonwealth shall allow every person, except those specified in section fifty, but including watchmen and employees maintaining fires, employed in such manufacturing, mechanical or mercantile establishment or workshop at least twenty-four consecutive hours of rest, which shall include an unbroken period comprising the hours between eight o'clock in the morning and five o'clock in the evening, in every seven consecutive days.

Mass. Gen. Laws Ch. 149, § 48.

[9] The relevant sections of the Massachusetts Civil Rights Act provide:
> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights

rest" statute is part of a broader regulatory scheme, which
provides in an earlier section that "[t]he attorney general
shall, except as otherwise specifically provided, enforce this
chapter." Mass. Gen. Laws c. 149 § 2. While some sections of
this chapter contain a specific grant of a private right of
action, there is no such grant for § 48. *Id.* at § 150. This
statute, therefore, does not provide for a private right of
action. *C.f. Salvas* v. *Wal-Mart Stores, Inc.*, 893 N.E.2d 1187,
1215-16 (Mass. 2008) (engaging in identical analysis in holding
that there is no private right of action for Mass. Gen. Laws c.
149, § 100).

---

secured by the constitution or laws of the United
States, or of rights secured by the constitution or
laws of the commonwealth, the attorney general may
bring a civil action for injunctive or other
appropriate equitable relief in order to protect the
peaceable exercise or enjoyment of the right or rights
secured.
Mass. Gen. Laws c. 12, § 11H.
Any person whose exercise or enjoyment of rights
secured by the constitution or laws of the United
States, or of rights secured by the constitution or
laws of the commonwealth, has been interfered with, or
attempted to be interfered with, as described in
section 11H, may institute and prosecute in his own
name and on his own behalf a civil action for
injunctive and other appropriate equitable relief as
provided for in said section, including the award of
compensatory money damages.
Mass. Gen. Laws c. 12, § 11I.

38

Nor can Mr. Drexler bootstrap this claim into a violation of the MCRA.  To prevail under the MCRA, a plaintiff must prove that "(1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation, or coercion.'" *Davis* v. *Rennie*, 264 F.3d 86, 111 (1st Cir. 2001) (quoting *Swanset Dev. Corp.* v. *City of Taunton*, 668 N.E.2d 333, 337 (Mass. 1996)).

Mr. Drexler has alleged that, in order to complete the tasks assigned to him by Ms. Chu, he was compelled to work twenty-five weeks without a break.  Mr. Drexler's allegations also suggest that this work was performed under threat of disciplinary sanction and potential termination.  The dispositive question for purposes of this motion to dismiss is whether the threat of disciplinary action or termination is sufficient to satisfy the third prong of the test described in *Swanset* and to sustain a claim under the MCRA.

In *Webster* v. *Motorola, Inc.*, 637 N.E.2d 203, 206 (Mass, 1994), the Massachusetts Supreme Judicial Court addressed whether threatening to terminate at-will employees who refused

39

to submit to urine drug testing was conduct actionable under the
MCRA.  The court explained that:

> The plaintiffs were employed "at will."  Thus, the
> defendants allegedly attempted to interfere with the
> plaintiffs' rights by threatening the loss of their
> "at-will" positions. This is not actionable conduct. No
> physical confrontation is alleged, and because the
> plaintiffs were employed "at will," they had no
> contract right to their positions.

*Id.*

Since *Webster*, a number of federal decisions have
recognized that threatening to fire an at-will employee cannot,
as a matter of law, constitute the sorts of "threats,
intimidation, or coercion" for which relief may be sought under
the MCRA.  *See, e.g.*, *Nolan* v. *CN8*, 656 F.3d 71, 77 (1st Cir.
2011) (" [T]he termination, or threatened termination, of at-
will employees is not coercive in the relevant sense under the
MCRA."); *Delmonte* v. *Laidlaw Environmental Services, Inc.*, 46 F.
Supp. 2d 89, (D. Mass. 1999) ("[R]egardless of the nature and
import of the implicated 'secured right,' an employer's threat of
the loss of at-will employment does not constitute interference
which is actionable under the MCRA . . . in essence, at-will
employees are not entitled to their employment, and therefore do
not, when threatened with its loss, reasonably suffer coercion
or intimidation."); *French* v. *United Parcel Service, Inc.*, 2 F.

Supp. 2d 128, 133 (D. Mass. 1998) ("As in *Webster*, the 'coercion' [plaintiff] complains of was the 'threat' of adverse employment action.  Following *Webster*, that is insufficient.").

Finally, nothing is altered in this analysis by the claims that he was subjected to economic coercion and that along with termination from his job, he would lose his economic livelihood, his insurance benefits, etc.  All of these are incidents of his continued employment and so no different than the threats found insufficient in *Webster* and its progeny.

As set forth in his offer letter, Mr. Drexler's employment with Tel Nexx was at will.  Threats to terminate him, as a matter of law, do not constitute "threats, intimidation, or coercion" under the MCRA.  Accordingly, Mr. Drexler has not alleged an actionable claim for relief under that statute.

**D.    *Is Mr. Drexler's Claim That Tel Nexx Misclassified Him as an Independent Contractor Time-Barred?***

Mr. Drexler claims that he was misclassified as an independent contractor and so denied employee benefits such as paid holidays and vacation time, medical, disability and life insurance, and the opportunity to receive bonuses and sick pay from July 1, 2003, through December 31, 2005.

The Massachusetts Wage Act requires that:

41

Every person having employees in his service shall pay
weekly or bi-weekly each such employee the wages
earned by him to within six days of the termination of
the pay period during which the wages were earned if
employed for five or six days in a calendar week, or
to within seven days of the termination of the
pay period during which the wages were earned if such
employee is employed seven days in a calendar
week . . . and any employee discharged from such
employment shall be paid in full on the day of his
discharge.

Mass. Gen. Laws, c. 149, § 148.

The statute of limitations for Wage Act claims is three

years.  *See* Mass. Gen. Laws, Ch. 149, § 150; *Stanton* v.

*Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 17 (D. Mass.

2009) (Under the Wage Act, a plaintiff must "bring suit within

three years of the alleged violation.").

The defendants assert that any alleged violation occurred

no later than December 2005 and that this suit, brought in 2013,

is time-barred.  Mr. Drexler asserts that the alleged violation

occurred upon Tel Nexx's failure to pay the wrongly withheld

benefits at the time of his discharge in 2013 and that the

statute of limitations only began to run at that later date.

In *Crocker* v. *Townsend Oil Co.*, 979 N.E. 2d 1077 (Mass.

2012), the Massachusetts Supreme Judicial Court addressed a

usefully analogous set of facts.  The plaintiffs in that case

were two truck drivers, who were hired by the defendant,

42

putatively as independent contractors, in 1999 and 2002
respectively.  *Id.* at 1080.  Both drivers' contracts were
terminated in early 2007.  *Id.*  The plaintiffs filed their
complaint over two years later in December 2009.  *Id.* at 1081.
The defendant moved for summary judgment, claiming that all or
part of their claims were time-barred.  *Id.*  The court addressed
the specific question "whether the plaintiffs' damages are
limited to those arising from [defendant's] tortious failure to
pay wages accruing within the three-year period immediately
prior to the filing of the complaint."  *Id.* at 1084.  The court
explained that "'pay claims . . . give rise to a cause of action
each time they occur and are easily identifiable,'" *id.* at 1085
(quoting *Silvestris* v. *Tantasqua Regional Sch. Dist.*, 847 N.E.2d
328, 339 (Mass. 2006)), making the "continuous violation" theory
inapplicable.  The court held that each failure to pay wages
owed under the Wage Act is a "discrete injury' and accordingly
concluded that "the plaintiffs' recovery is limited to those
damages that occurred within the three-year period prior to
filing the complaint."  *Id.*  This result is inconsistent with
Mr. Drexler's theory regarding the application of the statute of
limitations to his Wage Act claim.  Mr. Drexler contends, in
essence, that the misclassification claims accrue at the time of

43

termination (or at least that the statute of limitations is restarted then).  If applied to the facts of *Crocker*, however, that theory would have allowed the plaintiffs to seek compensation for all of their damages for their misclassification — which all would have accrued at the time of their termination.  Instead, the Supreme Judicial Court held that plaintiffs could recover only for those damages which occurred in the last three years — implicitly holding that the statute of limitations begins to run at each failure to pay wages and benefits, and not at the time of the employee's discharge.

Accordingly, Mr. Drexler's Wage Act claim in Count V relating to his misclassification as an independent contractor from 2003 until 2005 is time-barred.

**D.   *Has Mr. Drexler Adequately Pled the Doe Claims?***

Finally, the defendants seek dismissal of the claims against the "Doe" defendants, claiming that Mr. Drexler has failed to set forth sufficiently specific allegations to satisfy the requirements of *Iqbal* and *Twombly*.

On this they are correct.  The only allegation regarding the Doe defendants is that they are responsible "in some manner" for the occurrences alleged in the complaint.  Compl. ¶ 104.

This is simply insufficient to state a plausible claim to relief.

## V. CONCLUSION

For the reasons set forth more fully above, Defendants' Motion to Dismiss (Dkt. No. 7) is hereby GRANTED as to the named defendants as to Counts III, IV and V, and DENIED as to Counts I and II; it is FURTHER ORDERED all of the claims against the Doe Defendants are hereby DISMISSED.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

45