### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                                          )
JOSHUA DREXLER,                           )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )        Civil Action
                                          )        No. 13-13009-PBS
TEL NEXX, INC.; TOKYO ELECTRON U.S.       )
HOLDINGS, INC.; TOKYO ELECTRON AMERICA,   )
INC.; THOMAS WALSH; CHRISTINA CHU;        )
and REZWAN LATEEF,                        )
                                          )
                    Defendants.           )
_____)
```

### MEMORANDUM AND ORDER

July 20, 2017

Saris, C.J.

### INTRODUCTION

Pro se plaintiff Joshua Drexler sued his former employer, TEL NEXX, Inc. (TEN), subsidiary entities, and a number of current and former employees of the companies. The Court (Woodlock, J.) previously allowed in part and denied in part Defendants' motion to dismiss.[1] See Drexler v. TEL NEXX, Inc., 125 F. Supp. 3d 361, 379 (D. Mass. 2015). Currently pending are the parties' cross-motions for summary judgment (Docket Nos. 104, 110) on Drexler's unpaid overtime wage claims under the federal Fair Labor Standards Act (FLSA) and Massachusetts law.

---

[1] The case was reassigned on April 27, 2017. See Docket No. 129.

1

Because Drexler was an exempt employee under the administrative-employee exemption, the Court **ALLOWS** Defendants' Motion for Summary Judgment (Docket No. 104) and **DENIES** Plaintiff's Motion for Summary Judgment (Docket No. 110).

## FACTUAL BACKGROUND

When all reasonable inferences are drawn in the non-moving party's favor, the following facts are treated as undisputed except where stated.[2]

A.   The Parties

TEN manufactures complex, expensive semiconductor fabrication equipment for the production of chips used in smart phones and other products. TEN charges customers between $1.5 and $3.5 million for the equipment it produces. See Affidavit of Yoel Roznitsky, March 16, 2017 (Roznitsky Aff.), Docket No. 107, Ex. 2 at ¶ 8. In May 2012, Tokyo Electron U.S. Holdings, Inc. (TEH) acquired NEXX Systems, Inc. (NEXX). TEN is a wholly owned subsidiary of TEH. See Rule 30(b)(6) Deposition of Vickie Lee, Oct. 26, 2016 (Lee 30(b)(6) Dep.), Docket No. 107, Ex. 1, 6:25-8:7, 12:21-13:16, 16:5-10. Individual defendants Thomas Walsh,

---

[2]   In the weeks before the Court heard argument on the cross-motions for summary judgment, Defendants filed three motions to strike certain portions of Drexler's filings. Docket Nos. 135, 138, 149. The motions are **DENIED**. For purposes of ruling on the summary judgment motions, the Court considers the evidence in the record consistent with Fed. R. Civ. P. 56(c)-(e).

Christina Chu, and Rezwan Lateef were TEN employees during the relevant time period.[3]

Drexler attended the Massachusetts Institute of Technology, where he took courses in physics, math, chemistry, and English, but did not graduate. See Deposition of Joshua Drexler, March 2, 2016 (Drexler Dep.), Docket No. 107, Ex. 3, 10:19-22, 11:7-12. In the 1970s, Drexler earned an undergraduate degree in economics at the University of Wisconsin at Madison. Drexler Dep. 10:24-11:1. Drexler later earned a Master's in Business Administration at the University of New Hampshire. Drexler Dep. 11:2-6. Drexler held a number of jobs between graduating from the University of Wisconsin and starting to work for TEN's predecessor. His job immediately prior to working for TEN's predecessor was in "technical sales" at Alase, which involved informing customers about machine capability and drafting data sheets. Drexler Dep. 13:9-16:23, 20:2-21:1. To learn about the machine's capabilities, Drexler interviewed the inventor and conducted additional research. Drexler Dep. 21:3-8.

B.   Drexler's Technical Writing Job

Drexler first began working for TEN's predecessor in the late 1990s, when he was hired on a contract basis to draft a

_____

[3]   Barry Mayer, TEH's President, was originally named in the complaint. See Docket No. 1, Ex. 2. Mayer was dismissed with prejudice, by joint stipulation, on October 21, 2016. See Docket No. 88.

manual for a product that had already been shipped to a customer in Taiwan. Drexler Dep. 27:2-28:11. From the start of his contract work with TEN until he was hired full-time in 2005, Drexler performed technical writing duties. Drexler Dep. 31:14-17.

In January 2006, NEXX converted Drexler from his role as "senior technical writer consultant," an independent contractor position, to a full-time employee role in light of concerns raised by a human resources official that Drexler did not qualify as an independent contractor under Internal Revenue Service regulations. See Deposition of Donna Tinsley, Oct. 18, 2016 (Tinsley Dep.), Docket No. 107, Ex. 5, 8:9-10:15. As a result NEXX offered Drexler a position as a "payroll-enrolled employee," a position which he accepted. Tinsley Dep. 13:18-24. A NEXX employee determined that Drexler's role qualified as exempt under the FLSA. Tinsley Dep. 21:18-22:3; Lee 30(b)(6) Dep. 65:1-22. However, no contemporaneous written job description or determination of FLSA exemption status appears in the record. On December 8, 2005, NEXX sent Drexler an offer letter for a position of "Sr. Technical Writer." Deposition of Lori Vitale, Oct. 18, 2016 (Vitale Dep.), Docket No. 107, Ex. 6, at Ex. 1. The letter stated that Drexler's salary would be $77,000 annually, paid on a biweekly basis. Vitale Dep., at Ex. 1. According to a former NEXX human resources employee, offer

letters were based on templates, and those that used the term "salary" reflected an exempt position, while offer letters that used the term "hourly rate" reflected a non-exempt position. Vitale Dep. 11:20-12:6.

Drexler contends that he understood his compensation to be based on a spreadsheet sent to him in November 2005 by then-CEO Dr. Richard Post. Affidavit of Joshua Drexler, Apr. 10, 2017 (Drexler Aff.), Docket No. 128, ¶¶ 38-39. Drexler interpreted the spreadsheet as stating that he would work 40 hours per week on average. Drexler Aff. ¶ 38. When TEN acquired NEXX, in 2012, Drexler received a new offer letter (dated Apr. 9, 2012) stating that his annual salary would be $88,997.48, paid biweekly. See Letter from Kathy Garner to Joshua Drexler, Docket No. 107, Ex. 7. There is no evidence of a completed employment contract between Drexler and TEN in the record. Drexler never received additional compensation for working more than forty hours per week while he worked for NEXX or TEN, nor was he ever paid on an hourly basis. Drexler Dep. 111:14-24; 112:23-113:1. Drexler knew his salary covered 40 hours per week on average, maybe more or less depending on the week. Drexler Dep. 113:9-13. Payroll records for the claims period reflect that Drexler was paid a set biweekly salary regardless the number of hours he worked each week. See Docket No. 144 at 47-110; Vitale Dep. 21:5-18. Drexler kept a "contemporaneous record of [his] daily hours and

activities" beginning in 2007 and continuing until his termination. Drexler Dep. 100:6-9; Drexler Aff. ¶¶ 72-74; Docket No. 107, Ex. 10 ("Drexler Work Log"). The log captured Drexler's "major work" each day. Drexler Dep. 104:12-18.[4]

Throughout his employment for NEXX and TEN, Drexler performed technical writing duties. Drexler Dep. 31:14-32:1. Drexler estimated that seventy to eighty percent of his time at work was devoted to developing or revising technical manuals. Drexler Dep. 85:7-8. The technical manuals Drexler developed were "big collections of procedures, or . . . a smaller procedure for one particular thing." Drexler Dep. 32:3-10. Drexler created the manuals by "Observing the element to be documented, talking to [subject matter experts] about it," "[w]atching the element operate," "[p]ulling drawings," and "[d]eveloping scratch sheets of pre-made questions in order to facilitate [] interaction with busy [subject matter experts]." Drexler Dep. Errata, Docket No. 107, Ex. 3 at 96; Drexler Dep. 146:13-21. Drexler also sometimes conducted online or other research. Drexler Dep. 66:9-67:14. Drexler developed these methods when he worked as an independent contractor, and continued using them when NEXX hired him full-time, and

---

[4]    Drexler's Work Log is not hearsay for purposes of Defendants' motion for summary judgment. The journal constitutes statements of a party opponent. Fed. R. Evid. 801(d)(2)(A).

throughout his employment. Drexler Dep. 49:4-19, 69:5-70:5.
Drexler copied some portions of existing manuals. Beginning in
early 2012, defendant Chu, his supervisor, set limits on which
subject matter experts Drexler could confer with to develop
certain manuals. Drexler Dep. 88:11-22, 91:6-98:2; Drexler Aff.
¶¶ 16, 30. When TEN acquired NEXX, Drexler faced increased
pressure to conform his work to TEN's style guide. Drexler Aff.
¶¶ 23-24.

Drexler wrote manuals related to the maintenance and
operating procedures for TEN's semiconductor fabrication
equipment, including updating existing manuals to reflect
ongoing engineering improvements. Drexler Dep. 74:19-75:7, 83:2-
12. No equipment was shipped to a customer without a manual. TEN
also provided manuals in electronic form. Drexler Dep. 74:5-18.

Drexler also wrote safety procedures associated with the
operation and maintenance of the machines for which he wrote
technical manuals. Drexler Aff. ¶¶ 3, 19; see also Docket No.
107, Ex. 12 ("Stratus 300 Manual"), at 140-77. TEN's
semiconductor fabrication equipment and the associated manuals
are subject to government regulations (including those
promulgated by the Occupational Safety and Health Administration
(OSHA)) and industry standards (including those promulgated by
Semiconductor Equipment and Materials International (SEMI)). See
Roznitsky Aff. ¶¶ 3-5. Many of the regulations and standards

concern the safety of TEN's customers who use the equipment. Roznitsky Aff. ¶ 3. Drexler also wrote portions of manuals which described to users how to interact with the computer software associated with the equipment TEN produced. Drexler Dep. 70:6-72:14. Drexler understood that the purpose of the manuals was so customers could learn how to operate and maintain the equipment TEN sold. Drexler Dep. 233:20-24. Drexler visited NEXX customers in Maine, New York, Texas, and North Carolina, and observed copies of his manuals at those locations. Drexler Aff. ¶ 48.

As an example of how Drexler wrote maintenance procedures for a technical manual, he was

> "told to address the alignment of the Lanier drive in the Nimbus, and [he went] to the engineer, [he] look[ed] at [the Lanier Drive] when it was open . . . . These things were normally sealed up and kept at vacuum. And they were rarely opened to the atmosphere. But when they were [he]'d take [] pictures, [he]'d look at them, [he]'d talk to techs, [he]'d talk to engineers, and [he]'d [] work up a picture of how you go about aligning this particular mechanism. And then [he]'d write out a series of scratch questions in the form of the steps, sort of in a step order and pass that by someone who knew how to do it, and then [] they'd say, yay or nay, or 'here's the step that comes first' or 'change things around.' Then [he]'d write it up. Then it would be submitted back to the same people for redlines. [He]'d correct the redlines, and then it was pretty much done."

Drexler Dep. 75:10-76:6. Drexler's Work Log reflects his meetings with subject matter experts while Drexler was in the

8

process of drafting or updating technical manuals. See, e.g., Drexler Work Log entries dated Oct. 12, 2010; Oct. 18, 2010; Oct. 19, 2010; Feb. 13, 2011; May 31, 2012; Sept. 16, 2012. Drexler noted that his superiors did not understand the complexity of technical writing at TEN. Drexler Work Log entry dated Sept. 17, 2011 ("Non-practitioners don't understand that top-down command and control do not work for creating bottoms-up technical documentation. . . . Until you've actually tried to document something with literally hundreds or thousands of separate details all revolving around each other and interacting with each other you just can't imagine what a mental effort it takes. But one clue might be neither the hardware nor the software engineering team willingly produces its own technical documentation.").

C. Supervision

The level of oversight Chu and others provided (or forced upon) Drexler is in dispute. Drexler stated that, at least until a February 2012 incident described below, he spent a "de minimis" amount of time working directly with Chu, despite his perception that she complained of having to "devote large amounts of her time to working with" Drexler. Drexler Dep. 85:14-21. The record reflects that Drexler received emails from Chu and others on nights and weekends. Drexler Aff. ¶ 78. Chu set numerous deadlines and tasks for Drexler. Drexler Aff.

¶¶ 79-80. However, nothing in the record reflects direct and persistent supervision, to the extent of limiting Drexler's freedom to develop the substance of the technical manuals during his first six years of full-time employment at TEN.

In February 2012, Chu reprimanded Drexler for instructing a coworker to send a customer an unapproved version of an older technical manual, which Drexler had updated to meet the needs of the customer's customized machine. Drexler Dep. 91:19-94:17. Following that incident, Drexler stated that Chu curtailed his ability to approach subject matter experts directly in a "light and informal" manner and that he should go through her to set up meetings with engineers. Drexler Dep. 94:19-95:15. Drexler testified at his deposition that Chu's limitation on his access to subject matter experts after the February 2012 incident was the first time he felt Chu impeded his independent discretion. Drexler Dep. 96:12-17. Drexler does not point to specific evidence of his supervisors impeding his discretion prior to the February 2012 incident. Drexler's self-evaluation from December 2011 does not specify other limits on his access to subject matter experts. Deposition of Christina Chu, Oct. 19, 2016 (Chu Dep.), Docket No. 107, Ex. 13, at Ex. 3. Beginning in late 2012, Drexler perceived that Chu assigned Jeffrey Stoddard, a TEN technical writer in Texas, to oversee Drexler's work. Drexler Aff. ¶¶ 61-62; Drexler Dep. 96:19-97:4. Stoddard significantly

edited Drexler's work and insisted that he follow TEN's style manual. Drexler Aff. ¶ 63.

On November 19, 2012, Drexler handed defendant Lateef a letter titled "THIS IS A WAGES AND HOUR COMPLAINT." Drexler Aff. ¶ 101. On April 11, 2013, TEN terminated Drexler's employment. Drexler Aff. ¶ 2.

## DISCUSSION

### I.   Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the non-moving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. Quinones v. Houser Buick, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't

of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)). In its review of the evidence, the Court must examine the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Sands, 212 F.3d at 661. Ultimately, the Court is required to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (quotation marks omitted).

## II. The Question of Drexler's FLSA Status

Defendants argue that Drexler is not entitled to overtime wages because he is an exempt employee under the FLSA and parallel Massachusetts law exemptions. Defendants argue a number of individual exemptions apply to Drexler including the administrative exemption.[5] Defendants contend that Drexler was exempt under the administrative exemption because he was paid a sufficient amount to meet the salary test, he performed non-manual work related to the management and general business of the company and its customers, and as part of his primary duty he exercised discretion and independent judgment with respect to matters of significance. As to the learned-professional exemption, Defendants argue it applies because Drexler's primary

---

[5]     Defendants also argue that the learned-professional, creative-professional, and combination exemptions apply to Drexler. For the reasons stated, the Court need not reach those arguments and declines to do so.

duty required knowledge of an advanced type in a field of science customarily acquired by a prolonged course of specialized intellectual construction.

Drexler argues that he was not an exempt employee. First he argues that he was creating an end-product that was an integral part of the manufactured machines. That is, Drexler argues that he was essentially an assembly-line employee because his manuals were a necessary element of the machines that were eventually shipped to customers. In addition to his contention that his output was a product unrelated to the general business operations of TEN or its customers, Drexler argues that he lacked the necessary discretion and freedom to use independent judgment for the administrative exemption to apply to him.

The FLSA generally requires employers to pay overtime compensation at one and one-half an employee's "regular rate" for any work in excess of forty hours in any week. 29 U.S.C. § 207(a)(1) (2012). The Massachusetts statute governing overtime pay mirrors the FLSA. See Drexler, 125 F. Supp. 3d at 377 n.3 (citing Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 40 (1st Cir. 1999)). This general rule, however, is subject to exceptions, and does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1) (2012). "Because of the remedial nature of the statute, the Supreme Court has emphasized that the

exemptions should be 'narrowly construed' and 'limited to those establishments plainly and unmistakably within their terms and spirit.'" Hines v. State Room, Inc., 665 F.3d 235, 242 (1st Cir. 2011) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)). The FLSA places the burden on the employer to establish that an exemption applies. Id. at 240. Although exempt status will typically be a question of fact, where there is no dispute of the material facts governing the exemption analysis, summary judgment can be granted. See, e.g., Hines v. Longwood Events, Inc., No. 08-cv-11653, 2010 WL 2573194, at *10 (D. Mass. June 23, 2010), aff'd Hines, 665 F.3d at 236.

A.   Was Drexler Involved in Production?

As an initial matter, Drexler contends that he could not be an exempt employee because he produced the product TEN sold. The crux of this argument is that the technical manuals were a necessary part of TEN's semiconductor fabrication equipment, rendering Drexler's work essentially part of the assembly line. The undisputed record evidence supports Drexler's contention that manuals were shipped with equipment as a matter of course. Indeed, Drexler saw copies of manuals he created on trips to visit TEN customers in multiple states. Simply put, his argument is that because the manual was shipped in the box, he helped produce the product. Drexler argues that there is an "abundance

14

of evidence that manuals were an intrinsic part of [TEN's] product." Docket No. 150 at 14.

The fact that an employee develops something that is shipped in the same box as an employer's product is not dispositive. Since the relevant Department of Labor regulations were revised in 2004, the First Circuit rejected a rigid dichotomy between production and non-production employees and relied on the Department of Labor's regulations to determine the type of work performed by the employee. See Cash v. Cycle Craft Co., Inc., 508 F.3d 680, 684 (1st Cir. 2007) (citing 29 C.F.R. § 541.201(a)-(b)); see also Verkuilen v. MediaBank, LLC, 646 F.3d 979, 981 (7th Cir. 2011) ("Notice the gap: employees who don't perform work directly related to assisting with the running or servicing of the employer's or its customers' business are not necessarily employees who 'for example' work on an assembly line or work in a retail store as a salesperson.").

The post-2004 regulation makes clear that the proper analysis is more fine-grained than whether or not something the employee developed was included in the box that went to the customer:

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business

operations" refers to the type of work
performed by the employee. To meet this
requirement, an employee must perform work
directly related to assisting with the
running or servicing of the business, as
distinguished, for example, from working on
a manufacturing production line or selling a
product in a retail or service
establishment.

(b) Work directly related to management or
general business operations includes, but is
not limited to, work in functional areas
such as tax; finance; accounting; budgeting;
auditing; insurance; quality control;
purchasing; procurement; advertising;
marketing; research; safety and health;
personnel management; human resources;
employee benefits; labor relations; public
relations, government relations; computer
network, internet and database
administration; legal and regulatory
compliance; and similar activities. Some of
these activities may be performed by
employees who also would qualify for another
exemption.

29 C.F.R. § 541.201. Thus, the Court must engage in a

fact-bound inquiry.

B.   Does the Administrative Exemption Apply?

Because Drexler's production-dichotomy argument does not

end the matter, it is necessary to analyze whether his specific

duties meet any of the FLSA exemptions that Defendants proffer.

"[E]xempt status depends less on [] title, and more on the

actual duties performed." DiBlasi v. Liberty Mut. Grp. Inc., No.

Civ. 12-10967, 2014 WL 1331056, at *6 (D. Mass. Apr. 3, 2014)

(citation omitted).

The Department of Labor's regulations establish a three-prong test for determining whether an employee qualifies under the FLSA's administrative exemption:

> The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee: (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Employees who spend more than fifty percent of their time performing exempt work will generally satisfy the primary duty requirement. See Crowe v. Examworks, Inc., 136 F. Supp. 3d 16, 39 (D. Mass. 2015) (citing 29 C.F.R. § 541.700(b)).

First, Drexler does not dispute that he was paid a sufficient salary to meet the salary test, and he does not dispute that he spent between seventy and eighty percent of his working hours developing technical manuals, thus rendering that task his primary duty. Drexler does dispute whether, on the undisputed facts in the record, the second and third prongs of the administrative exemption apply to his position.

Turning to the second prong, on the undisputed facts in the record, the Court concludes that Drexler's "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). In particular Drexler's "work directly related to assisting with the running or servicing of the [customers'] business." 29 C.F.R. § 541.201(a). First, the undisputed evidence leads to the conclusion that Drexler performed non-manual work in an office setting, not on the production line. Drexler's work log is replete with entries regarding meetings, observations of equipment, developing graphics, and generally trying to understand how TEN's complex equipment worked and how to explain it to customers. Second, the technical manuals Drexler produced were directly related to the business operations of TEN's customers, as he saw when he visited the sites of many customers. Third, the regulations include within work directly related to management or general business operations "work in . . . safety and health; . . . legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). Drexler's work involved safety and regulatory compliance. It is undisputed that the manuals included sections to assist with safe operation of TEN's machines, see Stratus 300 Manual at 140–77, and the manuals were also developed to ensure regulatory

18

compliance. Fourth, the fact that Drexler visited customer sites also supports the exemption in this case. See Verkuilen, 646 F.3d at 982 (discussing exempt employee's interactions with customers, including visits to customers' premises).

With respect to the third prong, Drexler's discretion and independent judgment relating to these matters of significance, the undisputed facts show that--at least until February 2012--he had the imprimatur to go about the substantive elements of his manual writing as he saw fit. In this context, discretion and independent judgment require more than "applying well-established techniques, procedures or specific standards described in manuals or other sources . . . [or] recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e). The fact that Drexler was subject to supervision, that he was told which manuals and portions of manuals to write, and that his work product was reviewed and heavily edited does not defeat the conclusion that he exercised discretion and independent judgment with respect to significant matters like safety and regulatory compliance.

Even after Chu and Stoddard were conducting thorough and searching reviews of his work, the subject of the supervision was the pace of work and the style--not the substance. And the substance is critical here. Drexler was not writing a simple,

19

rote manual, say, for operating a toaster. He was not a copy editor on a manual written by another.[6] TEN's manuals could run more than five hundred pages long, see Stratus 300 Manual, and included highly complex and scientific materials, as well as materials that were customized for particular customer's business needs, see Drexler Dep. 92:2-24.

Drexler pushes back against this conclusion arguing that he was subject to strict and overbearing oversight by his manager, Christina Chu, and others who worked at TEN, including noting that his work product was always subject to review by the "change control board" and others. See Drexler Dep. 97:14–98:2. Even if Drexler's work product was subject to review throughout his employment, and even if supervision of his style and productivity increased from February 2012 to April 11, 2013, it is of no moment. As the regulations make clear, discretion regarding matters of significance can coexist with supervision.

> [E]mployees can exercise discretion and
> independent judgment even if their decisions
> or recommendations are reviewed at a higher
> level. Thus, the term 'discretion and
> independent judgment' does not require that
> the decisions made by an employee have a
> finality that goes with unlimited authority
> and a complete absence of review. . . . The

---

[6] Drexler's freedom to develop work product, and his personal responsibility for crafting words, graphics, and other means to describe equipment parts and processes distinguish Drexler from the copy editors in the Department of Labor, Wage and Hour Division's opinion letter, FLSA 2006-45, which Drexler urges the Court to follow.

> fact that an employee's decision may be
> subject to review and that upon occasion the
> decisions are revised or reversed after
> review does not mean that the employee is
> not exercising discretion and independent
> judgment.

29 C.F.R. § 541.202(c). Thus, although Drexler was subject to review, his work received significant edits, and he was chastised for going beyond the bounds of the corporate style guide, those facts do not render the administrative exemption inapplicable. Indeed, the undisputed record reflects that, even when Drexler was subject to more rigorous oversight from Chu and others, beginning in 2012, he still decided which questions to ask subject matter experts and developed first drafts of the technical manuals subject to the confines of TEN's style guide. Drexler himself defined Chu's direct oversight as "de minimis" which is also relevant to the analysis. See Verkuilen, 646 F.3d at 981 ("Employees tasked with jobs requiring the exercise of independent judgment usually are expected to work with a minimum of supervision even when they are working in their office rather than on a customer's premises.").

In many ways, Drexler's duties for FLSA exemption purposes mirror those of the technical writers in Renfro v. Indiana Michigan Power Co., 497 F.3d 573 (6th Cir. 2007). With regard to the independent judgment and discretion analysis, there is substantial factual similarity between the two cases. In Renfro,

as with Drexler, the technical writers wrote maintenance procedures for equipment, worked without constant supervision, and had discretion to determine what level of detail a procedure should be written in. Id. at 574–75. The technical writers in Renfro consulted numerous sources to develop procedures, including consulting with colleagues in the engineering department. Id. at 575. In Renfro, as here, the employer had a style guide which constrained certain format and stylistic aspects of the technical writers' work. Id. Concluding that the technical writers exercised discretion and independent judgment, a divided panel of the Sixth Circuit reversed the district court's judgment for the technical writers and remanded the case with an order that the district court enter summary judgment for the employer. Id. at 577–78.

The key distinguishing characteristic between the writers in Renfro and Drexler goes to the second prong of the administrative exemption test. In Renfro, the writers wrote maintenance procedures for an internal audience, whereas Drexler wrote manuals for use by TEN's customers. See Drexler, 125 F. Supp. 3d at 372 n.5. This distinction does not preclude finding Drexler exempt, because the second prong of the exemption focuses on how the employee's work relates to the general business operations of either the employer or the employer's customers. See 29 C.F.R. § 541.200(a)(2). In Renfro, the

22

technical writers work directly related to the employer's general business operations. See 497 F.3d at 574. Here, Drexler's work directly related to TEN's customers' business operations, in that his manuals made it possible for customers to operate the complex equipment purchased from TEN. Alternatively, there is a strong argument that Drexler's work directly related to TEN's general business operations, in that Drexler's manuals permitted his employer to comply with regulations propounded by government and industry entities, such as OSHA and SEMI.

Therefore, on the undisputed facts in the record, TEN has met its burden of proving that Drexler's duties during the relevant period met the FLSA's administrative exemption.

### ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 104) on Counts I and II is **ALLOWED**. Drexler's Motion for Summary Judgment on Liability (Docket No. 110) is **DENIED**. The Court previously allowed Drexler's motion to withdraw his only remaining claim--one alleging retaliation. See Docket No. 171. Therefore, the Clerk shall enter final judgment for the defendants.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge